Ravi Batra, Esq. (RB4299)
Todd B. Sherman (TS 4031)
The Law Firm of Ravi Batra, P.C.
*Attorneys for plaintiff*
142 Lexington Avenue
New York, N.Y. 10016
212-545-1993; fax 212-545-1993

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

KRITTIKA BISWAS,

        *Plaintiff,*

    - against -

(1) THE CITY OF NEW YORK, (2) NEW YORK CITY
DEPARTMENT OF EDUCATION, (3) HON. DENNIS M.
WALCOTT, in his official capacity as Chancellor of the
New York City Department of Education, (4) HOWARD
KWAIT individually and in his official capacity as a Principal
within and for the New York City Department of Education
at John Bowne High School, (5) JAMIE KIM-ROSS individually
and in her official  capacity as a Teacher within and for the
New York City Department of Education at John Bowne High
School, (6) ELAYNA KONSTAN, individually and in her
official capacity as Chief Executive Officer of the New York
City Department of Education Office of School And Youth
Development, (7) JOHN/JANE DOE NEW YORK CITY
DEPARTMENT OF EDUCATION PERSONNEL ## 1-10,
so named as their identities have yet to be established, involved
in the sham investigation, unlawful arrest and detention and
unlawful suspension of Krittika Biswas, (8) HON. RAYMOND
W. KELLY, in his official capacity as Commissioner of the
New York City Police Department, (9) Police Officer "JANE
DOE" MALDONADO (possible shield # 10559), individually
and in her official capacity as a Police Officer  within and for
the New York City Police Department, so named because
her exact identity has yet to be confirmed,(10) Police Officer
LARRY GRANSHAW, individually and in his official capacity as
a Police Officer within and for the New York City Police
Department, and (11) JOHN/JANE DOE POLICE PERSONNEL,
so named as their identities have yet to be established, involved
in the unlawful arrest and detention of Krittika Biswas,

        *Defendants.*

-------------------------------------------------------------------X

CIVIL ACTION NO.

# 12 CIV 3607

JUDGE KOELTL

**CIVIL COMPLAINT
WITH JURY DEMAND**



RECEIVED
MAY - 7 2012
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff KRITTIKA BISWAS ("Krittika") by and through her attorneys, THE

LAW FIRM OF RAVI BATRA, P.C., as and for her Civil Complaint with Jury Demand

against the Defendants (1) THE CITY OF NEW YORK, (2) NEW YORK CITY

DEPARTMENT OF EDUCATION, (3) HON. DENNIS M. WALCOTT, in his official

capacity as Chancellor of the New York City Department of Education, (4) HOWARD

KWAIT individually and in his official capacity as a Principal within and for the New

York City Department of Education at John Bowne High School, (5) JAMIE KIM-ROSS

individually and in her official  capacity as a Teacher within and for the New York City

Department of Education at John Bowne High School, (6) ELAYNA KONSTAN,

individually and in her official capacity as Chief Executive Officer of the New York City

Department of Education Office of School And Youth Development, (7) JOHN/JANE

DOE NEW YORK CITY DEPARTMENT OF EDUCATION PERSONNEL ## 1-10, so

named as their identities have yet to be established, involved in the sham investigation,

unlawful arrest and detention and unlawful suspension of Krittika Biswas, (8) HON.

RAYMOND  W. KELLY, in his official capacity as Commissioner of the  New York

City Police Department, (9) Police Officer "JANE DOE" MALDONADO, (possible

shield # 10559), individually and in her official capacity as a Police Officer  within and

for the New York City Police Department, so named because her exact identity has yet to

be confirmed, (10) Police Officer LARRY GRANSHAW, individually and in his official

capacity as a Police Officer within and for the New York City Police Department, and

(11) JOHN/JANE DOE POLICE PERSONNEL, so named as their identities have yet to be established, involved in the unlawful arrest and detention of Krittika Biswas, alleges the following:[1]

## I.   TABLE OF CONTENTS

1.    The contents of the instant complaint are as follows:

I.      Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.     Table of Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III.    Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

V.      Jurisdiction and Venue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

VI.     Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

VII.    Jury Demand . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

VIII.   Notice of Claim to Municipal Defendants . . . . . . . . . . . . . . . . . . . 19

IX.     Factual Allegations Common to All Counts . . . . . . . . . . . . . . . . . . 21

●     Krittika Was Enrolled in an Enriched
      Academic Program of Study . . . . . . . . . . . . . . . . . . . . . . . . . 21

●     Defendant Kim-Ross Was Recommending
      Krittika to an Honors College: October 2010 . . . . . . . . . . . 22

●     Defendant Kim-Ross Received Offensive
      E-mails Which Krittika Had Nothing to do
      with - but which the Defendants Falsely
      Accused Her: November 2010 . . . . . . . . . . . . . . . . . . . . . . . 23

---

[1]Except those allegations which specifically state "upon information and belief," and as to them Krittika will likely have evidentiary support after a reasonable opportunity for discovery and further investigation.

- The First Confrontation with Krittika by School Administrators Seeking a False Confession, by Coercion: December 21, 2010 . . . . . . . . . 24

- There Was No Direct Evidence Linking Krittika to Any Offensive or Threatening E-mails - So the Defendants Fabricated "Evidence": December 22, 2010 . . . . . . . . . . . . . . . . . . . . . 26

- Defendant Kim-Ross Begins to Penalize Krittika . . . . . . . 27

- The "Investigation" Was a Sham . . . . . . . . . . . . . . . . . . . . 27

- The Defendants Knew They Had No Evidence Against Krittika, who Was Actually Innocent . . . . . . . . . . . 30

- Krittika was Falsely and Wrongly Arrested: February 8, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

- Defendant P.O. Granshaw Tried to Unconstitutionally Coerce a Confession from Krittika, Through Threats and Force . . . . . . . . . . . . . . . . . . 34

- Defendant P.O. Maldonado Takes Forcible Custody of Krittika . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

- Krittika Sought to Exercise Her Rights under the Vienna Convention on Consular Relations but the Defendants Thwarted Same . . . . . . . . . . . . . . . . . . . 39

- The Defendants Publically Humiliated Krittika . . . . . . . . . 48

- Krittika Was Wrongly Disciplined and Suspended beginning on February 10, 2011 . . . . . . . . . . . . . . . . . . . . 54

- Krittika Was Substantially Harmed by the Defendants' Misconduct and Violations of Her Constitutional Rights and Privileges . . . . . . . . . . . . . . . . . 60

- Krittika Was Discriminated Against Because of Her Ethnicity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

4

VIII.   The Municipal Defendants' Unconstitutional
        Policies, Practices and Customs  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

   ●      Defendants NYC and Hon. Raymond W. Kelly,
          in His Official Capacity as Commissioner of the
          NYPD  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

   ●      Defendants NYC, NYCDOE and Hon. Dennis Walcott,
          in His Official Capacity as Chancellor of the
          NYCDOE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

IX.    Federal Law Based Counts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

       Counts Pursuant to 42 U.S.C. § 1983  . . . . . . . . . . . . . . . . . . . . . . . 80

                  Count I:      U.S. Const. 4th and 14th Amend.:
                                Unreasonable Searches, Seizures
                                and Arrests (Against All Defendants)  . . . . . . 82

                  Count II:     U.S. Const. 14th Amend.: Deprivation
                                of Liberty Without Due Process of Law
                                by Fabricating Evidence and Failing to
                                Investigate (Against All Defendants)  . . . . . . 82

                  Count III:    U.S. Const. 4th and 14th Amend.:
                                Malicious Prosecution
                                (Against All Defendants)  . . . . . . . . . . . . . . 85

                  Count IV:     U.S. Const. 14th Amend.:
                                Engaging in Conduct That Shocks the
                                Conscience (Against All Defendants)  . . . . . . 88

                  Count V:      U.S. Const. 4th and 14th Amend.:
                                Excessive Force (Against Defendants
                                NYC, NYCDOE and P.O. Granshaw)  . . . . . 91

                  Count VI:     Civil Rights Conspiracy Pursuant to
                                42 U.S.C. § 1983
                                (Against All Defendants)  . . . . . . . . . . . . . . 92

5

Count VII:   42 U.S.C. § 1983 Claim Against the
City of New York  . . . . . . . . . . . . . . . . . . . . . 94

Count VIII:  42 U.S.C.. § 1983 Claim Against the
City of New York and New York City
Department of Education  . . . . . . . . . . . . . . 95

Count Pursuant to 42 U.S.C. § 1985 . . . . . . . . . . . . . . . . . . . . . . . . . 95

Count IX:    Civil Rights Conspiracy Based upon
Race Based Animus - 42 U.S.C. § 1985(3)
(Against All Defendants)  . . . . . . . . . . . . . . 95

Count Pursuant to Title VI of the Civil Rights Act of 1964 . . . . . . 96

Count X:     Violation of Krittika's Federal Civil
Rights under Title VI of the Civil
Rights Act of 1964
(Against All Defendants)  . . . . . . . . . . . . . . 96

X.   State Law Based Counts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

Count XI:    Unlawful Seizures and Arrests in
Violation of the New York State
Constitution (Against All Defendants)  . . . . 103

Count XII:   Deprivation of Due Process  in
Violation of the New York State
Constitution (Against All Defendants)  . . . . 105

Count XIII:  Deprivation of Equal Protection on
the Basis of Race  in Violation of the
New York State Constitution
(Against All Defendants)  . . . . . . . . . . . . . . 105

Count XIV:   False Arrest (Against All Defendants)  . . . . 106

Count XV:    False Imprisonment
(Against All Defendants)  . . . . . . . . . . . . . . 107

Count XVI:     Malicious Prosecution -
               Criminal Proceedings
               (Against All Defendants) . . . . . . . . . . . . . . 107

Count XVII:    Malicious Prosecution -
               Disciplinary Proceedings
               (Against All Defendants) . . . . . . . . . . . . . . 108

Count XVIII: Battery (Against All Defendants) . . . . . . . . 109

Count XIX:     Intentional Infliction of Emotional
               Distress (Against All Defendants) . . . . . . . 110

Count XX:      Negligence (Against Defendants
               Granshaw, Maldonado and
               John/Jane Doe NYPD Personnel) . . . . . . . . 110

Count XXI:     Negligence (Against Defendants
               Kim-Ross, Kwait, Konstan and
               John/Jane Doe NYCDOE Personnel) . . . . . 111

Count XXII:    Negligence (Against Defendant NYC) . . . . 112

Count XXIII: Negligence (Against Defendants NYC
               and NYCDOE) . . . . . . . . . . . . . . . . . . . . . . . 113

Count XXIV:  Negligent Infliction of Emotional
               Distress (Against All Defendants) . . . . . . 115

Count XXV:     *Respondeat Superior* Claim
               Against NYC . . . . . . . . . . . . . . . . . . . . . . . 116

Count XXVI:  *Respondeat Superior* Claim
               Against NYCDOE . . . . . . . . . . . . . . . . . . 116

XI.    Prayer for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

## II.   TABLE OF EXHIBITS

2.      The materials exhibited to the instant complaint are as follows:

Exhibit 1:      Notice of Claim Served Upon Municipal Defendants

Sub-Ex. 1:      *Note Vebale* issued by the Consulate General of India on February 9, 2011;

Sub-Ex. 2:      Letter from Queens County District Attorney's Office confirming that all charges against Krittika Biswas were dismissed and sealed;

Sub-Ex. 3:      NYCDOE "Occurrence Report" dated February 8, 2011 at 11:30 a.m. and entered on February 8, 2011 at 5:02 p.m. reporting, *inter alia*, Krittika's unwarranted and illegal arrest;

Sub-Ex. 4:      Documents related to Krittika's unwarranted and unlawful discipline and suspension from school and need to retain counsel;

Sub-Ex. 5:      Sworn to expert report of computer forensics expert Gleb Liferenko sworn to on March 10, 2011;

Sub-Ex. 6:      Invoice dated April 18, 2011 from computer forensics expert Gleb Liferenko;

Sub-Ex. 7:      E-mail from defendant Kwait and letter approved by defendant Konstan memorializing the withdrawal of all disciplinary charges against Krittika and expungement of same from Krittika's student records;

Sub-Ex. 8:      Affidavit of Deboleena Kanjilal sworn to on March 7, 2011 with supporting documentation, supporting Krittika's actual innocence;

Sub-Ex. 9:    Affidavits of Ravichandran Kalyansundaram and Bhoop Singh Bisht, each sworn to on March 7, 2011 with supporting documentation, supporting Krittika's actual innocence;

Sub-Ex. 10:    NYCDOE "Summary of Proceedings" form dated March 11, 2011 memorializing that the adjournment of Krittika's suspension hearing was at the school's request based upon an alleged witness;

Sub-Ex. 11:    Documents reflecting efforts made on behalf of Krittika to obtain subpoenas to further disprove the wholly false disciplinary charges brought against Krittika;

Sub-Ex. 12:    Documents reflecting efforts made on behalf of Krittika to obtain copies of the transcript of disciplinary proceedings on March 11, 2011, wherein the NYCDOE falsely alleged that an adjournment of Krittika's suspension hearing was required because of the death of the family member of a witness;

Sub-Ex. 13:    Written report of Krittika's New York state licensed physician, Ishvar S. Patel, M.D.;

Exhibit 2:    Vienna Convention on Consular Relations;

Exhibit 3:    Transcript of March 11, 2011 disciplinary proceedings wherein NYCDOE Dean John Tsapelas reported that John Bowne High School required an adjournment of the disciplinary hearing because of a death in the family of a NYCDOE witness against Krittika;

Exhibit 4:    Memorandum of Understanding ("MOU") dated September 17, 1998 transferring school security functions to the NYPD; Executive Order No. 44 of 1998, directing that the MOU take effect immediately; and, agreement dated January 22, 2003, wherein defendants NYC, by the Mayor, and NYCDOE, by its Chancellor, agreed that the transfer given effect by the

September 1998 MOU would continue in effect unless further amended or terminated by written agreement; and,

Exhibit 5:    June 11, 2007 letter from NYPD Commissioner Kelly to New York City Council Member Hon. Robert Jackson, then Chair of the Council's Education Committee.

## I.    PRELIMINARY STATEMENT

3.    This is a civil rights action brought to vindicate Krittika's rights under the United States Constitution, the statutory laws of the United States, along with the laws of the State of New York.

4.    At all times herein mentioned, plaintiff Krittika Biswas ("Krittika"), the daughter of the Vice-Consul in the Consulate General of India in New York City, was an 18 year old girl lawfully present and resident in the United States of America and the State of New York.

5.    During the times complained of herein, Krittika was a full time secondary school student, enrolled in honors classes at John Bowne High School, 63-25 Main Street, Flushing, NY 11367, an educational facility controlled, maintained and operated by the New York City Department of Education ("NYCDOE").

6.    The defendants individually and collectively wrongly, falsely and unlawfully accused Krittika of crimes and bad acts, while Krittika was actually innocent.

7.    Krittika did not commit any offense.

8.    Kriitika did not commit any crime.

9.    Krittika did not commit any felony.

10.    On February 8, 2011, the defendants individually and collectively wrongly, falsely and unlawfully caused the detention of Krittika and detained Krittika, while Krittika was actually innocent.

11.    The defendants individually and collectively wrongly, falsely and unlawfully caused the arrest of Krittika and arrested Krittika, while Krittika was actually innocent.

12.    The defendants individually and collectively wrongly, falsely and unlawfully caused the detention of Krittika and detained Krittika, while Krittika was actually innocent.

13.    The defendants individually and collectively wrongly, falsely and unlawfully caused Krittika to be placed in custody, while not free to go, where she remained for more than 24 hours, notwithstanding that she was actually innocent.

14.    The defendants individually and collectively wrongly, falsely, maliciously and unlawfully caused the prosecution of Krittika, while Krittika was actually innocent.

15.    On February 9, 2011, the Queens County District Attorney's Office, led by District Attorney Richard Brown, an American Hero, admirably reviewed the facts and circumstances surrounding Krittika's wrongful arrest, and dropped all charges brought by the defendants prior to compelling Krittika to face a judge, and directed the sealing of all records associated with what was the wrongful arrest and detention of

Krittika caused and carried out by and on behalf of the defendants, individually and collectively.

16.    On February 10, 2011, despite knowing of District Attorney Brown's action, the defendants individually and collectively wrongly, falsely, and unlawfully caused Krittika to be suspended from school, did suspend her from school, and compelled Krittika to attend classes at Robert Wagner High School, an alternate location without an applicable enriched academic program, and more akin to "reform school," while Krittika was actually innocent.

17.    The defendants individually and collectively wrongly, falsely, and unlawfully compelled Krittika to undergo repeated appearances at a suspension hearing which was commenced with no basis in fact or law, while Krittika was actually innocent.

18.    Ultimately Krittika was cleared of all wrongdoing - notwithstanding her suffering due to a misguided official rush to judgment, under color of law.

## II.    JURISDICTION AND VENUE

19.    This action is brought pursuant to, *inter alia*, 42 U.S.C. § § 1983, 1985 and 2000d.

20.    Subject matter jurisdiction for these federal claims exists under 28 U.S.C. §§ 1331, 1332(a)(2), 1343(a)(4) and 42 U.S.C. §2000d-7.

21.    This court has jurisdiction over Plaintiffs' pendent state law claims pursuant to 28 U.S.C. § 1367(a).

22.     The Court has authority to award costs and attorneys' fees under 42 U.S.C. § 1988.

23.     Plaintiff is a citizen of India and resides in India.

24.     Upon information and belief, all of the defendants are residents of the State of New York.

25.     The matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

26.     Upon information and belief, in their official capacities, all of the defendants are residents of the State of New York.

27.      Venue is proper pursuant to 28 U.S.C.1391(b) in that Defendants City of New York and New York City Department of Education maintain their principal offices in New York County, which is located within the Southern District of New York.

28.     Venue is also proper pursuant to 28 U.S.C.1391(b) in that Defendant Hon. Dennis M. Walcott, in his official capacity as Chancellor of the New York City Department of Education, is deemed a resident of New York County, where the New York City Department of Education maintains its principal offices.

29.     Venue is also proper pursuant to 28 U.S.C.1391(b) in that Defendant Hon. Raymond W. Kelly, in his official capacity as Commissioner of the New York City Police Department, is deemed a resident of New York County, where the New York City Police Department maintains its principal offices.

### III.    PARTIES

30.    Plaintiff **KRITTIKA BISWAS** is a citizen of India, who at all times complained of herein was a foreign national lawfully present and resident in the United States and within the City and State of New York, Queens County.

31.    At all relevant times, Krittika was a foreign national lawfully present and residing within the United States and the City and State of New York as a child of vice-consul of the Consulate General of India in the City of New York.

32.    Krittika and her family were lawfully present and resident in New York City for consular purposes.

33.    The Consulate General of India was, at all relevant times, located within the City, State and County of New York, to wit: 3 East 64th Street, New York, NY 10065.

34.    The Consulate General of India in New York is tasked with, *inter alia*, handing India's consular affairs in the United States associated with Connecticut, Maine, Vermont, Massachusetts, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Puerto Rico, Rhode Island, and the U.S. Virgin Islands.

35.    As a result of the traumatic events complained of, Krittika has since left the United States to better further her studies in India.

36.    Krittika now resides in India where she is enrolled in college studying matters related to science and engineering.

37.    Defendant **CITY OF NEW YORK** ("NYC") is a municipal corporation within the State of New York, with its principal offices located within the County of New York, within the Southern District of New York.

38.    Defendant NYC operates the New York City Police Department ("NYPD"), which is headquartered and maintains its principal executive offices within the Southern District of New York.

39.    Defendant **NEW YORK CITY DEPARTMENT OF EDUCATION** ("NYCDOE") is a municipal corporation within the State of New York, with its principal offices located within the County of New York, within the Southern District of New York.

40.    Upon information and belief, defendant NYCDOE receives federal financial assistance.

41.    John Bowne High School is an educational facility controlled, maintained and operated by defendant NYCDOE.

42.    Upon information and belief, a portion of the federal financial assistance that is received by defendant NYCDOE is used by and/or for John Bowne High School.

43.    Defendant NYCDOE operates the New York  City Department of Education Office of School And Youth  Development  ("OSYD").  Upon information and belief, OSYD is the unit within NYCDOE generally responsible for the development and

implementation of, *inter alia*, student disciplinary policies and programs within the NYCDOE.

44.     Defendant **HON. DENNIS M. WALCOTT**, is a well regarded former Deputy Mayor under Mayor Michael Bloomberg and is the current Chancellor of the NYCDOE.[2]  Chancellor Walcott  is sued <u>only</u> in his official capacity.  In his official capacity, Chancellor Walcott maintains his principal offices in New York County and accordingly is a resident of the Southern District of New York.

45.     Defendant **HOWARD KWAIT** was, at all times complained of herein, the Principal of John Bowne High School, who has embarrassed New York City and the United States to a friendly nation, India; a strategic partner of the United States.  Mr. Kwait is sued in his official and individual capacities.  In his official capacity as a Principal with the Department of Education, Mr. Kwait is deemed a resident of the State of New York.

46.     Defendant **JAMIE KIM-ROSS** was, at all times complained of herein, a teacher at John Bowne High School, who has embarrassed New York City and the United States to a friendly nation, India; a strategic partner of the United States. .  Ms. Kim-Ross is sued in her official and individual capacities.  In her official capacity as a Teacher with

---

[2]Hon. Cathleen P. Black was serving as Chancellor at the time of the events complained of; however, Chancellor Walcott succeeded Ms. Black prior to the filing of the Notice of Claim in May 2011 and commencement of this action.

16

the Department of Education, Ms. Kim-Ross is deemed a resident of the State of New

York.

47.    Upon information and belief, defendant Kim-Ross is of Oriental Asian race,

heritage and descent.

48.    Upon information and belief, defendant Kim-Ross favored students of

similar ethnicity to herself while disfavoring students of Southeast Asian Indian ancestry.

49.    Defendant **ELAYNA KONSTAN** was, at all times complained of herein,

the Chief Executive Officer of the OSYD.   Ms. Konstan is sued in her official and

individual capacities.  In her official capacity, Ms. Konstan maintains her principal

offices in New York County and accordingly is a resident of the Southern District of New

York.

50.    Defendants **JOHN/JANE DOE NEW YORK CITY DEPARTMENT OF**

**EDUCATION PERSONNEL ## 1-10**, so named as their identities have yet to be

established, are unidentified employees, servants, agents or others acting under the

authority and/or control of the New York City Department of Education who were

involved in the sham investigation, unlawful arrest and detention and unlawful

suspension of Krittika Biswas.  These John/Jane Does 1 - 10 are sued in their official and

individual capacities.

51.    Defendant **HON. RAYMOND W. KELLY**, is the well regarded and

highly respected Commissioner of the NYPD.  Commissioner Kelly is sued <u>only</u> in his

17

official capacity.  In his official capacity, Commissioner Kelly maintains his principal

offices in New York County and accordingly is a resident of the Southern District of New

York.

52.    Defendant **POLICE OFFICER "JANE DOE"  MALDONADO** (possible

shield # 10559), was, at the times complained of herein, a Police Officer employed by the

NYPD, who is so identified as her exact identity has yet to be confirmed. Defendant "Jane

Doe" Maldonado participated in the unlawful arrest and detention of Krittika Biswas.

P.O. "Jane Doe" Maldonado is sued in her official and individual capacities.  Upon

information and belief, all NYPD Police Officers are required to be citizens of the United

States and residents of the State of New York, and accordingly, P.O. "Jane Doe"

Maldonado is, upon information and belief, a resident of the State of New York.  In her

official capacity as a Police Officer with the NYPD, Officer Maldonado is deemed a

resident of the State of New York.

53.    Defendant **POLICE OFFICER LARRY GRANSHAW**, was, at the times

complained of herein, a Police Officer employed by the NYPD.  Officer Granshaw

participated in the unlawful arrest and detention of Krittika Biswas.   P.O. Granshaw is

sued in his official and individual capacities. Upon information and belief, all NYPD

Police Officers are required to be citizens of the United States and residents of the State

of New York, and accordingly, P.O. Granshaw is, upon information and belief, a resident

of the State of New York.  In his official capacity as a Police Officer with the NYPD,

Officer Granshaw is deemed a resident of the State of New York.

54.    Defendants **JOHN/JANE DOE POLICE PERSONNEL## 1 - 10**, so

named as their identities have yet to be established, are unidentified employees, servants,

agents or others acting under the authority and/or control of the NYPD who were

involved in the sham investigation, unlawful arrest and detention of Krittika Biswas.

These John/Jane Does 1 - 10 are sued in their official and individual capacities.  Upon

information and belief, all NYPD Police Officers are required to be citizens of the United

States and residents of the State of New York.  Upon further information and belief, all

law enforcement personnel of the NYPD are required to reside within the State of New

York.  Accordingly, upon information and belief, all of the John/Jane Does are residents

of the State of New York.

### IV.    JURY DEMAND

55.    The plaintiff demands a trial by jury on each and every one of her claims.

### V.    NOTICE OF CLAIM TO MUNICIPAL DEFENDANTS

56    On or about May 6, 2011, the plaintiff timely served Notices of

Claim upon the municipal defendants pursuant to New York General Municipal Law §

50-e.  A true copy of this Notice, along with its 13 attached exhibits, is appended hereto

as Exhibit 1, and its contents are incorporated herein.

57.    Each Notice of Claim concerned the plaintiff herein and stated, amongst other things, the name and post office address of plaintiff and her attorney, the nature of the claim, the time and place where and the manner in which the claim arose, and the injuries and damages sustained insofar as they were then practicable, for adjustment.

58.    On or about July 20, 2011, the municipal defendants conducted an Examination of Claim of the plaintiff under oath pursuant to New York General Municipal Law § 50-h.

59.    The municipal defendants are therefore on notice of the facts and circumstances alleged herein, and have been afforded ample opportunity to investigate Krittika's claims.

60.    The municipal claims remain unadjusted, and suit is commenced timely, to wit: the plaintiffs have complied with all of the conditions precedent to the bringing of this action by presenting to and serving the above referenced Notices of Claim upon the municipal defendants, within the time prescribed by law, and all municipal defendants have refused or neglected for more than thirty (30) days and up to commencement of this action to make any adjustment or payment thereof, and that thereafter and within the time provided by law, this action is commenced.

61.    Pursuant to Fed. R. Civ. P. 9(c), all conditions precedent to bringing this suit have been met by plaintiff.

20

## VI.    FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

62.    At all relevant times defendant Jamie Kim-Ross was employed by

defendant NYCDOE as a mathematics teacher at John Bowne High School.

63.    Defendant Kwait was the principal at John Bowne High School.

- *KRITTIKA WAS ENROLLED IN AN ENRICHED ACADEMIC PROGRAM OF STUDY*

64.    Krittika had been a student in an Advanced Placement calculus course

taught by defendant Kim-Ross.

65.    Generally, Advanced Placement courses are designed to permit well

prepared high school students the opportunity to take college level courses as part of their

high school curriculum.

66.    Generally, Advanced Placement courses follow a syllabus designed by

The College Board and geared toward a standardized test at the conclusion of the

academic year.

67.    Generally, students who perform well enough on the standardized

Advanced Placement examination can seek college credit for the course from the college

or university they matriculate at.

68.    At all relevant times, there were two Advanced Placement calculus

courses available, to wit: "calculus AB" and "calculus BC."  The "BC" course covers

more topics in the same amount of time as the "AB" course.

21

69.    The "Calculus BC" course is generally considered harder and/or more advanced than the "Calculus AB" course.

70.    With the approval and consent of defendant NYCDOE, Krittika was enrolled in "Calculus BC."

71.    With the approval and consent of defendant NYCDOE Krittika was also enrolled in other academically enriched courses, including Advanced Placement chemistry.

- *DEFENDANT KIM-ROSS WAS RECOMMENDING KRITTIKA TO AN HONORS COLLEGE: OCTOBER 2010*

72.    At all relevant times, with the approval and consent of defendant NYCDOE, while Krittika was attending classes at and within John Bowne High School, she was enrolled in a college preparatory program that was generally expected to be academically enriched.

73.    Krittika had considered applying to the Macaulay Honors College at the City University of New York ("Macaulay")  for her college studies after graduation from high school.

74.    Upon information and belief, Macaulay is an academically enriched program geared towards high achieving students, which, upon admission, provides, *inter alia*, a full undergraduate tuition scholarship, *i.e.* free tuition.

22

75.    Krittika requested that defendant Kim-Ross write her a letter of recommendation for Macaulay.

76.    Defendant Kim-Ross agreed to write a letter of recommendation for Krittika.

77.    Krittika's grandmother passed away in India in or about late September 2010.

78.    As a result of the death of her grandmother, Krittika left New York and went to India on or about October 6, 2010.

79.    Krittika received school work from some of her teachers and took it to India with her in an effort to stay on top of her studies.

80.    Because she was in India for bereavement when recommendations for Macaulay were then due, Krittika was unable to apply; however, defendant Kim-Ross did show the letter of recommendation letter to Krittika in early October 2010 prior to Krittika leaving for India on defendant Kim-Ross' office computer as, upon information and belief, defendant Kim-Ross had e-mailed said letter to herself from her computer at home.

- *DEFENDANT KIM-ROSS RECEIVED OFFENSIVE E-MAILS WHICH KRITTIKA HAD NOTHING TO DO WITH - BUT WHICH THE DEFENDANTS FALSELY ACCUSED HER: NOVEMBER 2010*

81.    Upon information and belief, thereafter, on or about November 18, 2010, defendant Kim-Ross received an offensive e-mail on her NYCDOE e-mail account.

82.    Upon information and belief, on or about November 19, 2010 defendant Kim-Ross reported the offensive e-mail to NYCDOE officials (*see e.g.* Ex. 1, sub-ex. 4).

83.    Upon information and belief, thereafter, on or about December 11, 2010, defendant Kim-Ross received an offensive e-mail on her NYCDOE e-mail account.

84.    Defendant Kim-Ross falsely accused Krittika of sending the offensive e-mails.

85.    Krittika did not send any offensive e-mails.

86.    Krittika did not send any offensive e-mails to defendant Kim-Ross.

87.    Krittika did not have any involvement in the creation or transmission of these e-mails.

- *THE FIRST CONFRONTATION WITH KRITTIKA BY SCHOOL ADMINISTRATORS SEEKING A FALSE CONFESSION, BY COERCION*: *DECEMBER 21, 2010*

88.    On or about December 21, 2010 Krittika was attending her Advanced Placement chemistry class at which time she was directed to leave the learning environment and go to the office of Naomi Eutsey, the Assistant Principal of Security (A.P. Eutsey).

24

89.    Krittika immediately complied and went to A.P. Eutsey's office where she was directed to identify a fellow student from an image on a computer monitor, to wit: "Student 1."[3]

90.    A.P. Eutsey then took Krittika to a school cafeteria and had Krittika locate Student 1, at which time both students were directed to accompany A.P. Eutsey to her office.

91.    Upon returning to A.P. Eutsey's office, Krittika and Student 1 were told that their names had "come up" in an "investigation" being conducted by A.P. Eutsey regarding foul and sexually "threatening" e-mails being sent to two teachers.  According to A.P. Eutsey's statements to Krittika, the "building IP" address of the e-mails was identified, in substance, as the IP Address of the entire large apartment building, with more than 200 apartments, where Krittika lived.

92.    The accused students were both of Southeast Asian Indian background.

93.    Student 1 asked A.P. Eutsey which two teachers received the e-mails, and A.P. Eutsey identified them as defendant Kim-Ross and a teacher named Mr. Cohill. A.P. Eutsey then demanded to know if Krittika and/or Student 1 had any information about the e-mails, and both students advised that they personally had nothing to do with sending such e-mails, and did not know who, if anyone, was responsible.

---

[3]All students other than Krittika are identified by pseudonym so as to protect their privacy in these publically filed court papers.  While this action will require the production and inspection of such student records, the plaintiff and her counsel stand ready to protect the identities of such students as may be required by law and/or directive of the Court.

94.    On or about December 21, 2010, after meeting with A.P. Eutsey, Krittika

and Student 1 informed defendant Kim-Ross that they had not sent any e-mails to her.

Defendant Kim-Ross responded, in substance, that she had nothing to do with it as it was

the school administration that was running the investigation.

- *THERE WAS NO DIRECT EVIDENCE LINKING KRITTIKA TO ANY OFFENSIVE OR THREATENING E-MAILS - SO THE DEFENDANTS FABRICATED "EVIDENCE": DECEMBER 22, 2010*

95.    On or about December 22, 2010, at approximately 9:00 a.m., Krittika

and her father, Debashish Biswas, as well as Student 1 and Student 1's father and brother

met with A.P. Eutsey, at A.P. Eutsey's direction.  A.P. Eutsey repeated that teachers had

received threatening e-mails and that Krittika and Student 1's names had "come up"

because the "building IP" address was identified.

96.    A.P. Eutsey further indicated to Krittika's father, in Krittika's presence,

that there was greater suspicion as to Krittika because she had both defendant Kim-Ross

and Mr. Cohill as teachers and because one of the e-mails had words in the French

language, and Krittika was, according to A.P. Eutsey, without any supporting basis, the

only person in her residential building who had "French as a second language."

97.    A.P. Eutsey then stated, in substance, that because Krittika and Student 1

refused to confess, that the matter would be turned over to the NYPD.

98.    "Student 2," the actual culprit and sender of the e-mails, a fact then

unknown to Krittika, also simultaneously had defendant Kim-Ross and Mr. Cohill

26

as teachers; however, Student 2 was removed from Kim-Ross' class because, upon information and belief, Student 2 was a poorly performing student and was thus academically ineligible to continue in Calculus BC.

99.    Upon information and belief, like defendant Kim-Ross, Student 2 was of Oriental Asian race and heritage.

100.    Student 2 actually sent the offensive e-mails to defendant Kim-Ross.

101.    Upon information and belief, because Student 2 was of Oriental Asian background, notwithstanding direct evidence linking Student 2 to the offensive e-mails, and Student 2 having studied under both defendant Kim-Ross and Mr. Cohill, Student 2 was omitted from the initial investigation as defendant Kim-Ross would not consider an Oriental Asian student capable of sending foul and threatening e-mails.

- *DEFENDANT KIM-ROSS BEGINS TO PENALIZE KRITTIKA*

102.    In or about January 2011 Krittika asked defendant Kim-Ross for the recommendation letter she had previously written so that Krittika could apply to different colleges; however, Kim-Ross then expressed an unwillingness to issue the letter.

- *THE "INVESTIGATION" WAS A SHAM*

103.    Upon information and belief, NYCDOE personnel performed what they referred to as an "investigation" which revealed that the e-mail messages received by defendant Kim-Ross originated from an Internet Protocol Address ("IP Address") not associated with Krittika Biswas.

27

104.    Generally, an IP Address is an identifier of computers and devices on an internet network.

105.    Generally, e-mail messages contain information referred to as a "header" which contains details about the sender, the route the e-mail took, when the e-mail was sent, and the targeted receiver of the e-mail.

106.    Generally, the e-mail header contains the IP Address of the sender's computer.

107.    By accessing the IP Address of the sender of an e-mail the network where the e-mail originated from can be identified.

108.    The IP Addresses associated with the e-mails that defendant Kim-Ross identified as offensive were sent on a computer network maintained by Earthlink, Inc. [See Ex. 1, sub-ex. 5].

109.    Krittika's e-mail and internet access was on a computer network maintained by Road Runner, LLC [*Id.*].

110.    Upon information and belief, Road Runner was, at all relevant times, a joint venture of Time Warner and AT&T.

111.    Upon information and belief, Road Runner was, at all relevant times, the only internet service available to Time Warner cable television subscribers if they obtain their internet access packaged with their television signal.

28

112.    Upon information and belief, at all relevant times Earthlink was a publically traded company.

113.    Upon information and belief, the Road Runner and Earthlink networks are unrelated competitors.

114.    Upon information and belief, at all relevant times herein, that Earthlink and Road Runner were separate unrelated entities was information available to the general public.

115.    Department of Education representatives insisted, in substance, that the IP Address that the e-mail messages received by defendant Kim-Ross originated from were associated with all internet users in the large apartment building that Krittika Biswas resided in with her family, including the Vice-Consul.

116.    Upon information and belief, there were approximately in excess of 200 apartments in the building that Krittika and her family lived in.

117.    Upon information and belief, other students at John Bowne High School resided in the same apartment building that Krittika and her family resided within.

118.    The IP Address associated with the computer in Krittika's apartment was not associated with the entire building.

119.    Upon information and belief, there is no single IP Address associated with all internet users in the apartment building that Krittika resided at.

- *THE DEFENDANTS KNEW THEY HAD NO EVIDENCE AGAINST KRITTIKA, WHO WAS ACTUALLY INNOCENT*

120.   No defendant had any evidence, whatsoever, linking Krittika to the e-mail messages received by defendant Kim-Ross, as no such evidence existed.

121.   No defendant had any evidence, whatsoever, linking any computer that Krittika used to the e-mail messages received by defendant Kim-Ross, as no such evidence existed.

122.   No defendant had any evidence, whatsoever, linking any computer that Krittika used to the network that the e-mail messages received by defendant Kim-Ross originated from, as no such evidence existed.

123.   There was no evidence to support any claim against Krittika, as Krittika was completely innocent and had no involvement whatsoever in the drafting or transmittal of any offensive e-mails to defendant Kim-Ross or Mr. Cohill.

124.   The actual evidence readily available to all of the defendants indicated that the e-mails sent to defendant Kim-Ross originated from a source other than Krittika.

125.   Upon information and belief, defendant Kim-Ross is not a police officer.

126.   Upon information and belief, defendant Kim-Ross is not a peace officer.

127.   There was no evidence to support Defendant Kim-Ross' claim that Krittika sent her offensive e-mail messages, because no such evidence existed.

128.    Upon information and belief, defendant Kim-Ross knew that there was no evidence linking Krittika to any of the e-mails sent to her.

129.    It was not reasonable for defendant Kim-Ross to believe that Krittika had sent any of the e-mails to her.

130.    Upon information and belief, defendant Kim-Ross has no expertise in internet forensics.

131.    Defendant Kim-Ross made false and discriminatory assumptions about Krittika.

132.    Defendant Kim-Ross falsely reported her assumptions as facts.

133.    Upon information and belief, defendant Kwait is not a police officer.

134.    Upon information and belief, defendant Kwait is not a peace officer.

135.    Upon information and belief, defendant Kwait has no expertise in internet forensics.

136.    Defendant Kwait made false and discriminatory assumptions about Krittika.

137.    It was not reasonable for defendant Kwait to believe that Krittika had sent any of the e-mails to defendant Kim-Ross.

138.    The NYPD has a Computer Crimes Squad/Unit.

139.    The NYPD has investigators with training in the investigation of acts involving computers, including sending offensive and/or threatening e-mails.

31

140.    Upon information and belief, the defendants did not alert the NYPD Computer Crime Squad/Unit to the investigation of the e-mails sent to defendant Kim-Ross.

141.    Upon information and belief, the defendants did not involve the NYPD Computer Crime Squad/Unit in the investigation of the e-mails sent to defendant Kim-Ross.

142.    Upon information and belief, the defendants did not involve any personnel with sufficient expertise in computers and internet technology in the investigation of the e-mails sent to defendant Kim-Ross.

- *KRITTIKA WAS FALSELY AND WRONGLY ARRESTED: FEBRUARY 8, 2011*

143.    As a result of defendant Kim-Ross' conclusory, unfounded, unsubstantiated and factually baseless allegations, which were contradicted by electronic evidence that defendants Kwait, Department of Education, and others with the Department of Education were, upon information and belief, aware of, and which through the exercise of reasonable inquiry and discretion they should have been aware of, Krittika was arrested, restrained and detained involuntarily and against her will by Department of Education personnel at John Bowne High School on February 8, 2011.

144.    On February 8, 2011 at approximately 9:45 a.m., A.P. Eutsey came to Krittika's art classroom and directed Krittika to take all of her belongings and to come with her.    At A.P. Eutsey's direction, Krittika then accompanied her to the office of

Assistant Principal Michele Kearse, where Krittika was directed to wait - without any explanation from A.P. Eutsey or any other personnel of the Department of Education or any other entity.

145.   A.P. Eutsey was acting by, for and on behalf of defendants NYC and NYCDOE.

146.   A.P. Eutsey did not have consent to detain Krittika.

147.   Upon information and belief, A.P. Eutsey is not a peace officer.

148.   Upon information and belief, A.P. Eutsey is not a police officer.

149.   Krittika was not free to leave from A.P. Kearse's office.

150.   A reasonable person in the same position as Krittika would have believed that she was not free to leave from A.P. Kearse's office.

151.   Krittika did not commit any crime in the presence of A.P. Eutsey.

152.   A.P. Eutesey arrested Krittika.

153.   After waiting without explanation or freedom to leave for approximately 30 minutes, Krittika was then joined by her guidance counselor, Lauren Prettitore.

154.   Ms. Prettitore informed Krittika that defendant Kim-Ross had received another offensive e-mail on February 6, 2011 and that the police were coming to question her.

155.   Krittika informed Ms. Prettitore, as she had to all prior Department of Education personnel, that she did not send any threatening or offensive e-mails to

33

defendant Kim-Ross, to which Ms. Prettitore responded, in substance, that the school had

turned the matter over to the police.

> ● *DEFENDANT P.O. GRANSHAW TRIES TO*
> *UNCONSTITUTIONALLY COERCE A CONFESSION*
> *FROM KRITTIKA, THROUGH THREATS AND*
> *FORCE*

156.    At approximately 11:45 a.m. on February 8, 2011, defendant P.O.

Granshaw, acting individually and on behalf of defendant NYC and the NYPD, entered

A.P. Kearse's office and confronted Krittika.

157.    Krittika was not free to go when defendant P.O. Granshaw came to A.P.

Kearse's office.

158.    Krittika did not commit any offense in the presence of any police officer.

159.    Krittika did not commit any crime in the presence of any police officer.

160.    No police officer had reasonable cause to believe that Krittika committed

any offense.

161.    No police officer had reasonable cause to believe that Krittika committed

any crime.

162.    No police officer had reasonable suspicion to detain or restrain Krittika.

163.    A reasonable person in the position of any police officer would not

have believed that he or she had reasonable suspicion to detain or restrain Krittika.

164.    No police officer had probable cause to detain, restrain and/or arrest

Krittika.

165.    No reasonable person in the position of a police officer would have believed that he or she had probable cause to detain, restrain and/or arrest Krittika.

166.    Defendant P.O. Granshaw did not provide Krittika with any of the warnings mandated by the Supreme Court of the United States in *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny.

167.    Defendant P.O. Granshaw questioned Krittika.

168.    Defendant P.O. Granshaw coercively questioned Krittika.

169.    Krittika was in custody while being questioned by defendant P.O. Granshaw.

170.    Defendant P.O. Granshaw demanded that Krittika tell him, in substance, why she hated defendant Kim-Ross, to which Krittika replied that she did not hate defendant Kim-Ross.

171.    Defendant P.O. Granshaw demanded that Krittika tell him, in substance, why she sent e-mails to defendant Kim-Ross, to which Krittika replied that she did not send e-mails to defendant Kim-Ross.

172.    Defendant P.O. Granshaw demanded that Krittika tell him, in substance, who sent e-mails to defendant Kim-Ross, to which Krittika replied that she did not know who sent e-mails to defendant Kim-Ross because she had nothing to do with sending e-mails to defendant Kim-Ross.

173.    Defendant P.O. Granshaw then appeared to be angry, and asked Krittika, in substance, "do you think I'm stupid?  I'm going to walk back out and come back in, and I'm going to start this thing again."

174.    Defendant P.O. Granshaw then left A.P. Kearse's office and re-entered the office and again asked Krittika, in substance, why she sent the e-mails to defendant Kim-Ross, and if she did not send the e-mails than who did.

175.    Krittika again truthfully replied, in substance, that she did not send any of the e-mails to defendant Kim-Ross and had nothing to do with the e-mails sent to defendant Kim-Ross.

176.    Notwithstanding Krittika's consistent and persistent denials, and the lack of a scintilla of legitimate evidence linking Krittika to the e-mails, defendant P.O. Granshaw then coercively demanded that Krittika either confess to sending the e-mails or be handcuffed.

177.    Defendant P.O. Granshaw again asked Krittika, in substance, why she sent the e-mails to defendant Kim-Ross, and if she did not send the e-mails than who did. Krittika again replied, in substance, that she did not send any of the e-mails to defendant Kim-Ross and had nothing to do with the e-mails sent to defendant Kim-Ross.

178.    Defendant P.O. Granshaw then stood up and <u>tightly</u> placed handcuffs on both of Krittika's wrists as punishment.

179.    As placed by against her wrists by P.O. Granshaw the handcuffs caused Krittika substantial pain, swelling, redness, bruising, annoyance and alarm.

180.    Krittika did not consent to P.O. Granshaw handcuffing her.

181.    Krittika did not consent to P.O. Granshaw having any physical contact with her.

182.    Defendant P.O. Granshaw did not have reasonable suspicion to detain or restrain Krittika.

183.    A reasonable person in defendant P.O. Granshaw's position would not have believed that he had reasonable suspicion to detain or restrain Krittika.

184.    Defendant P.O. Granshaw did not have probable cause to detain, restrain and/or arrest Krittika.

185.    A reasonable person in defendant P.O. Granshaw's position would not have believed that he had reasonable suspicion to detain, restrain and/or arrest Krittika.

186.    Krittika expeditiously informed P.O. Granshaw that the handcuffs were tight and were causing her pain, to which P.O. Granshaw replied, in substance, that Krittika should not move as movement would make the handcuffs tighter.

187.    Defendant P.O. Granshaw then stated, in substance, to Krittika, that she apparently thought defendant P.O. Granshaw "was stupid" and that he "guaranteed" that if she persisted in refusing to confess that she would "not graduate from high school" and would end up "in jail with prostitutes and people with HIV".

188.    After being handcuffed by defendant P.O. Granshaw, Krittika again repeated her truthful denial of any involvement with e-mails sent to teachers.  Moreover, Krittika expressed a willingness to permit police to access her computer and e-mails.

189.    Notwithstanding that Krittika offered to make her computers and e-mails available to the police in an effort to demonstrate her actual innocence, defendant P.O. Granshaw made no efforts to follow up on Krittika's offer, instead stating, in substance, that such review would "be taken care of later."

190.    Krittika did not commit any offense in the presence of P.O. Granshaw.

191.    Krittika did not commit any crime in the presence of P.O. Granshaw.

192.    P.O. Granshaw did not have reasonable cause to believe that Krittika committed any offense.

193.    P.O. Granshaw did not have reasonable cause to believe that Krittika committed any crime.

- *DEFENDANT P.O. MALDONADO TAKES FORCIBLE CUSTODY OF KRITTIKA*

194.    Shortly thereafter defendant P.O. Maldonado entered A.P. Kearse's office, approached Krittika, removed P.O. Granshaw's handcuffs from Krittika's wrists and then placed her own handcuffs upon Krittika's wrists.

195.    Krittika did not consent to P.O. Maldonado handcuffing her.

196.    Krittika did not consent to P.O. Maldonado having any physical contact with her.

38

197.    Krittika was handcuffed behind her back.

198.    Krittika did not commit any offense in the presence of P.O. Maldonado.

199.    Krittika did not commit any crime in the presence of P.O. Maldonado.

200.    P.O. Maldonado did not have reasonable cause to believe that Krittika committed any offense.

201.    P.O. Maldonado did not have reasonable cause to believe that Krittika committed any crime.

202.    Defendant P.O. Maldonado did not have reasonable suspicion to detain or restrain Krittika.

203.    A reasonable person in defendant P.O. Maldonado's position would not have believed that she had reasonable suspicion to detain or restrain Krittika.

204.    Defendant P.O. Maldonado did not have probable cause to detain, restrain and/or arrest Krittika.

205.    A reasonable person in defendant P.O. Maldonado's position would not have believed that she had probable cause to detain, restrain and/or arrest Krittika.

- *KRITTIKA SOUGHT TO EXERCISE HER RIGHTS UNDER THE VIENNA CONVENTION ON CONSULAR RELATIONS BUT THE DEFENDANTS THWARTED SAME*

206.    Krittika informed both defendants P.O. Maldonado and P.O. Granshaw that her father was vice-consul for the Consulate General of India in New York City and that she had cause to believe that she possessed immunity from detention and/or arrest.

39

207.    Krittika expeditiously requested of P.O. Granshaw and P.O. Maldonado the opportunity to communicate with the Consulate General of India.

208.    The United States is a signatory to the Vienna Convention on Consular Relations.

209.    India is a signatory to the Vienna Convention on Consular Relations.

210.    Article 36 of the Vienna Convention on Consular Relations is entitled "Communication and contact with nationals of the sending State".

211.    A copy of the Vienna Convention on Consular Relations is appended hereto as Exhibit 2.[4]  In pertinent part, Article 36 of the Vienna Convention on Consular

---

[4]Articles 40 - 42 of the Vienna Convention on Consular Relations provide:

Article 40:    Protection of consular officers.  The receiving State shall treat consular officers with due respect and shall take all appropriate steps to prevent any attack on their person, freedom or dignity.

Article 41:    Personal inviolability of consular officers.

1.    Consular officers shall not be liable to arrest or detention pending trial, except in the case of a grave crime and pursuant to a decision by the competent judicial authority.

2.    Except in the case specified in paragraph 1 of this article, consular officers shall not be committed to prison or be liable to any other form of restriction on their personal freedom save in execution of a judicial decision of final effect.

3.    If criminal proceedings are instituted against a consular officer, he must appear before the competent authorities. Nevertheless, the proceedings shall be conducted with the respect due to him by reason of his official position and, except in the case specified in paragraph 1 of this article, in a manner which will

Relations provides that:

————————————————

        hamper the exercise of consular functions as little as possible. When, in the circumstances mentioned in paragraph 1 of this article, it has become necessary to detain a consular officer, the proceedings against him shall be instituted with the minimum of delay.

        Article 42:     Notification of arrest, detention or prosecution.  In the event of the arrest or detention, pending trial, of a member of the consular staff, or of criminal proceedings being instituted against him, the receiving State shall promptly notify the head of the consular post. Should the latter be himself the object of any such measure, the receiving State shall notify the sending State through the diplomatic channel.

Furthermore, Article 53 of the Vienna Convention on Consular Relations provides, in pertinent part, that

        Article 53:     Beginning and end of consular privileges and immunities.

        1.     Every member of the consular post shall enjoy the privileges and immunities provided in the present Convention from the moment he enters the territory of the receiving State on proceeding to take up his post or, if already in its territory, from the moment when he enters on his duties with the consular post.

        2.     <u>Members of the family of a member of the consular post forming part of his household</u> and members of his private staff shall receive the privileges and immunities provided in the present Convention from the date from which he enjoys privileges and immunities in accordance with paragraph 1 of this article or from the date of their entry into the territory of the receiving State or from the date of their becoming a member of such family or private staff, whichever is the latest. . .

(<u>emphasis added</u>).   The current Second Circuit jurisprudence on the Vienna Convention on Consular Relations, based upon the "great weight" afforded the Executive's current interpretation,  causes violations of VCCR rights to be vindicated by sovereign states that are parties thereto and not by individual persons.

1.      With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

(a) consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;

(b) if he so requests, the competent authorities of the receiving State shall, <u>without delay</u>, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall be forwarded by the said authorities <u>without delay</u>. The said authorities shall inform the person concerned without delay of his rights under this subparagraph;

(c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation.  They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgement. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.

2.      The rights referred to in paragraph 1 of this article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this article are intended.

(<u>Emphasis added</u>).

212.    Generally, foreign nationals who are arrested and/or detained by law enforcement authorities in the United States, must be advised, without delay, of their right to have consular officers of their home country notified of their arrest and/or detention.

213.    Generally, foreign nationals who are arrested and/or detained by law enforcement authorities in the United States, must be advised, without delay, that they have a right to have communications with consular officers of their home country forwarded to such consular officers.

214.    Generally, when a foreign national is arrested or detained by law enforcement authorities in the United States, upon the request of the foreign national their consular officers must be notified without delay of such arrest and/or detention.

215.    The NYPD has rules and regulations governing the conduct of its sworn law enforcement officers, including rules and regulations promulgated into the NYPD "Patrol Guide."

216.    Upon information and belief, the rules and regulations of the NYPD are created and approved by policy makers within the NYPD and NYC.

217.    Upon information and belief, pursuant to the rules and regulations of the NYPD, Police Officers of the NYPD are required to comply with the NYPD rules and regulations, including those delineated within the Patrol Guide.

218.    Upon information and belief, at times the rules and regulations of the NYPD are revised and updated.

219.    Upon information and belief, at time the NYPD alters, suspend, amends and/or changes rules and regulations.

220.    Upon information and belief, at time when the NYPD alters, suspend, amends and/or changes rules and regulations in between revisions of its published rules and regulations, including the Patrol Guide, the NYPD issues and disseminates Interim Orders amongst its personnel to reflect such changes.

221.    Upon information and belief, the rules and regulations of the NYPD, including as reflected in the Patrol Guide and/or Interim Orders, mandate compliance with the consular notification provisions of Article 36 of the Vienna Convention on Consular Relations.

222.    When an Indian foreign national is arrested and/or detained by the NYPD such Indian foreign national must be advised, without delay, of their right to have consular officers of the Consulate General of India notified of their arrest and/or detention.

223.    When an Indian foreign national is arrested and/or detained by the NYPD such Indian foreign national must be advised, without delay, that they have a right to have communications with consular officers of the Consulate General of India forwarded to such consular officers of the Consulate General of India.

224.    When an Indian foreign national is arrested and/or detained by the NYPD, upon the request of such Indian foreign national, the NYPD must, without delay, notify

consular officers of the Consulate General of India of the arrest and/or detention of the Indian foreign national.

225.    Upon information and belief, when a foreign national is arrested by the NYPD, the rules and regulations of the NYPD mandate that the arresting officer(s) must notify the foreign national that they have a right to have their embassy or consulate notified.

226.    <u>NYPD Inter-City Correspondence Unit Must be Notified by the Arresting Officer</u>:  Upon information and belief, when a foreign national is arrested by the NYPD, and such arrested person requests that notification of their detention be made to consular officials, the rules and regulations of the NYPD mandate that the arresting officer(s) must, *inter alia*: (a) contact the Inter-City Correspondence Unit ("ICCU") of the NYPD; (b) provide pedigree information about the arrested foreign national to the ICCU; and, (c) advise the ICCU exactly where the arrested foreign national is being detained.

227.    Upon information and belief, the rules and regulations of the NYPD mandate that when a foreign national in NYPD custody requests notification of their arrest and detention be made to consular officials, the ICCU must notify the embassy and/or consulate of the arrested foreign national.

228.    Upon information and belief, the rules and regulations of the NYPD mandate that when a foreign national in NYPD custody requests notification of their arrest and detention be made to consular officials, the <u>Desk Officer</u> at the NYPD precinct

of arrest must ensure that the arresting officer complied with consular notification requirements.

229.    Upon information and belief, the rules and regulations of the NYPD mandate that when a foreign national in NYPD custody requests notification of their arrest and detention be made to consular officials, the <u>NYPD supervisor on duty at Central Booking</u> must ensure that the arresting officer complied with consular notification requirements.

230.    Upon information and belief, as a matter of policy, practice and custom, the NYPD and its members, routinely ignore the consular notification requirements imposed by the Vienna Convention on Consular Relations and their own rules and regulations.

231.    The NYCDOE had actual knowledge that Krittika's father was, at all relevant times, including at the time of Krittika's arrest and detention, vice-consul to the Consulate General of India.

232.    Upon information and belief, NYPD personnel obtained personal information about Krittika from NYCDOE personnel at John Bowne High School, and were accordingly on notice that Krittika's father was vice-consul to the Consulate General of India.

233.    Krittika requested to communicate with Consular officials of the Consulate General of India.

234.    Krittika requested that Consular officials of the Consulate General of India be notified of her arrest and detention by the NYPD, including by defendants Granshaw, Maldonado and John/Jane Doe NYPD personnel.

235.    Krittika requested to communicate with her father, the vice-consul of the Consulate General of India.

236.    Krittika requested that her father, the vice-consul of the Consulate General of India, be notified of her arrest and detention.

237.    No representative of NYC, the NYPD and/or the NYCDOE advised Krittika of her right to have the Consulate General of India notified of her arrest and detention.

238.    No representative of NYC, the NYPD and/or the NYCDOE advised Krittika of her right to have communications on her behalf forwarded to the Consulate General of India.

239.    No representative of NYC, the NYPD and/or the NYCDOE notified any Consular Officer from India, including representatives of the Consulate General of India in New York that Krittika was arrested and/or detained.

240.    No representative of NYC, the NYPD and/or the NYCDOE notified Krittika's parents, including Krittika's father, the vice-consul of the Consulate General of India in New York, that Krittika was arrested and/or detained.

- *THE DEFENDANTS PUBLICALLY HUMILIATED KRITTIKA*

241.    Shortly after defendant P.O. Maldonado handcuffed Krittika, defendants P.O. Granshaw and P.O. Maldonado walked her through public areas of John Bowne High School to the front door of the school, humiliatingly exposing the fact that Krittika was handcuffed to other students.

242.    Defendants P.O. Maldonado and P.O. Granshaw then placed Krittika into an NYPD police car and transported her to an NYPD precinct station house.

243.    Upon information and belief, the precinct station house is a building operated and controlled by defendant NYC via and for the NYPD.

244.    After arrival at the NYPD precinct station house, defendant P.O. Maldonado directed Krittika to remove her shoelaces and after Krittika complied she was locked within a cell along with another female in custody.

245.    Krittika asked defendant P.O. Maldonado what would happen to her next, and was informed that she would be fingerprinted, photographed and eventually transported to the NYPD Queens Central Booking facility.

246.    While detained at the NYPD precinct station house Krittika was not free to go.

247.    Krittika did not consent to any police officers handcuffing her.

248.    Krittika did not consent to any police officers having any physical contact with her.

48

249.    While detained at the NYPD precinct station house, Krittika asked to use a bathroom in order to relief herself, and defendant P.O. Maldonado refused to let her use a bathroom, directing her, in substance, to wait until after she was fully processed at the precinct and then transported to central booking.

250.    Thereafter a bald or balding, male, Caucasian appearing NYPD Officer, John Doe # 1, whose identity is not yet known, came to the vicinity of the holding cell where Krittika was detained and then looked through the e-mails which defendant P.O. Maldonado had placed on a desk.

251.    John Doe Officer # 1 took hold of Krittika and took her within the NYPD precinct station house and fingerprinted and photographed her.

252.    Krittika did not consent to being fingerprinted or photographed.

253.    While John Doe Officer # 1 had custody of Krittika, she asked him for permission to notify her father and/or the Consulate General of India of her arrest and detention; however, John Doe Officer # 1 refused, instead stating, in substance, "you need to call daddy?  You're a big girl and you should have thought of this before you sent the e-mails."

254.    Krittika did not send the e-mails that she was accused of sending.

255.    After photographing and fingerprinting Krittika, John Doe Officer # 1 returned Krittika to the holding cell at which time Krittika again asked John Doe Officer # 1, defendant P.O. Maldonado, and other officers present, to notify her father and/or the

49

Consulate General of India of her arrest and detention; however, all of the officers refused, informing Krittika that she would have to wait until she went to Central Booking before any calls could be made.

256.    While being returned to the holding cell, Krittika again asked to use the bathroom and was again refused, while being told that she would have to wait until she was taken to Central Booking.

257.    Some time thereafter, Krittika and another female detainee were removed from the holding cell by defendant P.O. Maldonado and John Doe Officer # 1, at which time Krittika was again handcuffed behind her back, escorted to an NYPD vehicle, and then transported to Queens Central Booking, arriving at approximately 3:45 p.m. on February 8, 2011.

258.    Upon arrival at Queens Central Booking Krittika was directed to sit on a bench, and was then handcuffed to the bench.

259.    Krittika was then taken for further fingerprinting and photographing at Queens Central Booking, as well as a search of her person physically and with a metal detector.

260.    Krittika did not consent to any search of her person.

261.    Krittika again asked for permission to notify her father and/or the Consulate General of India of her arrest and detention; however, she was unable to call until moved to a Central Booking holding cell that had a working telephone.

50

262.    Not until being placed in a holding cell at Queens Central Booking at approximately 5:00 p.m. was Krittika finally permitted to use a bathroom, and then only on a toilet within a cell in semi-public view of others.

263.    At approximately 7:00 p.m. Krittika was placed in another holding cell at Queens Central Booking, also along with other female detainees, and was then transferred to another cell with a telephone.

264.    While in the third cell at Central Booking that she had been detained within Krittika was finally able to call her father.

265.    Prior to Krittika calling her father, Krittika's family and the Consulate General of India were unaware that she had been arrested and/or detained.

266.    At approximately 9:00 p.m., two law enforcement personnel in plainclothes, whom Krittika perceived to be detectives, took custody of Krittika and took her to a room with videotaping equipment.

267.    These apparent detectives provided Krittika with the warnings mandated by *Miranda v. Arizona* and its progeny and then, in a session the "detectives" claimed was being memorialized on video, questioned Krittika, seeking a confession, wherein Krittika again wholly denied involvement with any e-mails sent to teachers.

268.    After the video statement was concluded, Krittika was escorted back to the holding cell with the working phone, at which time she again called her father.

269.    Krittika called her father 4 times from Queens Central Booking.

51

270.    Representatives from the Consulate General of India were notified by Krittika's father that Krittika had been arrested and was being detained at Queens Central Booking.

271.    Representatives of the Consulate General of India went to Queens Central Booking and were denied access to Krittika by John and Jane Doe NYPD personnel.

272.    Sometime at or after 11:00 p.m. a Jane Doe NYPD personnel distributed dirty and stained mattresses and blankets to the female detainees being held at Queens Central Booking, including Krittika.

273.    This female Jane Doe NYPD personnel essentially threw the filthy mattresses and blankets at the female detainees, including Krittika.

274.    This female Jane Doe NYPD personnel stepped on the filthy blanket prior to throwing it at Krittika.

275.    In an effort not to expose her person to the filthy mattress and blanket, Krittika joined another arrestee on a bench within the Central Booking holding cell and attempted to sleep on the bench.

276.    Krittika stayed on or near the bench, while locked within the holding cell in Queens Central Booking, until approximately 9:00 a.m. on February 9, 2011, at which time she again called her father.

277.    At approximately 12:00 p.m., having still not been seen by or communicated with consular officials, Krittika again called her father, and was able to speak with an attorney by phone.

278.    Thereafter, at approximately 1:30 p.m., a male John Doe NYPD Officer took custody of Krittika, removed her from the holding cell, handcuffed her and took her to an area where she was first able to meet with an attorney.

279.    After meeting with her attorney, Krittika was escorted back to the holding cell in Queens Central Booking and again locked inside.

280.    At approximately 2:00 p.m. on February 9, 2011, after intervention of counsel on behalf of Krittika, the District Attorney of Queens County dismissed all charges against Krittika prior to criminal court arraignment (*see* Ex. 1, sub-ex. 2).

281.    At approximately 2:30 p.m. on February 9, 2011 Krittika was again removed from the holding cell by a John Doe NYPD Officer who informed her that she had to sign a document and would then be permitted to leave.  Krittika signed the document and was then released from custody.

282.    Krittika was not provided a copy of the document she was directed to sign.

283.    Krittika was not involuntarily detained and not free to leave from approximately 9:45 a.m. on February 8, 2011 until approximately 2:30 p.m. on February 9, 2011.

284.   Krittika remained involuntarily in the custody of the NYPD, detained against her will and not free to leave, from approximately 11:45 a.m. on February 8, 2011 until approximately 2:30 p.m. on February 9, 2011.

285.   Krittika did not consent to any part of her seizure, restraint, detention, handcuffing or physical contact with her person by any NYC, NYCDOE and NYPD personnel.

286.   Krittika was detained against her will, without license, basis or reason for approximately 28 hours.

287.   As a result of her wrongful arrest, detention, seizure, restrain and imprisonment, Krittika's family retained an attorney to defend her as necessary.

288.   Retention of counsel to defend Krittika was at great personal expense to Krittika's family.

289.   Krittika's need for retained counsel was caused by NYC, NYCDOE, Kwait , Kim-Ross,  Konstan, Granshaw, Maldonado and John/Jane Doe NYPD and NYCDOE personnel, including A.P. Eutsey, wrongly causing and effecting Krittika's wrongful and unconstitutional arrest, detention, seizure, restrain and imprisonment.

- *KRITTIKA WAS WRONGLY DISCIPLINED AND SUSPENDED BEGINNING ON FEBRUARY 10, 2011*

290.   Notwithstanding that the public prosecutor dismissed all charges against Krittika, on or about February 10, 2011, defendant NYCDOE, via defendants Kim-Ross, Kwait, Konstan and the OSYD suspended Krittika from school.

291.    Notwithstanding that there was no evidence linking Krittika to any e-mails sent to teachers, this suspension was nevertheless sought, approved and authorized by defendants Kim-Ross, Kwait, Konstan and John/Jane Does..

292.    Prior to the suspension, Krittika was not properly provided adequate notice that a suspension was possible.

293.    Krittika repeatedly and truthfully denied all allegations of misconduct levied against her.

294.    Prior to the suspension, Krittika was not properly afforded an informal conference to set forth her side of the story.

295.    Prior to the suspension, Krittika's parents were not properly afforded an informal conference to set forth Krritika's side of the story.

296.    Prior to the suspension, Krittika was not properly afforded an informal conference to ask questions of the allegedly complaining witnesses.

297.    Prior to the suspension, Krittika's parents were not properly afforded an informal conference to ask questions of the allegedly complaining witnesses.

298.    Krittika did not pose a danger to persons or property.

299.    Krittika was not an ongoing threat of disruption to the academic process.

300.    Krittika did nothing to warrant any discipline, including suspension from school and interference with her enriched level academics.

301.    Krittika's suspension from school only compounded the harm resulting from her wrongful and baseless arrest.

302.    As a result of being suspended from John Bowne High School, Krittika was unable to attend Advanced Placement classes and instead had to try to keep up with complex and sophisticated academic work without any professional instruction, in a new setting worthy of "reform school."

303.    As a result of being suspended from John Bowne High School, Krittika was unable to attend Shakespeare studies in her English class and instead was relegated to lower level work that was well below her academic level and ability.

304.    Upon information and belief, on or about February 16, 2011, after all criminal charges against Krittika were dismissed, defendant Kim-Ross generated a false and misleading written complaint about Krittika, falsely alleging that Krittika sent the offensive e-mails when defendant Kim-Ross knew that Krittika had not sent them, and further knew that there was no evidence whatsoever linking Krittika to the e-mails (*See* Ex. 1, sub-ex. 4).

305.    Upon information and belief, defendant Kim-Ross knew that Krittika did not send the offensive e-mails to her, yet still demanded Krittika's arrest and suspension from school.

306.    Upon information and belief, defendant Kwait knew that Krittika did not send offensive e-mails to any teachers, yet still demanded Krittika's arrest and suspension from school.

307.    Upon information and belief, defendant Kim-Ross knew that there was no evidence linking Krittika to the offensive e-mails sent to her, yet still demanded Krittika's arrest and suspension from school.

308.    Upon information and belief, defendant Kwait knew that there was no evidence linking Krittika to the offensive e-mails sent to teachers, yet still demanded Krittika's arrest and suspension from school.

309.    Upon information and belief, defendants NYC, NYCDOE, Kwait , Kim-Ross,  Konstan and John/Jane Doe NYCDOE personnel knew that there was no evidence linking Krittika to the offensive e-mails sent to teachers, yet still authorized her suspension from school.

310.    Upon information and belief, defendants NYC, NYCDOE, Kwait , Kim-Ross,  Konstan and John/Jane Doe NYCDOE personnel knew that there was no evidence linking Krittika to the offensive e-mails sent to teachers, yet still directed her suspension from school.

311.    Upon information and belief, defendants NYC, NYCDOE, Kwait , Kim-Ross,  Konstan and John/Jane Doe NYCDOE personnel knew that there was no evidence

linking Krittika to the offensive e-mails sent to teachers, yet still caused her suspension from school.

312.    Upon information and belief, defendants Kwait , Kim-Ross and John/Jane Doe NYCDOE personnel publicized Krittika's arrest to staff and students at John Bowne High School.

313.    Upon information and belief, defendants Kwait , Kim-Ross and John/Jane Doe NYCDOE personnel publicized Krittika's suspension to staff and students at John Bowne High School.

314.    In an effort to combat the baseless suspension Krittika's family retained counsel to defendant Krittika against the baseless charges.

315.    Krittika's need for counsel in the disciplinary matter, including suspension hearing proceedings, was caused by NYC, NYCDOE, Kwait , Kim-Ross,  Konstan and John/Jane Doe NYCDOE personnel, including A.P. Eutsey causing false disciplinary and criminal charges and a resulting suspension to be levied against Krittika.

316.    The need for a counsel resulted in great personal expense to Krittika and her family.

317.    In an effort to combat the baseless suspension Krittika's family retained Gleb Liferenko, a computer expert, to analyze the e-mails reportedly received by defendant Kim-Ross and their associated header information.

58

318.    Mr. Liferenko determined to a reasonable degree of certainty based upon his expertise that the e-mails received by defendant Kim-Ross did not originate from Krittika's family computer (*see* Ex. 1, sub-ex. 5).

319.    Krittika's need for a computer expert was caused by NYC, NYCDOE, Kwait , Kim-Ross,  Konstan and John/Jane Doe NYCDOE personnel causing false disciplinary and criminal charges and a resulting suspension to be levied against Krittika.

320.    The need for a computer expert resulted in great personal expense to Krittika and her family, as reflected in the invoice from Mr. Liferenko for $3,363.20 (*see* Ex. 1, sub-ex. 6).

321.    Defendants NYC, NYCDOE, Kwait , Kim-Ross,  Konstan and John/Jane Doe NYCDOE personnel needlessly and maliciously prolonged the suspension period by delaying Krittika's formal hearing.

322.    On Friday, March 11, 2011 John Tsapelas, a NYCDOE employee at John Bowne High School appeared as a "Dean" on behalf of the NYCDOE at what was to be a hearing regarding Krittika's suspension and reported that the school required an adjournment of the hearing because of a death in the family of a NYCDOE witness against Krittika [Exhibit 3] (*see also* Ex. 1, sub-ex. 10).

323.    Krittika, her family, her attorney and her computer expert were present and prepared to proceed on March 11, 2011.

324.   On March 11, 2011 Krittika's attorney provided NYCDOE with the report of Krittika's computer expert.

325.   Upon information and belief, the adjournment requested by the NYCDOE was granted because of the reported death.

326.   Upon information and belief there was no death and the report of same to the hearing officer was false.

327.   On March 15, 2011 the suspension of Krittika was withdrawn by the Superintendent and reportedly expunged (*see e.g.* Ex. 1, sub-ex. 7).

328.   Krittika was actually innocent and, upon information and belief, this actual innocence was the ultimate cause for the withdrawal of the suspension.

329.   A.P. Eutsey later informed Krittika that none of the supposed witnesses against her had experienced a death in their family necessitating an adjournment of the disciplinary hearing.

330.   Because of the needless, baseless, meritless and groundless suspension, Krittika was compelled to remain away from John Bowne High School, involuntarily and against her will, for approximately 1 month.

- *KRITTIKA WAS SUBSTANTIALLY HARMED BY THE DEFENDANTS' MISCONDUCT AND VIOLATIONS OF HER CONSTITUTIONAL RIGHTS AND PRIVILEGES*

331.   Krittika returned to John Bowne High School, yet had to withdraw from the Calculus BC course because given that defendant Kim-Ross had falsely accused her of

60

crimes and misconduct, Krittika was understandably uncomfortable with defendant Kim-Ross as a teacher.

332.    Accordingly, Krittika lost the opportunity to even attempt to obtain college calculus credit by way of an Advanced Placement examination.

333.    Furthermore, Krittika also suffered from no longer having calculus on her course program and transcript as reported to potential colleges.

334.    Upon Krittika's return to John Bowne High School she experienced substantial embarrassment as word of her arrest was widely known due to students and staff having seen defendants P.O. Granshaw and P.O. Maldonado escorting her from the school in handcuffs on February 8, 2011.

335.    Krittika was emotionally traumatized by her arrest and involuntary detention.

336.    Krittika was emotionally traumatized by her suspension from school.

337.    Upon Krittika's return to John Bowne High School she experienced substantial embarrassment as word of her arrest was widely known due to, upon information and belief, defendants Kwait , Kim-Ross and John/Jane Doe NYCDOE personnel publicizing Krittika's arrest to staff and students at John Bowne High School.

338.    Upon Krittika's return to John Bowne High School she experienced substantial embarrassment as word of her suspension was widely known due to, upon information and belief, defendants Kwait , Kim-Ross and John/Jane Doe NYCDOE

personnel publicizing Krittika's suspension to staff and students at John Bowne High School.

> ● *KRITTIKA WAS DISCRIMINATED AGAINST*
> *BECAUSE OF HER ETHNICITY*

339.    Upon Krittika's return to John Bowne High School, on March 14, 2011, she was informed that the actual sender of the offensive e-mails was identified as Student 2 - once the defendants' had Krittika's computer forensic engineer's report.

340.    Upon information and belief, Student 2 admitted to sending the offensive e-mails to teachers, including to defendant Kim-Ross.

341.    Upon information and belief, defendant Kim-Ross falsely accused Krittika of sending offensive e-mails because Krittika is Indian and of Southeast Asian decent.

342.    Upon information and belief, defendant Kim-Ross maliciously accused Krittika of sending offensive e-mails because she held racial and ethnic animus towards Krittika.

343.    Defendant Kim-Ross, acting under color of law, falsely accused Krittika of crimes and bad acts based, upon information and belief, upon her race and ethnicity as an Indian of Southeast Asian decent.

344.    Defendant Kwait, acting under color of law, selected Krittika for false arrest and detention, malicious prosecution, suspension and disciplinary treatment based, upon information and belief, upon her race and ethnicity as an Indian of Southeast Asian decent.

345.    Defendant Kwait, acting under color of law, approved of Krittika's false arrest and detention, malicious prosecution, suspension and disciplinary treatment based upon her race and ethnicity as an Indian of Southeast Asian decent.

346.    Defendant Kwait, acting under color of law, authorized Krittika's false arrest and detention, malicious prosecution, suspension and disciplinary treatment based upon her race and ethnicity as an Indian of Southeast Asian decent.

347.    Defendant Kwait, acting under color of law, directed Krittika's false arrest and detention, malicious prosecution, suspension and disciplinary treatment based upon her race and ethnicity as an Indian of Southeast Asian decent.

348.    Defendant Kwait, acting under color of law, caused Krittika's false arrest and detention, malicious prosecution, suspension and disciplinary treatment based upon her race and ethnicity as an Indian of Southeast Asian decent.

349.    Upon information and belief, at the insistence of defendants Kim-Ross and Kwait, unlike the false and erroneous accusations pertaining to Krittika, the admitted misconduct of Student 2 was not referred to the NYPD.

350.    Upon information and belief, at the insistence of defendants Kim-Ross and Kwait, Student 2 was not arrested, despite his actual guilt and admission of guilt.

351.    Upon information and belief, Student 2 is of Oriental Asian decent.

352.    Upon information and belief, defendant Kim-Ross is of Oriental Asian decent.

353.    Upon information and belief, defendant Kim-Ross in her individual and official capacity insisted upon Student 2 not facing criminal charges for his admitted to misconduct because Student 2 is of Oriental Asian decent.

354.    Upon information and belief, defendant Kwait in his individual and official capacity insisted upon Student 2 not facing criminal charges for his admitted to misconduct because Student 2 is of Oriental Asian decent.

355.    Upon information and belief, defendants Kim-Ross, Kwait, Konstan, and John/Jane Doe NYCDOE personnel, including A.P. Eutsey, in their individual and official capacities, authorized the withholding of information about Student 2 from the NYPD because Student 2 is of Oriental Asian decent.

356.    As a result of Krittika's wrongful arrest, detention, restraint, arrest and suspension, Krittika experienced emotional and physical injury, including, significant embarrassment, severe anxiety, protracted fear, severe headaches, significant sleeplessness, appreciable loss of appetite, substantial weight loss, and prematurely left the United States for India.

357.    As a result of Krittika's wrongful arrest, detention, restraint, arrest and suspension, Krittika required treatment by a physician and with medication, including analgesics, sleep inducers and appetite enhancement medication (*see e.g.* Ex. 1, sub-ex. 13).

## VII.  THE MUNICIPAL DEFENDANTS' UNCONSTITUTIONAL POLICIES, PRACTICES AND CUSTOMS

- *DEFENDANTS NYC AND HON. RAYMOND W. KELLY, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE NYPD*

358.  Upon information and belief, NYC and the NYPD, by and through their final policymakers, including, but not limited to, defendant Hon. Raymond W. Kelly, who is sued solely in his official capacity, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques, including but not limited to the following: (a) disregarding the Fifth Amendment rights of criminal suspects and defendants, in particular young people; (b) fabricating evidence; (c) failing to document and disclose material and exculpatory; and (d) failing to investigate known exculpatory evidence and otherwise failing to conduct constitutionally adequate investigations.

359.  Upon information and belief, NYC and the NYPD, including its School Safety Division and NYPD personnel performing law enforcement functions within NYC public schools under the control of NYC and the NYCDOE, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional detentions, questioning, searching, and arresting of NYC public school students, in violation of the Fourth Amendment of the United States Constitution and state law, including, *inter alia*, (i) arresting students for minor violations of school rules, notwithstanding that such conduct does not constitute probable cause of criminal activity;

65

(ii) handcuffing students within NYCDOE public school buildings, without parental knowledge and/or consent, for alleged conduct that does not constitute probable cause of criminal activity; and, (iii) removing school children from schools without parental knowledge and/or consent, detaining them, and transporting them to NYPD facilities, while handcuffed, for continued detention, including within holding cells, for alleged conduct that does not constitute probable cause of criminal activity.

360.    Upon information and belief, as a result of these unconstitutional policies, customs, patterns and practices, students at NYC public schools suffer continued damage. Like Krittika, they face the indignity of being paraded in front of their classmates and teachers while handcuffed. Moreover, they further face the humiliation of being dragged from school, while handcuffed, in front of fellow students, teachers and administrators, and going through the lengthy and at times terrifying NYPD arrest processing procedures, including lengthy detentions in holding cells at the precinct of arrest and central booking facilities.

361.    Upon information and belief, NYC and the NYPD, by and through their final policymakers, including, but not limited to, defendant Hon. Raymond W. Kelly, who is sued solely in his official capacity, maintained a policy, custom, or pattern and practice of failing to train and supervise NYPD law enforcement personnel in connection with fundamental investigative tasks implicating the constitutional rights of witnesses and suspects, including but not limited to conducting and documenting criminal

investigations, conducting custodial interrogations and witness interviews, and documenting and disclosing exculpatory evidence.

362.    The policy, custom, or pattern and practice of NYC and the NYPD of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques, and its policy, custom, or pattern and practice of failing to train and supervise NYPD law enforcement personnel, were evidenced by, among other actions, multiple constitutional violations and related acts of misconduct committed by defendants Granshaw, Maldonado and John/Jane Does, in the course of the investigation and prosecution of Krittika, and in the course of prior and subsequent cases.

363.    The policies, customs, patterns and practices challenged by this action, constitute the official municipal policy of defendant NYC and defendant Kelly, in his official capacity as Commissioner of the NYPD.

364.    By Memorandum of Understanding ("MOU") dated September 17, 1998, the NYPD and the then NYC Board of Education (now defendant NYCDOE) transferred school security functions from the Board of Education's then Division of School Safety to the NYPD [Exhibit 4].    Thereafter, by Executive Order No. 44 of 1998, the Mayor directed that the MOU take effect immediately. (*Id.*).  Thereafter, by agreement dated January 22, 2003, defendants NYC, by the Mayor, and NYCDOE, by its Chancellor, agreed that the transfer given effect by the September 1998 MOU would continue in effect unless further amended or terminated by written agreement (*Id.*).

67

365.    The enforcement of school policies, including through arrest, seizure and detention, including by handcuffing, of NYC public school students for alleged behavior that does not rise to the level of probable cause of criminal activity, is the official stated policy of NYC, the NYPD and what is now the NYCDOE (*see e.g.* Ex. 4, MOU at ¶ 19).

366.    On June 11, 2007, defendant Commissioner Kelly, in his official capacity, wrote to New York City Council Member Hon. Robert Jackson, in Member Jackson's capacity as Chair of the Council's Education Committee.  By this letter, Commissioner Kelly conceded that NYPD personnel participate in conduct which constitutes the arrest of students for non-criminal conduct, including, "removing unruly students" [Exhibit 5].

367.    Upon information and belief, the removal of an allegedly "unruly" student by NYPD personnel constitutes an unconstitutional seizure and/or an arrest.  Such students are not free to go after they have been seized by NYPD personnel and are frequently transported to NYPD precincts for arrest processing when their alleged conduct did not rise to the level of probable cause to believe that a crime had been committed.  Case in point, Krittika: she did nothing whatsoever in or out of school that was criminal or even remotely provided NYPD personnel with probable cause to believe that a crime had been committed - and even under threat and upon application of physical force - consistently and truthfully denied any misconduct or criminality.  Notwithstanding same, consistent with the policies, customs, patterns and practices of the NYPD, on behalf of defendants NYC and NYCDOE, as regards their enforcement activities in NYC

68

public schools operated by NYCDOE, Krittika was unlawfully restrained, detained, questioned, and imprisoned for approximately 28 hours - for nothing; and she was never "unruly."

368.    Upon information and belief, unlawful seizures of, excessive force toward and arrests of NYC public school students constitutes municipal policy of defendants NYC and NYCDOE because such instances occur so often as to amount to the policy, custom, pattern and/or practice.

369.    Notably, in his June 11, 2007 letter, Commissioner Kelly advised that since 2002, NYC had received 2,670 complaints against NYPD school safety personnel. Furthermore, Commissioner Kelly confirmed that 27 percent of the complaints were substantiated by the NYPD itself.

370.    Furthermore, upon information and belief, defendants NYC and the NYCDOE are on actual notice of such instances based upon, *inter alia*: (a) frequent complaints made to the NYPD, including its Internal Affairs Bureau; (b) testimony at City Council proceedings; (c) legal proceedings commenced against NYC and/or NYCDOE, in state and federal courts, many of which have resolved in favor of the mistreated public school students and their families; (d) published media reports; and, (e) reports and publications submitted to NYC by non governmental organizations, such as the Drum Major Institute for Public Policy and the ACLU/NYCLU.

371.    Upon information and belief, the failures on the part of NYC and including by way of the NYPD, to appropriately train and supervise personnel involved in law enforcement functions, including NYPD officers, like defendants P.O. Granshaw, P.O. Maldonado and John/Jane Does, who are involved in the detention, arrest, discipline and prosecution of NYC public school students, in order to address a known pattern of unconstitutional arrests and seizures, and the use of excessive force amounts to deliberate indifference, thus constituting official municipal policy of defendant NYC.

372.    Upon information and belief, NYC and NYPD policymakers were deliberately indifferent to the known and obvious risk that the policy, custom, or pattern and practice of investigative misconduct and failure to train and supervise NYPD law enforcement personnel created a risk that the constitutional rights of criminal suspects like Krittika would be violated.

373.    Upon information and belief, defendants NYC, Commissioner Kelly, Chancellor Walcott, and the NYCDOE, including via the NYPD, are keenly aware of the allegations described herein, and of the pervasive nature of the policy, custom, pattern and/or practice of the NYPD unlawfully seizing and arresting NYC public school students, and subjecting them to excessive force; however, the defendants  have been deliberately indifferent to such policy, custom, pattern and/or practice, and have not attempted to remedy it.

374.    Upon information and belief, the misconduct and constitutional violations committed by defendants Granshaw, Maldonado and John/Jane Doe defendants of the NYPD in the course of the substandard investigation and prosecution of Krittika were carried out pursuant to the policy, custom, or pattern and practice of investigative misconduct of NYC and the NYPD, and were directly and proximately caused by NYC and the NYPD's failure to train and supervise law enforcement personnel.

- *DEFENDANTS NYC, NYCDOE AND HON. DENNIS WALCOTT, IN HIS OFFICIAL CAPACITY AS CHANCELLOR OF THE NYCDOE*

375.    Upon information and belief, prior to and at the time of the putative investigation, prosecution, and detention of Krittika, and continuing to at least 2011, NYC and the NYCDOE, by and through final policymakers and their delegees, including now defendant Hon. Dennis Walcott, who is sued here solely in his official capacity, maintained a policy, custom, or pattern and practice of failing to supervise, train, and discipline teachers and school administrators in connection with fundamental and recurring constitutional obligations.

376.    This policy, custom, or pattern and practice of failing to supervise, train, and discipline teachers and school administrators was evidenced by, *inter alia*, multiple constitutional violations and related acts of misconduct committed by teachers and school administrators of the NYCDOE in the course of the putative investigation and

disciplinary prosecution of Krittika, and in the course of prior and subsequent

investigations and disciplinary proceedings.

377.    Upon information and belief, NYC and the NYCDOE, by and through their

final policymakers, including, but not limited to, defendant Hon. Dennis Walcott, who is

sued solely in his official capacity, maintained a policy, custom, or pattern and practice of

promoting, facilitating, or condoning improper, illegal, and unconstitutional discipline,

arrests, detentions and academic suspensions, including, *inter alia*: (a) disregarding the

Fifth Amendment rights of students; (b) fabricating evidence; (c) failing to document and

disclose material and exculpatory evidence; (d) failing to investigate known exculpatory

evidence and otherwise failing to conduct constitutionally adequate investigations; (e)

seeking the arrest of students who had not committed any crime; (f)  imposing discipline,

including suspension from school, when school officials know that the student had not

committed any wrongdoing; (g) continuing with disciplinary proceedings after the

innocence of a student has been established; and, (h) encouraging the use of excessive

physical force upon students by NYPD personnel.

378.    Upon information and belief, NYC and the NYCDOE, including via its

interactions with the NYPD School Safety Division and the influence over such functions

that NYCDOE principals, including defendant Kwait have over enforcement policies

within schools, and the influence that defendant Konstan and her OSYD similarly have

over NYPD functions and actions within NYC public schools under the control of NYC

and the NYCDOE, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional detentions, questioning, searching, and arresting of NYC public school students, leading to unwarranted and unconstitutional depravation of educational rights through abuses of the disciplinary and suspension process.

379.    Upon information and belief, such violations also  manifested themselves by NYC, NYCDOE, Konstan, and Commissioner Walcott, permitting such unconstitutional  policies, customs, patterns and practices within New York City public schools, in violation of the Fourth Amendment of the United States Constitution and state law, including, *inter alia*, (i) arresting students for minor violations of school rules, notwithstanding that such conduct does not constitute probable cause of criminal activity; (ii) handcuffing students within NYCDOE public school buildings, without parental knowledge and/or consent, for alleged conduct that does not constitute probable cause of criminal activity; and, (iii) removing school children from schools without parental knowledge and/or consent, detaining them, and transporting them to NYPD facilities, while handcuffed, for continued detention, including within holding cells, for alleged conduct that does not constitute probable cause of criminal activity.

380.    Upon information and belief, as a result of these unconstitutional policies, customs, patterns and practices, students at NYC public schools suffer continued damage. Like Krittika, they face the indignity of being paraded in front of their classmates and

73

teachers while handcuffed.  Moreover, they further face the humiliation of being dragged

from school, while handcuffed, in front of fellow students, teachers and administrators,

and going through the lengthy and at times terrifying NYPD arrest processing procedures,

including lengthy detentions in holding cells at the precinct of arrest and central booking

facilities.

381.    Similarly, such students, like Krittika, are, upon information and belief,

also forced to stay away from the school in which they are enrolled at, while wrongly and

unjustly suspended from school, and must then face similar humiliation when their

suspension and discipline become known to classmates, teachers and administrators.

382.    Expungement of disciplinary records does little to mitigate the

immediate physical and emotional harm to such students, like Krittika, who suffer public

humiliation for conduct they did not commit.

383.    Upon information and belief, NYC and the NYCDOE, by and through their

final policymakers, including, but not limited to, now Chancellor, defendant Hon. Dennis

Walcott, who is sued solely in his official capacity, maintained a policy, custom, or

pattern and practice of failing to train and supervise NYCDOE personnel in connection

with fundamental tasks implicating the constitutional rights of students, including but not

limited to conducting and documenting investigations of alleged disciplinary and criminal

violations, use of detention and force, conducting custodial interrogations, and

documenting and disclosing exculpatory evidence.

384.    Upon information and belief, the policy, custom, or pattern and practice of NYC and the NYCDOE of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigations leading to unwarranted and unconstitutional suspensions, limiting and at times depriving students of their rights to education, and the policy, custom, or pattern and practice of failing to train and supervise NYCDOE personnel, were evidenced by, among other actions, multiple constitutional violations and related acts of misconduct committed by defendants Kim-Ross, Kwait, Konstan and John/Jane Does, as well as A.P. Eutsey, in the course of the investigation, arrest, detention, imprisonment, prosecution, discipline and suspension of Krittika, and in the course of prior and subsequent cases.

385.    The policies, customs, patterns and practices challenged by this action, constitute, what is, upon information and belief, the official municipal policy of defendants NYC and NYCDOE and defendant Walcott, in his official capacity as Chancellor of the NYCDOE.

386.    Upon information and belief, the enforcement of school policies, including through arrest, seizure and detention, including by handcuffing, of NYC public school students for alleged behavior that does not rise to the level of probable cause of criminal activity, is the official stated policy of NYC, the NYPD and what is now the NYCDOE (*see e.g.* Ex. 4, MOU at ¶ 19, *supra*).

387.   Upon information and belief, the policies, customs, patterns and practices of NYC and the NYCDOE encourage and permit the unconstitutional seizure and/or arrest of public school students.  Such students are not free to go after they have been seized by NYCDOE personnel and are frequently detained in rooms within schools without legal representation, and often are then further detained by NYPD personnel and transported to NYPD precincts for arrest processing when their alleged conduct did not rise to the level of probable cause to believe that a crime had been committed.  Case in point, Krittika: she did nothing whatsoever in or out of school that was criminal or even remotely provided NYPD personnel with probable cause to believe that a crime had been committed - and even under threat and upon application of physical force - consistently and truthfully denied any misconduct or criminality.  Notwithstanding same, consistent with the policies, customs, patterns and practices of the NYPD, on behalf of defendants NYC and NYCDOE, as regards their enforcement activities in NYC public schools operated by NYCDOE, Krittika was unlawfully restrained, detained, questioned, and imprisoned for approximately 28 hours - for nothing.

388.   Upon information and belief, unlawful seizures of, excessive force toward and arrests of NYC public school students constitutes municipal policy of defendants NYC and NYCDOE because such instances occur so often as to amount to the policy, custom, pattern and/or practice.

389.    Furthermore, upon information and belief, defendants NYC and the

NYCDOE are on actual notice of such instances based upon, *inter alia*: (a) frequent

complaints made to the NYPD, including its Internal Affairs Bureau; (b) testimony at City

Council proceedings; (c) legal proceedings commenced against NYC and/or NYCDOE,

in state and federal courts, many of which have resolved in favor of the mistreated public

school students and their families; (d) published media reports; and, (e) reports and

publications submitted to NYC by non governmental organizations, such as the Drum

Major Institute for Public Policy and the ACLU/NYCLU.

390.    Upon information and belief, the failures on the part of NYC and

NYCDOE to appropriately train and supervise personnel involved in the investigation,

detention, discipline and suspension of students, including NYCDOE teachers like

defendant Kim-Ross, administrators like defendants Kwait and Konstan, and including

A.P. Eutsey and John/Jane Does, who are involved in the detention, arrest, discipline,

suspension and prosecution of NYC public school students, in order to address a known

pattern of unconstitutional arrests, seizures, suspensions and the use of excessive force

amounts to deliberate indifference, thus constituting official municipal policy of

defendants NYC and NYCDOE.

391.    Upon information and belief, NYC and NYCDOE policymakers were

deliberately indifferent to the known and obvious risk that the policy, custom, or pattern

and practice of investigative and overbearing disciplinary misconduct and failure to train

and supervise NYCDOE personnel created a risk that the constitutional rights of students like Krittika would be violated.

392.    Upon information and belief, defendants NYC, Chancellor Walcott, and the NYCDOE, are keenly aware of the allegations described herein, and of the pervasive nature of the policy, custom, pattern and/or practice of the NYCDOE unlawfully seizing, detaining, restraining, arresting, disciplining and suspending NYC public school students, and subjecting them to excessive force; however, the defendants have been deliberately indifferent to such policy, custom, pattern and/or practice, and have not attempted to remedy it.

393.    The misconduct and constitutional violations committed by defendants Kim-Ross, Kwait and Konstan, John/Jane Does, including A.P. Eutsey, who were involved in the detention, arrest, discipline, suspension and prosecution of Krittika were carried out pursuant to what is, upon information and belief, the policy, custom, or pattern and practice of misconduct of NYC and the NYCDOE, and were directly and proximately caused by NYC and the NYCDOE's failure to train and supervise its personnel.

394.    As a direct and proximate result of what is, upon information and belief, NYC and the NYCDOE's policy, custom, or pattern and practice of failing to supervise, train, and discipline teachers and school administrators, teachers, including but not necessarily limited to defendant Kim-Ross, and school administrators, including, but not necessarily limited to, defendants Kwait and Konstan, along with A.P. Eutsey, committed

multiple constitutional violations and related misconduct in the course of the putative

investigation and resulting improper and unwarranted discipline of Krittika, including,

*inter alia*:

    a.    defendants Kim-Ross and Kwait, along with A.P. Eutsey, acting by

and for the NYCDOE, fabricated inculpatory evidence to provide a false report/ false

complaint for causing the arrest and discipline of Krittika;

    b.    A.P. Eutsey, acting by and for the NYCDOE, attempted to coerce

a false confession from Krittika, by threatening her with police involvement and

unwarranted discipline for her failure to confess, notwithstanding Krittika's actual

innocence;

    c.    A.P. Eutsey, acting by and for the NYCDOE, with the direction,

knowledge and consent of defendant Kwait, and at the request of defendant Kim-Ross,

improperly detained and arrested Krittika such that she was not free to go, for alleged

crimes that did not occur in A.P. Eutsey's presence, and for which Krittika was actually

innocent;

    d.    defendants Kim-Ross, Kwait and Kostan along with A.P. Eutsey,

and John/Jane Does, caused Krittika to be placed into the custody of the NYPD for

alleged crimes that did not occur in their presence and for which Krittika was actually

innocent;

e.    A.P. Eutsey, acting by and for the NYCDOE, with the direction, knowledge and consent of defendant Kwait, permitted Krittika to be questioned by defendant P.O. Granshaw, without Krittika's parents being notified;

f.    defendants Kim-Ross, Kwait and Kostan along with A.P. Eutsey, and John/Jane Does, caused Krittika to be suspended from John Bowne High School for acts that she did not commit and for which she lacked any knowledge and/or information; and,

g.    defendants Kim-Ross, Kwait and Kostan along with A.P. Eutsey, and John/Jane Does, caused Krittika to be suspended from John Bowne High School without providing her and her parents with an opportunity to explain their side of the story and to confront the evidence against them, notwithstanding that Krittika was not a threat to the academic environment at John Bowne High School and she was actually innocent.

## VIII.    FEDERAL LAW BASED COUNTS

### COUNTS PURSUANT TO 42 U.S.C. 1983

### COUNT I

### (U.S. Const. 4th and 14th Amend.)
### (Unreasonable Searches, Seizures and Arrests)
### (Against all Defendants)

395.    Krittika repeats, reiterates, and re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

396.    In arresting, searching and detaining Krittika without sufficient cause, the defendants engaged in unreasonable searches and seizures in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

397.    Defendants Kim-Ross, Kwait and Konstan are liable pursuant to 42 U.S.C. § 1983 for unreasonably causing, authorizing and directing the seizure and arrest of Krittika in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

398.    NYC and NYCDOE are liable pursuant to 42 U.S.C. § 1983 for A.P. Eutsey unreasonably seizing and arresting Krittika in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

399.    Defendants Granshaw and Maldonado are liable pursuant to 42 U.S.C. § 1983 for unreasonably seizing and arresting Krittika in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

400.    Defendants John/Jane Does  are liable pursuant to 42 U.S.C. § 1983 for unreasonably causing, authorizing, directing the seizure and arrest of Krittika, and for seizing and arresting Krittika in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

401.    Municipal liability for these violations of the Fourth Amendment is based upon the individual defendants in this case acting in a manner consistent with the policy, practice and custom of NYC, the NYPD and the NYCDOE of unreasonably seizing and

unlawfully arresting New York City public school students, absent probable cause of criminal activity in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

402.    Municipal liability for these violations of the Fourth Amendment is further based upon the failure of the NYC, the NYPD and the NYCDOE to train, supervise and discipline, amounting to deliberate indifference to the constitutional rights of Krittika.

403.    As a direct and proximate result of the defendants' actions Krittika was wrongly arrested, detained, restrained and imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

**COUNT II**

**(U.S. Const. 14th Amend.)**
**(Deprivation of Liberty Without Due Process of Law by**
**Fabricating Evidence and Failing to Investigate )**
**(Against all Defendants)**

404.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

405.    Defendants NYC, NYCDOE, Kim-Ross, Kwait, Konstan, Granshaw, Maldonado and John/Jane Does, acting individually and in concert, fabricated evidence, including, but not limited to, issuing false report(s) and/or false complaint(s), and deliberately and recklessly failed to conduct a constitutionally adequate criminal investigation, thereby depriving Krittika of her Fourteenth Amendment right not to be deprived of liberty without due process of law.

82

406.    Defendant Kim-Ross, in her individual and official capacity, falsely reported that Krittika sent offensive e-mails to her.

407.    Defendants NYC, NYCDOE, Kim-Ross, Kwait, and John/Jane Does, acting individually and in concert, falsely reported that the IP Address that the offensive e-mails originated from was linked to Krittika's home.

408.    Defendants NYC, NYCDOE, Kim-Ross, Kwait, and John/Jane Does, acting individually and in concert, falsely reported that the IP Address that the offensive e-mails originated from was assigned to the entire apartment building that Krittika and her family resided within.

409.    The false evidence which these defendants fabricated was used as a basis to call for Krittika's arrest.

410.    The false evidence which these defendants fabricated was used as a basis to suspend Krittika from John Bowne High School.

411.    Defendants NYC, NYCDOE, Kim-Ross, Kwait, Granshaw, Maldonado and John/Jane Does had no evidence linking Krittika to the offensive e-mails.

412.    Even after coercive questioning by NYCDOE and NYPD personnel, Krittika steadfastly and truthfully maintained her innocence.

413.    Defendants NYC, NYCDOE, Kim-Ross, Kwait, Granshaw, Maldonado and John/Jane Does deliberately and recklessly failed to investigate leads pointing toward other suspects, including Student 2, and corroborating Krittika's actual innocence,

including, but not limited to: failing to interview witnesses whose knowledge tended to disprove Krittika's guilt and prove her innocence; failing to investigate known exculpatory and potentially exculpatory information provided by Krittika and witnesses; failing to investigate exculpatory and potentially exculpatory computer forensic evidence.

414.    The defendants' deliberate and reckless failure to investigate exculpatory evidence that was known to them, or that in the absence of their deliberate and reckless indifference should have been known to them, caused Krittika to be deprived of her liberty without due process of law.

415.    The defendants' conduct violated Krittika's clearly established constitutional right to not be deprived of liberty without due process of law, as guaranteed by the Fourteenth Amendment.

416.    No reasonable person, including police officers, school teachers and/or school administrators in 2010 and 2011 would have believed that the actions taken by the defendants in fabricating evidence were reasonable or lawful.

417.    No reasonable person, including police officers, school teachers and/or school administrators in 2010 and 2011 would have believed that the actions taken by the defendants in failing to investigate exculpatory evidence was reasonable or lawful.

418.    Municipal liability for these violations of the Fourthteenth Amendment is based upon the individual defendants in this case acting in a manner consistent with the policy, practice and custom of NYC, the NYPD and the NYCDOE of fabricating

evidence and deliberately and recklessly failing to conduct constitutionally adequate criminal and disciplinary investigations, thereby depriving Krittika of her rights in violation of the Fourteenth Amendments to the United States Constitution.

419.    Municipal liability for these violations of the Fourth Amendment is further based upon the failure of the NYC, the NYPD and the NYCDOE to train, supervise and discipline, amounting to deliberate indifference to the constitutional rights of Krittika.

420.    As a direct and proximate result of the defendants' actions Krittika was wrongly arrested, detained, restrained and imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

## COUNT III

### (U.S. Const. 4th and 14th Amend.)
### (Malicious Prosecution)
### (Against all Defendants)

421.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

422.    Defendants NYC, NYCDOE, Kim-Ross, Kwait, Konstan, Granshaw, Maldonado and John/Jane Does, despite knowing that probable cause did not exist to arrest and prosecute Krittika for sending offensive and/or threatening e-mails to teachers, including defendant Kim-Ross, acted individually and in concert to cause Krittika to be arrested and prosecuted.

423.    The defendants' conduct violated Krittika's rights pursuant to the Fourth and Fourteenth Amendments of the United States Constitution to be free of unreasonable searches and seizures.

424.    Defendants NYC, NYCDOE, Kim-Ross, Kwait, Granshaw, Maldonado and John/Jane Does knew, or in the absence of their deliberate and reckless indifference to the truth should have known, that probable cause did not exist to arrest and prosecute Krittika.

425.    Defendants NYC, NYCDOE, Kim-Ross, Kwait, Granshaw, Maldonado and John/Jane Does knew, or in the absence of their deliberate and reckless indifference to the truth should have known, that Krittika was actually innocent.

426.    The deliberate and reckless investigative failures of the defendants included, but were not limited to, failing to investigate known exculpatory and potentially exculpatory information provided by witnesses and Krittika; failing to investigate exculpatory and potentially exculpatory computer forensic evidence; and, failing to timely pursue evidence and leads concerning other suspects.

427.    The defendants caused Krittika to be maliciously prosecuted.

428.    The defendants caused Krittika to be arrested and prosecuted deliberately, with reckless disregard for the truth, and with malice.

429.    Krittika was actually innocent of all charges.

430.   On February 9, 2011, the criminal prosecution terminated in Krittika's favor when all charges against her were dismissed by application of the Queens County District Attorney, and Krittika's subsequent release from detention by the NYPD after approximately 28 hours of wrongful incarceration.

431.   Defendants' actions to deprive Krittika of her liberty without probable cause were in violation of clearly established constitutional law, and no reasonable person, including a police officer, school teacher or school administrator in 2010 and 2011 would have believed that the defendants' actions were lawful.

432.   On or about March 15, 2011, the disciplinary prosecution of Krittika terminated in Krittika's favor when all disciplinary charges resulting in her unjust and unwarranted suspension were withdrawn by the superintendent and the suspension was expunged from Krittika's records.

433.   Defendants' actions to deprive Krittika of her educational rights and opportunities were in violation of clearly established constitutional law, and no reasonable person, including a police officer, school teacher or school administrator in 2010 and 2011 would have believed that the defendants' actions were lawful.

434.   Municipal liability for these violations of the Fourth and Fourteenth Amendments is based upon the individual defendants in this case acting in a manner consistent with the policy, practice and custom of NYC, the NYPD and the NYCDOE of unreasonably seizing and unlawfully arresting New York City public school students,

absent probable cause of criminal activity, fabricating evidence, deliberately and recklessly failing to conduct constitutionally adequate criminal and disciplinary investigations, and pursuing disciplinary charges and suspensions knowing they are without merit, thereby depriving Krittika of her rights in violation of the Fourteenth Amendments to the United States Constitution.

435.   Municipal liability for these violations of the Fourth Amendment is further based upon the failure of the NYC, the NYPD and the NYCDOE to train, supervise and discipline, amounting to deliberate indifference to the constitutional rights of Krittika.

436.   As a direct and proximate result of the defendants' actions Krittika was wrongly arrested and prosecuted, and was wrongfully imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

**COUNT IV**

**(U.S. Const. 14th Amend.)**
**(Engaging in Conduct that Shocks the Conscience)**
**(Against all Defendants)**

437.   Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

438.   In their zeal to scapegoat Krittika, defendants NYC, NYCDOE, Kim-Ross, Kwait, Konstan, Granshaw, Maldonado and John/Jane Does, deliberately engaged in arbitrary and conscious-shocking conduct that contravened fundamental canons of

decency and fairness and violated Krittika's substantive due process right under the Fourteenth Amendment.

439.    The defendants deliberately sought to exploit Krittika's youth, naivete, and vulnerabilities; attempted to coerce a confession by threatening academic disciplinary action; further sought to coerce a confession by threats of lengthy incarceration and exposure to fatal disease; further sought to coerce a confession by physical force, including the tight placement of handcuffs only when Krittika would not confess to crimes and bad acts in which she had no involvement; concealed the defendants' coercion and other misconduct; fabricated additional allegedly inculpatory evidence to corroborate false allegations of Krittika's guilt prior to her arrest; deliberately and recklessly failed to investigate leads pointing toward other suspects and corroborating Krittika's actual innocence; and engaged in additional, conscience-shocking misconduct that led to the false arrest and wrongful imprisonment of an innocent girl.

440.    The defendants' conduct violated Krittika's clearly established constitutional right to substantive due process, as guaranteed by the Fourteenth Amendment, and no reasonable person, including a police officer, school teacher or school administrator in 2010 and 2011 would have believed that the defendants' actions, including their deliberate failure to conduct a constitutionally adequate investigation, and their use of threats and physical force in an attempt to obtain a false confession, were lawful.

441.    Municipal liability for these violations of the Fourth and Fourteenth Amendments is based upon the individual defendants in this case acting in a manner consistent with the policy, practice and custom of NYC, the NYPD and the NYCDOE of unreasonably seizing and unlawfully arresting New York City public school students, absent probable cause of criminal activity, fabricating evidence, deliberately and recklessly failing to conduct constitutionally adequate criminal and disciplinary investigations, and pursuing disciplinary charges and suspensions knowing they are without merit, thereby depriving Krittika of her rights in violation of the Fourteenth Amendments to the United States Constitution.

442.    Municipal liability for these violations of the Fourth Amendment is further based upon the failure of the NYC, the NYPD and the NYCDOE to train, supervise and discipline, amounting to deliberate indifference to the constitutional rights of Krittika.

443.    As a direct and proximate result of the defendants' actions Krittika was wrongly arrested and prosecuted, and was wrongfully imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

## COUNT V

**(U.S. Const. 4th and 14th Amend.)**
**(Excessive Force)**
**(Against Defendants NYC, NYCDOE and P.O. Granshaw)**

444.    Krittika repeats, reiterates, and re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

445.    Defendants P.O. Granshaw is liable pursuant to 42 U.S.C. § 1983 for using excessive force against Krittika in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

446.    Municipal liability for these violations of the Fourth and Fourteenth Amendments is based upon P.O. Granshaw acting in a manner consistent with the policy, practice and custom of NYC, the NYPD and the NYCDOE of unreasonably seizing and unlawfully arresting New York City public school students, absent probable cause of criminal activity and using excessive force against New York City public school students in violation of the Fourth and Fourteenth Amendments to the United States Constitution, thereby depriving Krittika of her rights in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

447.    Municipal liability for these violations of the Fourth Amendment is further based upon the failure of the NYC, the NYPD and the NYCDOE to train, supervise and discipline, amounting to deliberate indifference to the constitutional rights of Krittika.

448.    As a direct and proximate result of the defendants' actions Krittika was wrongly arrested and prosecuted, and was wrongfully imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

## COUNT VI

### (Civil Rights Conspiracy Pursuant to 42 U.S.C. § 1983)
### (Against All Defendants)

449.    Krittika repeats, reiterates, and re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

450.    defendants Kim-Ross, Kwait, Konstan, Granshaw, Maldonado, John/Jane Does and others yet unknown, agreed among themselves and with other individuals to act in concert in order to deprive Krittika of her clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures and not to be deprived of her liberty without due process of law.

451.    In furtherance of the conspiracy the defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

a.    Defendants Kim-Ross, Kwait and John/Jane Does planned to and did falsely report to government agencies, including the NYCDOE and NYPD that Krittika sent offensive and/or threatening e-mails to teachers, including defendant Kim-Ross;

92

      b.     Defendants Kim-Ross, Kwait, Konstan and John/Jane Does planned to and did fabricate inculpatory evidence via their representations that the "IP Address" that the offensive and/or threatening e-mails originated from was associated with Krittika's home;

      c.     Defendants Kim-Ross, Kwait, Konstan and John/Jane Does planned to obtain a false confession from Krittika by having her removed from class by A.P. Eutsey and then having her threatened with disciplinary action should she fail to confess, notwithstanding her actual innocence;

      d.     Defendants Kim-Ross, Kwait, Konstan and John/Jane Does planned to obtain a false confession from Krittika by having her removed from class by A.P. Eutsey and then having her threatened with disciplinary action should she fail to confess, notwithstanding her actual innocence;

      e.     Defendants Kim-Ross, Kwait, Konstan, Granshaw, Maldonado and John/Jane Does planned to obtain a false confession from Krittika by again having her removed from class by A.P. Eutsey, detained at length, threatened by P.O. Granshaw with exposure to deadly disease, should she fail to confess, notwithstanding her actual innocence, tightly handcuffed by defendant P.O, Granshaw for refusing to confess, notwithstanding her actual innocence and then handcuffing by defendant P.O. Maldonado;

f.    Defendants Kim-Ross, Kwait, Konstan, Granshaw, Maldonado and John/Jane Does, and others deliberately and recklessly failed to investigate leads pointing to other suspects and corroborating Krittika's actual innocence, including but not limited to the following: intentionally failing to interview witnesses whose knowledge tended to disprove Krittika's guilt; failing to investigate known exculpatory and potentially exculpatory information provided by witnesses and Krittika; failing to investigate exculpatory and potentially exculpatory computer forensic evidence;

g.    Defendants Kim-Ross, Kwait, Konstan, Granshaw, Maldonado and John/Jane Does, and others hid their misconduct and caused Krittika's wrongful arrest and extended detention, notwithstanding her actual innocence.

452.   As a direct and proximate result of the defendants' conspiracy and actions in furtherance of that conspiracy, Krittika was wrongly arrested and prosecuted, and was wrongfully imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

## COUNT VII

### (42 U.S.C. § 1983 Claim Against the City of New York)

453.   Krittika repeats, reiterates, and re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

454.   As a direct and proximate result of NYC and the NYPD's policies, customs, or patterns and practices, Krittika was wrongly arrested and prosecuted, and was

wrongfully imprisoned for approximately 28 hours, and suffered other grievous and

continuing injuries and damages as set forth herein.

## COUNT VIII
### (42 U.S.C. § 1983 Claim Against the City of New York
### and New York City Department of Education)

455.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated

in the preceding paragraphs as if set forth in full herein.

456.    As a direct and proximate result of NYC and the NYCDOE's policies,

customs, patterns and/or practices, Krittika was wrongly arrested and prosecuted, and was

wrongfully imprisoned for approximately 28 hours, and suffered other grievous and

continuing injuries and damages as set forth herein.

## COUNT PURSUANT TO 42 U.S.C. 1985

## COUNT IX

### (Civil Rights Conspiracy Based Upon Race Based Animus - 42 U.S.C. § 1985(3))
### (Against All Defendants)

457.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated

in the preceding paragraphs as if set forth in full herein.

458.    While in the course of their duties and under color of law, defendants

conspired to injure and damage Krittika Plaintiff because of defendants' race-based

animus, including against persons of Southeast Asian Indian descent, in violation of 42

U.S.C. § 1985(3).

459.    In furtherance of this conspiracy, defendants subjected Krittika to unlawful acts thereby depriving Krittika of her rights to equal protection and equal privileges and immunities under the law in contravention of the Fourteenth Amendment of the United States Constitution.

460.    Defendants committed the foregoing acts intentionally, willfully, and with malicious disregard for Krittika's rights and are therefore liable for punitive damages.

## COUNT PURSUANT TO TITLE VI OF THE CIVIL RIGHTS ACT OF 1964

### COUNT X

**Violation of Krittika's Federal Civil Rights
under Title VI of the Civil Rights Act of 1964
(Against all Defendants)**

461.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

462.    At all times mentioned herein John Bowne High School was under the auspices of defendants NYC and NYCDOE.

463.    At all times mentioned herein, the NYPD was under the auspices of defendant NYC.

464.    Defendants NYC and NYCDOE receive federal funding.

465.    Federal funding received by NYC flows to the NYPD.

466.    Upon information and belief, federal funding received by defendants NYC and NYCDOE flows to John Bowne High School.

96

467.    Upon information and belief, federal funding received by defendant NYCDOE also flows to the NYPD for purposes of school safety.

468.    At all times mentioned herein Krittika was a New York City public school student, of Southeast Asian Indian descent and ancestry, enrolled at John Bowne High School.

469.    Kriitika was falsely accused of misconduct by NYC, NYCDOE and the NYPD.

470.    Kriitika was falsely accused of criminal conduct by NYC, NYCDOE and the NYPD.

471.    Krittika was wrongly detained by NYC, NYCDOE and the NYPD.

472.    Krittika was wrongly arrested by NYC, NYCDOE and the NYPD.

473.    Krittika was wrongly suspended by NYC and NYCDOE.

474.    Krittika was wrongly deprived of educational opportunities by NYC and NYCDOE.

475.    Krittika was actually innocent of the alleged misconduct.

476.    Krittika was actually innocent of the alleged criminality.

477.    The misconduct was actually committed by Student 2, then a New York City public school student, of Oriental Asian descent and ancestry, enrolled at John Bowne High School.

478.     Notwithstanding that there was no direct evidence linking Krittika to the alleged misconduct, NYC and the NYPD caused Krittika to be seized, detained, arrested and restrained, against her will.

479.     Notwithstanding that there was no probable cause to believe that Krittika had committed any crime, NYC and the NYPD caused Krittika to be seized, detained, arrested and restrained, against her will.

480.     Notwithstanding that Krittika repeatedly and consistently denied any involvement in the alleged misconduct and criminality, NYC and the NYPD caused Krittika to be seized, detained, arrested and restrained, against her will.

481.     Notwithstanding that there was no direct evidence linking Krittika to the alleged misconduct, NYC and NYCDOE caused Krittika to be seized, detained, arrested, restrained, disciplined and suspended, against her will.

482.     Notwithstanding that there was no probable cause to believe that Krittika had committed any crime, NYC and NYCDOE caused Krittika to be seized, detained, arrested, restrained, disciplined and suspended, against her will.

483.     Notwithstanding that Krittika repeatedly and consistently denied any involvement in the alleged misconduct and criminality, NYC and NYCDOE caused Krittika to be seized, detained, arrested, restrained, disciplined and suspended, against her will.

484.    NYC, NYCDOE and the NYPD refused to consider other suspects, notwithstanding that there was no direct evidence linking Krittika to the alleged misconduct and/or criminality.

485.    NYC, NYCDOE and the NYPD refused to consider other suspects who were not of Southeast Asian Indian ancestry and decent.

486.    NYC, NYCDOE and the NYPD refused to consider other suspects because of racial animus towards persons of Southeast Asian Indian ancestry and decent generally and Krittika particularly.

487.    While falsely accusing Krittika of misconduct and criminality, NYC, NYCDOE and the NYPD failed and refused to consider Student 2 as a suspect.

488.    While wrongly and unconstitutionally seizing, detaining, arresting and restraining Krittika, NYC and the NYPD  failed and refused to consider Student 2 as a suspect.

489.    While falsely accusing Krittika of and charging Krittika with misconduct and criminality, NYC, NYCDOE and the NYPD failed and refused to consider Student 2 as a suspect, notwithstanding that there was direct evidence linking Student 2 to the misconduct and criminality.

490.    While wrongly and unconstitutionally seizing, detaining, arresting, restraining, disciplining and suspending Krittika, NYC and NYCDOE  failed and refused to consider Student 2 as a suspect.

491.    While falsely accusing Krittika of and charging Krittika with misconduct and criminality, NYC, NYCDOE and the NYPD failed and refused to charge Student 2, notwithstanding that there was direct evidence linking Student 2 to the misconduct and criminality, and Krittika was actually innocent.

492.    Krittika was accused of misconduct and criminality for which she was actually innocent because of racial animus by NYC, NYCDOE and the NYPD directed towards persons of Southeast Asian Indian ancestry and decent.

493.    Krittika was seized, restrained, detained, arrested and imprisoned because of racial animus by NYC, NYCDOE and the NYPD directed towards persons of Southeast Asian Indian ancestry and decent.

494.    Krittika was treated differently than people of other races because of racial animus by NYC, NYCDOE and the NYPD directed towards persons of Southeast Asian Indian ancestry and decent.

495.    Student 2 was actually responsible for the alleged misconduct and criminality.

496.    Student 2 admitted to the alleged misconduct and criminality.

497.    Student 2 was not seized, restrained, detained, arrested and imprisoned.

498.    Representatives of NYC and NYCDOE, including defendants Kim-Ross and Kwait, intervened to ensure that Student 2 was not seized, restrained, detained, arrested and imprisoned.

499.    Student 2 was given preferential treatment than that afforded to Krittika.

500.    Krittika was treated differently and more harshly than similarly situated persons because of her race.

501.    Krittika suffered discrimination on account of her race.

502.    The defendants pattern of false accusations, fabrications of evidence, withholding of exculpatory evidence, failure to adequately investigate, and discrimination directed towards Krittika is in violation of Krittika's  rights under 42 U.S.C. Section 2000d, *et. seq.* and Title VI of the Civil Rights Act of 1964.

503.    Defendants, acting under color of law, deprived Krittika of her rights, including her right to due process of law, by failing to provide Krittika protection of her right to be free from racial harassment and discrimination in violation of Krittika's rights under 42 U.S.C. §2000d,  *et. seq.* and Title VI of the Civil Rights Act of 1964.

504.    Defendants' unequal treatment of Krittika whom they seized, restrained, detained, arrested and imprisoned, while allowing Student 2, to go relatively unpunished, notwithstanding that he was actually and admittedly responsible and Krittika was actually innocent, is in violation of Krittika's rights under 42 U.S.C. Section 2000d, *et. seq.* and Title VI of the Civil Rights Act of 1964.

505.    The Defendants failed to adequately train and/or supervise their employees, agents, servants and assigns, in regard to the equal and fair handling of identical allegations amongst students of differing ethnic and racial backgrounds, particularly, as here where the actually responsible student was of Oriental Asian background, the same background as the falsely accusing teacher and alleged victim, and Krittika, who was actually innocent, was of Southeast Asian Indian background, a background foreign to those involved in the putative investigation and resulting seizure, arrest, restraint, detention, imprisonment discipline and suspension, thereby failing to discourage and prevent further Constitutional violations by their employees, agents, servants and assigns.

506.    The above mentioned practices and/or policies of the Defendants, their agents, servants, assigns and employees, demonstrated, at best, a deliberate indifference on the part of the Defendants to Krittika's Constitutional rights, and other students of Southeast Asian Indian ethnicity within NYC and NYCDOE, and they continue to suffer the violation of their Constitutional rights as described herein.

507.    The defendants acted with deliberate indifference to the Krittika's rights, in derogation of Krittika's right to be free of discrimination, and this is in violation of Krittika's rights under 42 U.S.C. §2000d, *et. seq.* and Title VI of the Civil Rights Act of 1964.

508.    By reason of their acts and omissions, defendants, acting under color of state law, and within the scope of their authority, in gross and wanton violation of the Constitutional rights of Krittika and all other similarly situated students of Southeast Asian Indian background, subjected Krittika to unlawful discrimination in violation of the Fourteenth Amendment of the United States Constitution and of 42 U.S.C. §2000d, *et. seq.* and Title VI of the Civil Rights Act of 1964.

509.    As a direct and proximate result the defendants' acts, omissions and misconduct, Krittika was wrongly arrested and prosecuted, and was wrongfully imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

## STATE LAW BASED COUNTS

## COUNT XI

### UNLAWFUL SEIZURES AND ARRESTS IN VIOLATION OF THE NEW YORK STATE CONSTITUTION
#### (Against all Defendants)

510.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

511.    In arresting, searching and detaining Krittika without sufficient cause, the defendants engaged in unreasonable searches and seizures in violation of Article I, § 12 of the New York Constitution.

512.    Defendants Kim-Ross, Kwait and Konstan are liable for unreasonably causing, authorizing and directing the seizure and arrest of Krittika in violation of Article I, § 12 of the New York Constitution.

513.    A.P. Eutsey is liable pursuant for unreasonably seizing and arresting Krittika in violation of Article I, § 12 of the New York Constitution.

514.    Defendants Granshaw and Maldonado are liable for unreasonably seizing and arresting Krittika in violation of Article I, § 12 of the New York Constitution.

515.    Defendants John/Jane Does  are liable for unreasonably causing, authorizing, directing the seizure and arrest of Krittika, and for seizing and arresting Krittika in violation of Article I, § 12 of the New York Constitution.

516.    Defendant NYC is liable for the unreasonable seizure and arrest of Krittika, as caused by defendants Kim-Ross, Kwait, Konstan, John/Jane Does, including A.P. Eutsey, Granshaw and Maldonado, in violation of Article I, § 12 of the New York Constitution.

517.    Defendant NYCDOE is liable for the unreasonable seizure and arrest of Krittika, as caused by defendants Kim-Ross, Kwait, Konstan and John/Jane Does, including A.P. Eutsey, in violation of Article I, § 12 of the New York Constitution.

518.    As a direct and proximate result of the defendants' actions Krittika was wrongly arrested, detained, restrained and imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

104

## COUNT XII

### DEPRIVATION OF DUE PROCESS  IN VIOLATION OF THE
### NEW YORK STATE CONSTITUTION
### (Against all Defendants)

519.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

520.    The defendants deprivation of due process to Krittika was in violation of Article I, § 6 of the New York Constitution, and the defendants are thereby liable to Krittika.

521.    As a direct and proximate result of the defendants' actions Krittika was wrongly arrested, detained, restrained and imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

## COUNT XIII

### DEPRIVATION OF EQUAL PROTECTION ON THE BASIS OF RACE  IN
### VIOLATION OF THE NEW YORK STATE CONSTITUTION
### (Against all Defendants)

522.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

523.    The defendants deprived Krittika of equal protection of the law on account of her race as a minority of Southeast Asian Indian descent, in violation of Article I, § 11 of the New York Constitution, and the defendants are thereby liable to Krittika.

524.    As a direct and proximate result of the defendants' actions Krittika was wrongly arrested, detained, restrained and imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

## COUNT XIV

### FALSE ARREST
### (Against all Defendants)

525.    Krittika repeats, reiterates, and re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

526.    As a result of the actions of the municipal and individual defendants, Krittika was confined against her will.

527.    Krittika was continuously aware that she was not free to go.

528.    The defendants were without privilege to confine Krittika.

529.    The defendants had no probable cause to stop, arrest, detain, or otherwise confine Krittika.

530.    The defendants did not have a warrant to arrest or detain Krittika.

531.    The municipal defendants are liable to Krittika under the doctrine of *respondeat superior*.

## COUNT XV

### FALSE IMPRISONMENT
### (Against all Defendants)

532.    Krittika repeats, reiterates, and re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

533.    As a result of the actions of the municipal and individual defendants, Krittika was confined against her will.

534.    Krittika was continuously aware that she was not free to go.

535.    The defendants were without privilege to confine Krittika.

536.    The defendants had no probable cause to stop, arrest, detain, or otherwise confine Krittika.

537.    The defendants did not have a warrant to arrest or detain Krittika.

538.    The municipal defendants are liable to Krittika under the doctrine of *respondeat superior*.

## COUNT XVI

### MALICIOUS PROSECUTION - CRIMINAL PROCEEDINGS
### (Against all Defendants)

539.    Krittika repeats, reiterates, and re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

540.    As a result of the actions of the municipal and individual defendants, criminal proceedings were commenced against Krittika.

541.    The criminal proceedings were terminated in favor of Krittika.

542.    There was no probable cause to arrest Krittika.

543.    The defendants' collectively brought these charges against Krittika with actual malice to Krittika.

544.    The municipal defendants are liable to Krittika under the doctrine of *respondeat superior*.

## COUNT XVII

## MALICIOUS PROSECUTION - DISCIPLINARY PROCEEDINGS
### (Against all Defendants)

545.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

546.    As a result of the actions of the municipal and individual defendants, disciplinary proceedings were commenced against Krittika, in a judicial format.

547.    The disciplinary proceedings were terminated in favor of Krittika.

548.    There was no basis to bring disciplinary proceedings against Krittika.

549.    There was no basis to suspend Krittika from school.

550.    The defendants' collectively brought these disciplinary charges against Krittika with actual malice to Krittika.

551.    The municipal defendants are liable to Krittika under the doctrine of *respondeat superior*.

## COUNT XVIII

## BATTERY
### (Against all Defendants)

552.    Krittika repeats, reiterates, and re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

553.    As a result of the actions of the municipal and individual defendants, Krittika was confined against her will.

554.    In order to detain and restrain Krittika, the individual defendants touched her with their hands.

555.    In order to detain and restrain Gina, individual defendants placed Krittika in handcuffs.

556.    The defendants were without privilege to confine Krittika.

557.    The defendants had no probable cause to stop, arrest, detain, or otherwise confine Krittika.

558.    The defendants did not have a warrant to arrest or detain Krittika.

559.    The arrest of Krittika was unlawful.

560.    The contact by the defendants was offensive to Krittika.

561.    The defendants did not have Krittika's consent to make contact with her.

562.    The municipal defendants are liable to Krittika under the doctrine of *respondeat superior*.

## COUNT XIX

### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)
### (Against all Defendants)

563.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

564.    The behavior of the individual and municipal defendants as described herein was extreme and outrageous.

565.    The individual and municipal defendants intended to cause Krittika severe emotional distress

566.    The individual and municipal defendants did cause Krittika severe emotional distress.

## COUNT XX

### NEGLIGENCE
### (Against Defendants Granshaw, Maldonado and John/Jane Doe NYPD Personnel)

567.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

568.    Defendants Granshaw, Maldonado and John/Jane Doe NYPD defendants owed Krittika a duty of care including the duty to exercise due care in the course of their duties as NYPD officers and the duty to protect Krittika from the misconduct of other NYPD officers.

569.    By their aforementioned acts, defendants Granshaw, Maldonado and John/Jane Doe NYPD defendants negligently failed to use due care in the performance of their duties in that they failed to perform their duties with the degree of care that a reasonably prudent and careful officer would have used under similar circumstances.

570.    Defendant NYC is vicariously liable for the negligence of defendants Granshaw, Maldonado and John/Jane Doe NYPD defendants.

571.    All of these acts were performed without any negligence on the part of Krittika and were the proximate cause of injuries to Krittika.

## COUNT XXI

### NEGLIGENCE
**(Against Defendants Kim-Ross, Kwait, Konstan and John/Jane Doe NYCDOE Personnel)**

572.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein..

573.    Defendants Kim-Ross, Kwait, Konstan and John/Jane Doe NYCDOE defendants owed Krittika a duty of care including the duty to exercise due care in the course of their duties as NYCDOE personnel and the duty to protect Krittika from the misconduct of other NYCDOE personnel.

574.    By their aforementioned acts, defendants Kim-Ross, Kwait, Konstan and John/Jane Doe NYCDOE defendants negligently failed to use due care in the performance of their duties in that they failed to perform their duties with the degree of

care that reasonably prudent and careful teachers and school administrators would have used under similar circumstances.

575.    Defendants NYC and NYCDOE are vicariously liable for the negligence of defendants Kim-Ross, Kwait, Konstan and John/Jane Doe NYCDOE defendants.

576.    All of these acts were performed without any negligence on the part of Krittika and were the proximate cause of injuries to Krittika.

## COUNT XXII

## NEGLIGENCE
### (Against Defendant NYC)

577.     Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

578.    Defendant NYC, by its aforementioned acts, negligently failed to use due care in the performance of their duties.

579.    Defendant NYC hired and retained incompetent and unfit police officers whom it knew or should have known possessed dangerous propensities and a lack of proper temperament, and whom they knew or should have known harbored race based animus and hostility.

580.    Defendant NYC failed to exercise care in instructing police officers, officials, supervisors, and civilian employees as to their deportment, behavior, and conduct, including, *inter alia*, failing to: (a) give proper instructions as to determining whether probable cause exists to arrest for allegations of misconduct not occurring in the

112

officers presence; (b) give proper instructions as to the use of force to effect an arrest

when the arrestee is not posing a threat of violence or force; (c) give proper instructions

on using force in the course of arrests generally and of public school students in

particular; (d) give proper instruction concerning the obligation of police officers to

intervene to protect persons threatened with unwarranted force by other officers; (e) give

proper instruction concerning the obligation of police officers to intervene to protect

persons threatened with violations and deprivations of rights afforded them by the federal

and state constitutions by other municipal employees, including other police officers; and,

(f) failing to eliminate discrimination based on race.

## COUNT XXIII

### NEGLIGENCE
### (Against Defendants NYC and NYCDOE)

581.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated

in the preceding paragraphs as if set forth in full herein.

582.    Defendants NYC and NYCDOE, by their aforementioned acts, negligently

failed to use due care in the performance of their duties.

583.    Defendants NYC and NYCDOE hired and retained incompetent and unfit

teachers and public school administrators and disciplinarians whom they knew or should

have known possessed dangerous propensities and a lack of proper temperament, and

whom they knew or should have known harbored race based animus and hostility.

584.    Defendants NYC and NYCDOE failed to exercise care in instructing teachers, school administrators and disciplinarians, involved in the school disciplinary and suspension process, as to their deportment, behavior, and conduct, including, *inter alia*, failing to: (a) give proper instructions as to determining when seizure and detention of a student is permitted; (b) give proper instructions as to when a student may be detained, such that they are not free to go, for allegations of misconduct not occurring in the NYCDOE employees presence; (c) give proper instructions on referring allegations of disciplinary misconduct to the NYPD; (d) give proper instruction on seeking and/or directing the arrest of a student; (e) give proper instruction on seeking and/or directing the use of force upon a student, including the application of handcuffs; (f) give proper instruction concerning the obligation of NYCDOE personnel to intervene to protect public school students threatened with unwarranted force by other persons, including other NYCDOE personnel and/or NYPD personnel; (g) give proper instruction concerning the obligation of NYCDOE personnel to intervene to protect public school students threatened with violations and deprivations of rights afforded them by the federal and state constitutions by other municipal employees, including other NYCDOE personnel and/or NYPD personnel; and, (h) failing to eliminate discrimination based on race.

## COUNT XXIV

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Against all Defendants)

585.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

586.    In the performance of their duties the defendants owed Krittika a duty of care.

587.    In breach of that duty of care, the defendants' aforementioned conduct endangered Krittika's safety and caused her to fear for her safety.

588.    As a result, Krittika suffered emotional distress.

589.    Defendants' actions negligently to inflict emotion distress upon Krittika were in violation of clearly established law, and no reasonable police officer, teacher, school administrator or disciplinarian in 2010 - 2011 would have believed that the defendants' actions were lawful.

590.    NYC is vicariously liable for the negligence of the individual police officer defendants as set forth herein.

591.    NYC and NYCDOE are vicariously liable for the negligence of the individual NYCDOE defendants as set forth herein.

115

## COUNT XXV

### *RESPONDEAT SUPERIOR* CLAIM AGAINST NYC

592.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

593.    At all times relevant to this complaint defendants Kim-Ross, Kwait, Konstan, Granshaw, Maldonado and John/Jane Does, including A.P. Eutsey, acted as agents of, and in the scope of their employment with, defendant NYC.

594.    The conduct by which these defendants committed their misconduct was undertaken while the defendants were carrying out their duties as employees of NYC, including of the NYCDOE and NYPD, and engaging in such conduct as would have been reasonably expected, and was in fact foreseen by, by their employer.

595.    NYC is liable for its agents' acts delineated herein under the doctrine of respondeat superior.

## COUNT XXVI

### *RESPONDEAT SUPERIOR* CLAIM AGAINST NYCDOE

596.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

597.    At all times relevant to this complaint defendants Kim-Ross, Kwait, Konstan, and John/Jane Does, including A.P. Eutsey, acted as agents of, and in the scope of their employment with, defendant NYCDOE.

116

598.    The conduct by which these defendants committed their misconduct was undertaken while the defendants were carrying out their duties as employees of the NYCDOE, and engaging in such conduct as would have been reasonably expected, and was in fact foreseen by, by their employer.

599.    NYCDOE is liable for its agents' acts delineated herein under the doctrine of respondeat superior.

### IX.    PRAYER FOR RELIEF

**WHEREFORE**, Krittika prays for judgment granting for each of the counts the following:

A.    a fair and reasonable amount of compensatory damages of not less than $500,000.00;

B.    a fair and reasonable amount of not less than $1,000,000 as and for punitive damages;

C.    attorneys fees as and for prosecuting the instant case as well as defending Krittika against the illegal, unlawful and unconstitutional arrest, seizure, restraint, detention, imprisonment, discipline and suspension, as complained of herein;

D.    Costs and Disbursements;

E.   Interest in the greatest amount permitted by governing law; and,

F.   all additional relief as may appear just and proper to the Court.

Dated: New York, New York
       May 7, 2012

                              Respectfully submitted,
                              **THE LAW FIRM OF RAVI BATRA, P.C.**
                              *Attorneys for Plaintiff Krittika Biswas*

                              Ravi Batra, Esq. (RB 4299)
                              Todd B. Sherman (TS 4031)
                              142 Lexington Avenue
                              New York, NY 10016
                              (212) 545-1993
                              E-Mail: ravibatralaw@aol.com
                                      ravi@ravibatralaw.com

Biswas.782\050712CivilComplaint

Docket No.

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

——

KRITTIKA BISWAS,

*Plaintiff,*

- against -

(1) THE CITY OF NEW YORK, (2) NEW YORK CITY DEPARTMENT OF EDUCATION, (3) HON. DENNIS M. WALCOTT, in his official capacity as Chancellor of the New York City Department of Education, (4) HOWARD KWAIT individually and in his official capacity as a Principal within and for the New York City Department of Education at John Bowne High School, (5) JAMIE KIM-ROSS individually and in her official capacity as a Teacher within and for the New York City Department of Education at John Bowne High School, (6) ELAYNA KONSTAN, individually and in her official capacity as Chief Executive Officer of the New York City Department of Education Office of School And Youth Development, (7) JOHN/JANE DOE NEW YORK CITY DEPARTMENT OF EDUCATION PERSONNEL ## 1-10, so named as their identities have yet to be established, involved in the sham investigation, unlawful arrest and detention and unlawful suspension of Krittika Biswas, (8) HON. RAYMOND W. KELLY, in his official capacity as Commissioner of the New York City Police Department, (9) Police Officer "JANE DOE" MALDONADO, (possible shield # 10559), individually and in her official capacity as a Police Officer within and for the New York City Police Department, so named because her exact identity has yet to be confirmed, (10) Police Officer LARRY GRANSHAW, individually and in his official capacity as a Police Officer within and for the New York City Police Department, and (11) JOHN/JANE DOE POLICE PERSONNEL, so named as their identities have yet to be established, involved in the unlawful arrest and detention of Krittika Biswas

*Defendants.*

## CIVIL COMPLAINT WITH JURY DEMAND

THE LAW FIRM OF RAVI BATRA, P.C.
*Attorneys for Plaintiff*
The Batra Building
142 Lexington Avenue
New York, NY 10016
(212)545-1993

Biswas\.782050712CivilComplaint