Ravi Batra (RB4299)
Todd B. Sherman (TS 4031)
THE LAW FIRM OF RAVI BATRA, P.C.
*Attorneys for plaintiff*
142 Lexington Avenue
New York, N.Y. 10016
212-545-1993; fax 212-545-1993

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

KRITTIKA BISWAS,

     *Plaintiff,*

     -against-

(1) THE CITY OF NEW YORK, (2) NEW YORK CITY
DEPARTMENT OF EDUCATION, (3) HOWARD
KWAIT individually and in his official capacity as a
Principal within and for the New York City Department
of Education at John Bowne High School, (4) JAMIE
KIM-ROSS individually and in her official capacity as a
Teacher within and for the New York City Department of
Education at John Bowne High School, (5) ELAYNA
KONSTAN, individually and in her official capacity as
Chief Executive Officer of the New York City
Department of Education Office of School And Youth
Development, (6) JOHN/JANE DOE NEW YORK CITY
DEPARTMENT OF EDUCATION PERSONNEL ## 1-
10, so named as their identities have yet to be established,
involved in the sham investigation, unlawful arrest and
detention and unlawful suspension of Krittika Biswas, (7)
Police Officer MARGARET MALDONADO,
individually and in her official capacity as a Police
Officer  within and for the New York City Police
Department,(8) Police Officer LARRY GRANSHAW,
individually and in his official capacity as a Police Officer
within and for the New York City Police Department, and
(9) JOHN/JANE DOE POLICE PERSONNEL, so named
as their identities have yet to be established, involved
in the unlawful arrest and detention of Krittika Biswas,

     *Defendants.*

CIVIL ACTION No.
12 Civ 3607 (JGK)

FIRST AMENDED
CIVIL COMPLAINT
WITH JURY DEMAND

---

Plaintiff KRITTIKA BISWAS ("Krittika") by and through her attorneys, THE

LAW FIRM OF RAVI BATRA, P.C., as and for her First Amended Civil Complaint with

Jury Demand  against the Defendants (1) THE CITY OF NEW YORK ("NYC"), (2)

NEW YORK CITY DEPARTMENT OF EDUCATION ("NYCDOE"), (3) HOWARD

KWAIT individually and in his official capacity as a Principal within and for the New

York City Department of Education at John Bowne High School ("Kwait"), (4) JAMIE

KIM-ROSS individually and in her official  capacity as a Teacher within and for the New

York City Department of Education at John Bowne High School ("Kim-Ross"), (5)

ELAYNA KONSTAN, individually and in her official capacity as Chief Executive

Officer of the New York City Department of Education Office of School And Youth

Development ("Konstan"), (6) JOHN/JANE DOE NEW YORK CITY DEPARTMENT

OF EDUCATION PERSONNEL ## 1-10, so named as their identities have yet to be

established, involved in the sham investigation, unlawful arrest and detention and

unlawful suspension of Krittika Biswas, (7) Police Officer MARGARET

MALDONADO, individually and in her official capacity as a Police Officer  within and

for the New York City Police Department ("Maldonado"), (8) Police Officer LARRY

GRANSHAW, individually and in his official capacity as a Police Officer within and for

the New York City Police Department ("Granshaw"), and (9) JOHN/JANE DOE

POLICE PERSONNEL, so named as their identities have yet to be established, involved in the unlawful arrest and detention of Krittika Biswas, alleges the following:[1]

## I.    TABLE OF CONTENTS

1.    The contents of the instant complaint are as follows:

I.    Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.    Table of Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III.    Preliminary Statement and Allegations of Critical Facts . . . . . . . . 10

IV    Jurisdiction and Venue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

V.    Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

VI.    Jury Demand . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

VII.    Notice of Claim to Municipal Defendants . . . . . . . . . . . . . . . . . . . 33

VIII.    Factual Allegations Common to All Counts . . . . . . . . . . . . . . . . . . 34

- Krittika Was Enrolled in an Enriched
  Academic Program of Study . . . . . . . . . . . . . . . . . . . . . . . . . 34

- Defendant Kim-Ross Was Recommending
  Krittika to an Honors College: October 2010 . . . . . . . . . . . 35

- Defendant Kim-Ross Received Offensive
  E-mails Which Krittika Had Nothing to do
  with - but which the Defendants Falsely
  Accused Her: November 2010 . . . . . . . . . . . . . . . . . . . . . . . 37

---

[1] As to those allegations which specifically state "upon information and belief," Krittika will likely have evidentiary support after a reasonable opportunity for discovery and further investigation.

- The First Confrontation with Krittika by School Administrators Seeking a False Confession, by Coercion: On or About December 21, 2010 . . . . . . . . . . . . . . . . . . . . 39

- There Was No Direct Evidence Linking Krittika to Any Offensive or Threatening E-mails - So the Defendants Fabricated "Evidence": On or About December 22, 2010 . . . . . . . . . . 43

- Defendant Kim-Ross Begins to Penalize Krittika . . . . . . . 45

- The "Investigation" Was a Sham . . . . . . . . . . . . . . . . . . . . . 46

- The Defendants Knew They Had No Evidence Against Krittika, who Was Actually Innocent . . . . . . . . . . . 52

- Krittika was Falsely and Wrongly Arrested: February 8, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

- Kim-Ross, Kwait and Eutsey, all of the NYCDOE Conspired with Granshaw and Maldonado of the City of New York to Undertake the Malicious Bad Faith Based Arrest of Krittika . . . . . . . . . . . . . . . . . . . . 58

- Defendant P.O. Granshaw Tried to Unconstitutionally Coerce a Confession from Krittika, Through Threats and Force . . . . . . . . . . . . . . . . . . 61

- Defendant P.O. Maldonado Takes Forcible Custody of Krittika . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

- Krittika Sought to Exercise Her Rights under the Vienna Convention on Consular Relations but the Defendants Thwarted Same . . . . . . . . . . . . . . . . . . . 69

- The Defendants Publically Humiliated Krittika . . . . . . . . . 77

- Krittika Was Wrongly Disciplined and Suspended beginning on February 10, 2011 . . . . . . . . . . . . . . . . . . . . . 85

●  NYCDOE'S Constitutionally Defective
Suspension Protocol . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

●  Krittika Was Substantially Harmed by the
Defendants' Misconduct and Violations of Her
Constitutional Rights and Privileges . . . . . . . . . . . . . . . . . . 93

●  Krittika Was Discriminated Against Because of
Her Ethnicity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

IX.  The Municipal Defendants' Unconstitutional
Policies, Practices and Customs . . . . . . . . . . . . . . . . . . . . . . . . . . 97

●  Defendant NYC and the NYPD . . . . . . . . . . . . . . . . . . . . . 97

●  Defendant NYCDOE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

X.  Federal Law Based Counts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

Counts Pursuant to 42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . 116

Count I:    U.S. Const. 4th and 14th Amend.:
Unreasonable Searches, Seizures
and Arrests (Against All Defendants
except Konstan) . . . . . . . . . . . . . . . . . . . . . . . 116

Count II:   U.S. Const. 14th Amend.: Deprivation
of Liberty Without Due Process of Law
by Fabricating Evidence and Failing to
Investigate (Against All Defendants) . . . . . 118

Count III:  U.S. Const. 4th and 14th Amend.:
Malicious Prosecution
(Against All Defendants) . . . . . . . . . . . . . . 122

Count IV:   U.S. Const. 14th Amend.:
Engaging in Conduct That Shocks the
Conscience (Against All Defendants) . . . . . 126

Count V:      U.S. Const. 4th and 14th Amend.:
              Excessive Force (Against Defendants
              NYC, NYCDOE and P.O. Granshaw)  .... 129

Count VI:     Civil Rights Conspiracy Pursuant to
              42 U.S.C. § 1983
              (Against All Defendants)  .............. 130

Count VII:    42 U.S.C. § 1983 Claim Against the
              City of New York  .................... 135

Count VIII:   42 U.S.C.. § 1983 Claim Against the
              City of New York and New York City
              Department of Education  .............. 136

Count Pursuant to 42 U.S.C. § 1985 ........................ 136

Count IX:     Civil Rights Conspiracy Based upon
              Race Based Animus - 42 U.S.C. § 1985(3)
              (Against All Defendants)  .............. 136

Count Pursuant to Title VI of the Civil Rights Act of 1964 ..... 142

Count X:      Violation of Krittika's Federal Civil
              Rights under Title VI of the Civil
              Rights Act of 1964
              (Against NYC and NYCDOE)  .......... 142

XI.   State Law Based Counts  ................................ 151

Count XI:     Unlawful Seizures and Arrests in
              Violation of the New York State
              Constitution (Against All Defendants
              except Konstan) ...................... 151

Count XII:    Deprivation of Due Process  in
              Violation of the New York State
              Constitution (Against All Defendants) .... 152

Count XIII:    Deprivation of Equal Protection on
the Basis of Race  in Violation of the
New York State Constitution
(Against All Defendants)  . . . . . . . . . . . . . 153

Count XIV:   False Arrest (Against All Defendants
except Konstan) . . . . . . . . . . . . . . . . . . . . . . 154

Count XV:    False Imprisonment
(Against All Defendants except Konstan) . . 155

Count XVI:  Malicious Prosecution -
Disciplinary Proceedings
(Against All Defendants)  . . . . . . . . . . . . . 156

Count XVII: Battery (Against All Defendants
except Konstan) . . . . . . . . . . . . . . . . . . . . . . 157

Count XVIII:Intentional Infliction of Emotional
Distress (Against All Defendants)  . . . . . . . 158

Count XIX:   Negligence (Against Defendants
Granshaw, Maldonado and
John/Jane Doe NYPD Personnel) . . . . . . . . 159

Count XX:    Negligence (Against Defendants
Kim-Ross, Kwait, Konstan and
John/Jane Doe NYCDOE Personnel) . . . . . 160

Count XXI:  Negligence (Against Defendant NYC) . . . . . 161

Count XXII: Negligence (Against Defendants NYC
and NYCDOE)  . . . . . . . . . . . . . . . . . . . . . . 162

Count XXIII: Negligent Infliction of Emotional
Distress (Against All Defendants)  . . . . . . 164

Count XXIV: *Respondeat Superior* Claim
Against NYC  . . . . . . . . . . . . . . . . . . . . . . . 165

Count XXV:  *Respondeat Superior* Claim
                        Against NYCDOE  . . . . . . . . . . . . . . . . . . . 166

XII.    Prayer for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

## II.    TABLE OF EXHIBITS

2.      The materials exhibited to the instant complaint are as follows:

Exhibit 1:    Notice of Claim Served Upon Municipal Defendants

Sub-Ex. 1:    *Note Vebale* issued by the Consulate General of India
              on February 9, 2011;

Sub-Ex. 2:    Letter from Queens County District Attorney's Office
              confirming that all charges against Krittika Biswas
              were dismissed and sealed;

Sub-Ex. 3:    NYCDOE "Occurrence Report" dated February 8,
              2011 at 11:30 a.m. and entered on February 8, 2011 at
              5:02 p.m. reporting, *inter alia*, Krittika's unwarranted
              and illegal arrest;

Sub-Ex. 4:    Documents related to Krittika's unwarranted and
              unlawful discipline and suspension from school and
              need to retain counsel;

Sub-Ex. 5:    Affidavit of computer forensics expert Gleb Liferenko
              sworn to on March 10, 2011;

Sub-Ex. 6:    Invoice dated April 18, 2011 from  computer forensics
              expert Gleb Liferenko;

Sub-Ex. 7:    E-mail from defendant Kwait and letter approved by
              defendant Konstan memorializing the withdrawal of all
              disciplinary charges against Krittika and expungement
              of same from Krittika's student records;

8

Sub-Ex. 8:     Affidavit of Deboleena Kanjilal sworn to on March 7, 2011 with supporting documentation, supporting Krittika's actual innocence;

Sub-Ex. 9:     Affidavits of Ravichandran Kalyansundaram and Bhoop Singh Bisht, each sworn to on March 7, 2011 with supporting documentation, supporting Krittika's actual innocence;

Sub-Ex. 10:   NYCDOE "Summary of Proceedings" form dated March 11, 2011 memorializing that the adjournment of Krittika's suspension hearing was at the school's request based upon death of an alleged witness;

Sub-Ex. 11:   Documents reflecting efforts made on behalf of Krittika to obtain subpoenas to further disprove the wholly false disciplinary charges brought against Krittika;

Sub-Ex. 12:    Documents reflecting efforts made on behalf of Krittika to obtain copies of the transcript of disciplinary proceedings on March 11, 2011, wherein the NYCDOE falsely alleged that an adjournment of Krittika's suspension hearing was required because of the death of the family member of a witness;

Sub-Ex. 13:   Written report of Krittika's New York state licensed physician, Ishvar S. Patel, M.D.;

Exhibit 2:     Invoice reflecting Internet service provided to plaintiff 's home by Time Warner's RoadRunner, which service was provided from December 10, 2010 onward;

Exhibit 3:     Invoice reflecting Internet service provided to plaintiff's home by RCN, which service was provided until December 9, 2010;

Exhibit 4:     Vienna Convention on Consular Relations;

Exhibit 5:    Transcript of March 11, 2011 disciplinary proceedings wherein NYCDOE Dean John Tsapelas reported that John Bowne High School required an adjournment of the disciplinary hearing because of a death in the family of a NYCDOE witness against Krittika;

Exhibit 6:    Memorandum of Understanding ("MOU") dated September 17, 1998 transferring school security functions to the NYPD; Executive Order No. 44 of 1998, directing that the MOU take effect immediately; and, agreement dated January 22, 2003, wherein defendants NYC, by the Mayor, and NYCDOE, by its Chancellor, agreed that the transfer given effect by the September 1998 MOU would continue in effect unless further amended or terminated by written agreement;

Exhibit 7:    June 11, 2007 letter from NYPD Commissioner Kelly to New York City Council Member Hon. Robert Jackson, then Chair of the Council's Education Committee; and,

Exhibit 8:    October 10, 2007 transcript of a portion of joint proceedings before the New York City Council Committees on Education, Public Safety and Juvenile Justice.

## III   <u>PRELIMINARY STATEMENT AND ALLEGATIONS OF CRITICAL FACTS</u>

3.    This case is about the wrongful and unconstitutional forcible arrest,

detention and lengthy suspension from school of plaintiff Krittika Biswas ("Krittika").

Krittika was, at all relevant times, a student enrolled in an enriched academic curriculum

and was falsely charged with, arrested for and then suspended for offenses that she had

nothing to do with, was actually innocent of, and of which the accusing persons and

arresting police all had no cause to believe she was involved.   Indeed, they had

dispositive evidence, contained in the offensive e-mails themselves, that the e-mail's did

not originate from Krittika's home computer, but rather were sent by an Oriental Asian

student, "S.M.,"[2] who was academically ineligible for Kim-Ross' AP Calculus BC class,

and had been transferred out.

      4.     In substance, Krittika was arrested, tightly handcuffed causing physical

injury, and suspended from school all because a teacher received offensive e-mails

originating from an e-mail account and internet provider wholly unrelated to Krittika and

Krittika's computer.   The defendants, a teacher (Kim-Ross), school principal (Kwait),

school administrator (Konstan), all working for defendant New York City Department of

Education (NYCDOE) and arresting and custodial police officers (Granshaw and

Maldonado), all working for the NYPD, an agency of defendant City of New York, all

knew that there was no evidence linking Krittika to the writing or sending of the offensive

e-mails, yet they individually and collectively caused her arrest, detention, and prosecuted

suspension from school, all to prevent exposure of their substandard "investigation" and

to protect the actually guilty student, who was favored by Kim-Ross.  A time-line

summary of the events complained of follows:

      a.     Because Krittika was performing well in the Advanced Placement

calculus course taught by defendant Kim-Ross, in or about late September 2010 Krittika

asked Kim-Ross to write a letter of recommendation in support of Krittika's application

---

[2]All students other than Krittika are identified by pseudonym so as to protect their privacy in these publically filed court papers.  While this action will require the production and inspection of such student records, the plaintiff and her counsel stand ready to protect the identities of such students as may be required by law and/or directive of the Court.

to Macaulay Honors College at the City University of New York ("Macaulay"). Kim-Ross agreed to do so, and in fact, at her own home Kim-Ross wrote a supportive letter and e-mailed it to herself to her John Bowne and/or NYCDOE e-mail account. Once the letter was sent within John Bowne and/or NYCDOE's e-mail servers, it became part of NYCDOE's records. Kim-Ross subsequently showed Krittika this letter on a computer screen on a NYCDOE computer at John Bowne High School.

b.      In late September 2010, Krittika's grandmother passed away in India, and Krittika and her parents sought permission for a three week approved absence from school commencing on or about October 6, 2010, until October 26, 2010, to attend to Krittika's grandmother's last rites. Notwithstanding her absence, Krittika received school work from some teachers in an effort to stay on top of her studies.

c.      In or about mid-November 2010, defendant Kim-Ross began to receive offensive e-mails on herNYCDOEe-mail account. In total Kim-Ross is believed to have received 4 such e-mails over a several month period. A similar e-mail was also received by gym teacher Ivan Cohill. As Kim-Ross expeditiously reported every offensive e-mail to the NYCDOE, they were always in prompt possession of the e-mails. Importantly, each e-mail contains "Header" information, which can be used to track the Internet Protocol address ("IP address") and Internet Service Provider ("ISP") wherein the e-mails originated. The ISP gives a subscriber their own unique IP address. Furthermore, to the extent that these e-mails were sent to Kim-Ross and Mr. Cohill on

their John Bowne and/or NYCDOE e-mail accounts, these e-mail systems capture the sender's IP address. Thus, once these offensive e-mails were sent, the defendants already had possession of the e-mails and the IP address of the sender, S.M.. Accordingly, from each of the 4 offensive e-mails Kim-Ross received, the defendants were in possession of individually identifying information about the sender's computer and the provider of the sender's internet service. All of the e-mails originated from the same IP address, which was in no way linked to Krittika. These e-mails were apparently sent to Kim-Ross as follows:

| Date and Time of E-Mail | IP address of sender | ISP of sender |
| --- | --- | --- |
| November 18, 2010, 6:10 p.m. | 24.239.172.20 | Earthlink |
| December 16, 2010, 9:29 p.m. | 24.239.172.20 | Earthlink |
| February 6, 2011, 5:34 a.m. | 24.239.172.20 | Earthlink |
| February 6, 2011, 1:06 p.m. | 24.239.172.20 | Earthlink. |

Additionally, gym teacher Mr. Cohill also apparently received one (1) offensive e-mail as follows:

| Date and Time of E-Mail | IP address of sender | ISP of sender |
| --- | --- | --- |
| December 16, 2010, 9:25 p.m. | 24.239.172.20 | Earthlink. |

Critically, all of the e-mails were sent from IP address 24.239.172.20, which was directly associated with student S.M., not Krittika. Moreover, Krittika's IP address, at the time that the December and February e-mails were sent, was 72.229.54.162, associated with

her ISP, Time Warner's RoadRunner.  At the time of the November 18, 2010 e-mail

Krittika's ISP was RCN, also wholly unrelated to Earthlink, which was the ISP of the

actually guilty student, S.M.  All of this information was available to the NYCDOE at all

times, in their own records.

    d.  Publically accessible and simple to use databases, known as

"WHOIS," permit a search of IP addresses to determine which ISP provides the service to

a particular IP address.  These searches do not, however, provide data as to physical street

address associated with an IP address.  Some of these searches provide approximate

geographic locations, such as City and State; however, the physical address (*i.e.* street

address as used by the United States Postal Service) is not available absent data supplied

by the ISP.

    e.  The publically available information revealed that all of the

offensive  e-mails originated from a computer with internet service provided by Earthlink.

Thus, with five separate e-mails (4 to Kim-Ross and 1 to Mr. Cohill), the defendants were

in possession of information conclusively establishing that the offensive e-mails

originated from a computer wholly unrelated to Krittika.

    f.  The defendants knew that Krittika resided in a large 27 floor

apartment building, with approximately 240 apartments, each of which was free to

subscribe to the ISP of their choice.  Moreover, the defendants were all aware that the

computer used by Krittika had its internet service provided until December 9, 2010 by

RCN and from December 10, 2010 onwards by RoadRunner, which is operated by Time Warner and AT&T, and both which compete with Earthlink.  Earthlink was the originating ISP of <u>all</u> of the offensive e-mails; however, <u>Earthlink was never Krittika's ISP</u>.  Moreover, the defendants also knew that students at John Bowne High School, other than Krittika, also resided within her large apartment building and John Bowne was in the sameNYCDOEschool district as Krittika's home address (District # 25).

       g.    All of the defendants knew that Krittika did not send any of the offensive e-mails and that none of them originated from within her home or any computer that she used.  Rather, the defendants knew that the e-mails originated from Earthlink, an entirely different network than the RCN and then RoadRunner networks that Krittika used.

       h.    Notwithstanding that the defendants knew that Krittika did not author or send any of the e-mails, on or about December 21, 2010 Krittika was removed from her Advanced Placement chemistry class and ultimately questioned about the e-mails received by Kim-Ross, along with "Student 1," by Naomi Eutsey, the Assistant Principal of Security (A.P. Eutsey).   Both Krittika and Student 1 were of Southeast Asian Indian descent and were targeted because of their background.  A.P. Eutsey falsely represented that the all of the e-mails received by Kim-Ross originated from the IP address assigned to all of the residents of Krittika's building.  This was false and the defendants all knew that there was no single IP address associated with Krittika's 240

family apartment building, nor was there any nexus between Krittika and the e-mails. Both Krittika and Student 1 denied any involvement in the generation or transmission of the e-mails. Furthermore, both Krittika and Student 1 denied having any information as to the identity of the sender.

        i.        On or about December 22, 2010, Krittika, her father Indian Vice-Consul Debashish Biswas, as well as Student 1 and Student 1's father and brother met with A.P. Eutsey, at A.P. Eutsey's direction. A.P. Eutsey again claimed that Krittika and Student 1 had "come up" because the "building IP" address was identified (notwithstanding that there is no such thing as a "building IP" address in a residential apartment building with multiple ISP's). A.P. Eutsey warned that if either Krittika or Student 1 did not confess the police would become involved. Given that Krittika was actually innocent, she maintained same.

        j.        Krittika always truthfully maintained that she was not involved in authoring or sending any offensive e-mails. Moreover, Krittika also consistently and truthfully maintained that her ISP was RCN and later Time Warner, which is the cable television provider that provided the RoadRunner internet service and IP address to Krittika's computer.

        k.        On February 8, 2011, with no further information, and knowing that Krittika's computer was in no way involved in the sending of the offensive e-mails, Krittika was removed from class and detained in a school office, where she knew that she

was not free to leave.  After waiting for a while, Krittika was joined by a guidance

counselor who advised her that the police were coming to interrogate her.  Thereafter,

defendant P.O. Granshaw arrived and demanded that Krittika confess to sending the e-

mails, to which Krittika refused.  Granshaw then threatened that if Krittika did not

confess, he would handcuff her - yet being actually innocent, Krittika did not confess.

Granshaw then purposefully and intentionally handcuffed Krittika tightly and painfully,

causing her to need medical attention, while threatening that if she did not confess she

would not graduate from school and would be exposed to prostitutes with HIV in jail.

Notwithstanding that she was petrified, Krittika, being actually innocent, still did not

confess.

        l.     Prior to interrogating and handcuffing Krittika, and at the time that

he effectively detained and arrested Krittika, Granshaw had no information that would

permit him to reasonably conclude that Krittika was involved in the writing or sending of

offensive e-mails to anyone, including Kim-Ross.   Rather, clear evidence contained in

the e-mails themselves, available to Granshaw at that time, was that the e-mails originated

from a source other than Krittika - a source that was S.M, an Oriental Asian student. -

who on March 15, 2011 admitted to sending the e-mails, when asked by school officials.

Upon information and belief, NYCDOE personnel, including those at John Bowne High

School already had S.M.'s IP address from his prior e-mail exchanges within the school

e-mail and computer network, which captures the IP of an e-mails's sender, as it did with

the offensive e-mails received by Kim-Ross and Mr. Cohill, which were also sent by way of the school's network!   The defendants, rather than use actual evidence in their possession which factually and accurately implicated S.M. as the sender of all of the offensive e-mails, instead, maliciously, in bad faith and with racial animus, targeted Krittika, an Indian consular representative's daughter, by proffering knowingly false and fabricated evidence to the District Attorney as part of her seizure and arrest on February 8, 2011, and to the suspension hearing officer after suspending Krittika on February 10, 2011.

   m. Defendant P.O. Maldonado then entered the room, removed the handcuffs placed by Granshaw and replaced them with her own.  Thereafter, Maldonado walked Krittika through publically visible areas of John Bowne High School, effectively "perp walking" Krittika, with her handcuffs exposed for all to see.  Maldonado then transported Krittika in an NYPD vehicle to the 107th precinct where Krittika was detained for several hours, and refused access to a bathroom or a telephone.  Thereafter, Krittika was transported to Queens Central Booking where she was transferred from cell to cell, provided a dirty mattress and stepped on blanket, and was denied access to a telephone for several more hours.

   n. Prior to handcuffing, detaining, "perp walking" and transporting Krittika, and at the time that she did so, Maldonado had no information that would permit her to reasonably conclude that Krittika was involved in the writing or sending of

offensive e-mails to anyone, including Kim-Ross. Rather, clear evidence contained in the e-mails themselves, available to Maldonado at that time, was that the e-mails originated from a source other than Krittika - a source that was S.M, the admitted author and sender of the offensive e-mails.

o.      Nobody, including Kim-Ross, ever told Granshaw, Maldonado or any other police officer that Krittika actually wrote or actually sent the offensive e-mails.

p.      On February 9, 2011, upon a review of the circumstances of Krittika's arrest and detention, the District Attorney of Queens County declined to prosecute. No criminal complaint was ever filed with the Clerk of the Queens County Criminal Court and there was never a docket number assigned by any Court associated with the February 8, 2011 arrest of Krittika.

q.      Notwithstanding there was never any reasonable cause to believe that Krittika was the person involved in writing and/or sending the e-mails, and, in fact, the defendants were always in possession of evidence that absolutely exculpated Krittika and directly implicated S.M., Krittika was still compelled against her will to remain forcibly detained, in custody, in excess of 24 hours.

r.      Notwithstanding there was no evidentiary nexus between Krittika and the offensive e-mails, and the defendants knew that the e-mails originated from a source other than Krittika, on or about February 10, 2011, on the malicious demands of Kim-Ross and Kwait, Krittika was suspended with the approval of defendant Konstan,

who knew that there was no factual or legal basis to sustain a suspension - when the school personnel knew that the offensive e-mails came from S.M..  The NYCDOE defendants collaborated with the NYPD in the prosecution of Krittika's suspension by using the false arrest, based upon evidence absolutely exculpating Krittika, and inculpating S.M.,  to have Krittika physically and forcibly removed from the school. Thereafter, Krittka's suspension began and Krittika's liberty continued to be impaired in that she could no longer attend John Bowne High School and had to repeatedly attend suspension hearings.

       s.    On or about March 11, 2011 theNYCDOE obtained an adjournment of Krittika's suspension hearing - thereby prolonging the prosecution of Krittika's suspension hearing - on false pretenses.  Specifically, theNYCDOEfalsely claimed that a witness had a death in the family and could not appear.  Notwithstanding the DOE's continued malice, Krittika, by counsel, supplied the DOE's hearing representative and Dean of John Bowne High School John Tsapelas, with a computer forensics affidavit from expert computer engineer Gleb Liferenko irrefutably demonstrating that Krittika's ISP was not Earthlink and that she had a different IP address from that used to send the offensive e-mails which the school's network had captured - information the school already had in its electronic records and which evidence absolutely exculpated Krittika, who was actually innocent (*See* Ex. 1(5)).

t.      On or about March 14, 2011, the NYCDOE defendants, compelled by the affidavit of Krittika's expert, Gleb Liferenko (Ex. 1(5)), which exposed the defendants' malice and bad faith, had no choice but to stop the charade and pull S.M. in - at which point S.M., on March 15, 2011, promptly admitted that he was the author and sender of all of the offensive e-mails!

u.      On or about March 15, 2011, S.M. promptly admitted to DOE personnel that he was the author and sender of all of the offensive e-mails.  Notably, the IP address associated with the offensive e-mails was not assigned to the entirety of Krittika's approximately 240 family apartment building - as was knowingly falsely alleged by the defendants.  But was instead assigned by Earthlink to S.M.'s home - located at a different street address than Krittika.  Only after SM's confession did NYCDOE terminate Krittika's suspension hearing process, expunge the suspension and halt the associated post arrest deprivation of Krittka's liberties.

v.      Because S.M. was of Oriental Asian descent, and not of Southeast Asian descent, like Krittika, he was only suspended by the DOE, but was not arrested or criminally prosecuted.   Moreover, because of S.M.'s similar ethnic background to Kim-Ross, she refused to believe that SM was guilty, even after his confession.  Because of Kim-Ross' overt preference for Oriental Asian students over Southeast Asian students, she repeatedly proclaimed in and about John Bowne High School that she did not believe S.M. was responsible for the creation or transmission of the e-mails, even with S.M.'s

21

confession and dispositive IP address match (akin to a confession with DNA and a fingerprint match).

5.      This is a civil rights action brought to vindicate Krittika's rights under the United States Constitution, the statutory laws of the United States, along with the laws of the State of New York.  Because Krittika was of Southeast Asian ancestry, and was the daughter of an Indian consular representative to the United States, Krittika was targeted by the defendants for a baseless arrest, anticipated groundless criminal prosecution, and unwarranted disciplinary suspension from her New York City public high school.   As a result of this bad faith targeting by the defendants, Krittika was arrested and forcibly detained against her will, without probable cause, held in the custody of the City of New York for some 28 hours, suspended from school for an extended period of time based upon evidence that the Department of Education fabricated and knew was fabricated, and as a result Krittika sustained significant impairment of her federal and state constitutional rights, *inter alia*, to be free from unwarranted searches and seizures, and to enjoy the protections of due process.

6.      At all times herein mentioned, Krittika, the daughter of the Vice-Consul in the Consulate General of India in New York City, was an 18 year old girl lawfully present and resident in the United States of America and the State of New York.

22

7.    During the times complained of herein, Krittika was a full time secondary school student, enrolled in honors classes at John Bowne High School, 63-25 Main Street, Flushing, NY 11367, an educational facility controlled, maintained and operated by the NYCDOE.

8.    Defendants Kim-Ross and Kwait, acting individually and on behalf of the NYCDOE, individually and collectively with one another, and with defendants Granshaw and Maldonado, themselves acting individually and collectively on behalf of themselves and on behalf of the City of New York, wrongly, falsely and unlawfully accused Krittika of crimes and bad acts, while Krittika was actually innocent, and while they knew that Krittika was actually innocent.

9.    Krittika did not commit any offense.

10.    Kriitika did not commit any crime.

11.    Krittika did not commit any felony.

12.    On February 8, 2011, defendants Kim-Ross and Kwait, acting individually and on behalf of the NYCDOE, individually and collectively with one another, and with defendants Granshaw and Maldonado, themselves acting individually and collectively on behalf of themselves and on behalf of the City of New York, wrongly, falsely and unlawfully caused:

a.    the detention of Krittika and detained Krittika, while Krittika was actually innocent, and while they knew that Krittika was actually innocent;

b.      the arrest of Krittika and arrested Krittika, while Krittika was actually innocent, and while they knew that Krittika was actually innocent;

c.      the detention of Krittika and detained Krittika, while Krittika was actually innocent, and while they knew that Krittika was actually innocent; and,

d.      Krittika to be placed in custody, while not free to go, where she remained for more than 24 hours, while Krittika was actually innocent, and while they knew that Krittika was actually innocent.

13.    The defendants individually and collectively wrongly, falsely, maliciously and unlawfully caused the prosecution of Krittika, while Krittika was actually innocent, and while they knew that Krittika was actually innocent.

14.    On February 9, 2011, the Queens County District Attorney's Office, led by District Attorney Richard Brown, an American Hero, admirably reviewed the facts and circumstances surrounding Krittika's wrongful arrest, and dropped all criminal charges that had been wrongly brought by defendants Kim-Ross, Kwait, NYCDOE, Granshaw, Maldonado and the City of New York, prior to compelling Krittika to face a judge, and directed the sealing of all records associated with what was the wrongful arrest and detention of Krittika caused and carried out by and on behalf of defendants Kim-Ross, Kwait, NYCDOE, Granshaw, Maldonado and the City of New York, individually and collectively.

15.     On February 10, 2011, despite knowing of District Attorney Brown's action, defendants Kim-Ross, Kwait, Konstan and NYCDOE, aided by the February 8, 2011 wrongful arrest and detention of Krittika by, *inter alia*, Granshaw, Maldonado and the City of New York, individually and collectively wrongly, falsely, and unlawfully caused Krittika to be suspended from school, did suspend her from school, and compelled Krittika to attend classes at Robert Wagner High School, an alternate location without an applicable enriched academic program, and more akin to "reform school," while Krittika was actually innocent, and while they knew Krittika was actually innocent, with charges supported only be evidence which was fabricated by the NYCDOE and which the defendants knew to be fabricated .

16.     The defendants individually and collectively wrongly, falsely, and unlawfully compelled Krittika first to be criminally arrested, detained and imprisoned, and then to undergo repeated appearances at a judicial proceeding, to wit: a suspension hearing, which was commenced with no basis in fact or law, while Krittika was actually innocent, and while the defendants knew that Krittika was actually innocent.

17.     Ultimately Krittika was cleared of all wrongdoing - notwithstanding her suffering due to misconduct by officials atcing under color of law.   Accordingly, notwithstanding the defendants efforts to misuse the criminal justice and school disciplinary systems as a punitive tool against Krittika, to punish her for who she was, not for anything she actually did, the judicial proceedings which began with Krittika's unjust

forcible arrest and led into her unwarranted suspension, were terminated in Krittika's favor.

## IV.    JURISDICTION AND VENUE

18.    This action is brought pursuant to, *inter alia*, 42 U.S.C. § § 1983, 1985 and 2000d.

19.    Subject matter jurisdiction for these federal claims exists under 28 U.S.C. §§ 1331, 1332(a)(2), 1343(a)(4) and 42 U.S.C. §2000d-7.

20.    This court has jurisdiction over Plaintiffs' pendent state law claims pursuant to 28 U.S.C. § 1367(a).

21.    The Court has authority to award costs and attorneys' fees under 42 U.S.C. § 1988.

22.    Plaintiff is a citizen of India and resides in India.

23.    Upon information and belief, all of the defendants are residents of the State of New York.

24.    The matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

25.    Upon information and belief, in their official capacities, all of the defendants are residents of the State of New York.

26.    Venue is proper pursuant to 28 U.S.C.1391(b) in that Defendants City of New York and New York City Department of Education maintain their principal offices in New York County, which is located within the Southern District of New York.

## V.    PARTIES

27.    Plaintiff **KRITTIKA BISWAS** is a citizen of India, who at all times complained of herein was a foreign national lawfully present and resident in the United States and within the City and State of New York, Queens County.

28.    At all relevant times, Krittika was a foreign national lawfully present and residing within the United States and the City and State of New York as a child of vice-consul of the Consulate General of India in the City of New York.

29.    Krittika and her family were lawfully present and resident in New York City for consular purposes.

30.    The Consulate General of India was, at all relevant times, located within the City, State and County of New York, to wit: 3 East 64th Street, New York, NY 10065.

31.    The Consulate General of India in New York is tasked with, *inter alia*, handling India's consular affairs in the United States associated with Connecticut, Maine, Vermont, Massachusetts, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Puerto Rico, Rhode Island, and the U.S. Virgin Islands.

32.    As a result of the traumatic events complained of, Krittika has since left the United States to better further her studies in India.

33.    Krittika now resides in India where she is enrolled in college studying matters related to science and engineering.

34.    Defendant **CITY OF NEW YORK** ("NYC") is a municipal corporation within the State of New York, with its principal offices located within the County of New York, within the Southern District of New York.

35.    Defendant NYC operates the New York City Police Department ("NYPD"), which is headquartered and maintains its principal executive offices within the Southern District of New York.

36.    Defendant **NEW YORK CITY DEPARTMENT OF EDUCATION** ("NYCDOE") is a municipal corporation within the State of New York, with its principal offices located within the County of New York, within the Southern District of New York.  The NYCDOE was not created by way of the New York City Charter.  Pursuant to the by-laws of the NYCDOE, the NYCDOE is, *inter alia*, the Board of Education for the New York City School District.  Pursuant to New York State Education Law § 2551, "[t]he board of education of each  city school district of a city with one hundred twenty-five thousand inhabitants or more according to the latest federal census is hereby continued as a body corporate."  New York City has more than 125,000 inhabitants and accordingly the NYCDOE is not an agency or political subdivision of the City of New York and is instead its own municipal corporation as a matter of law and fact.

37.     Upon information and belief, defendant NYCDOE receives federal financial assistance.

38.     John Bowne High School is an educational facility controlled, maintained and operated by defendant NYCDOE.

39.     Upon information and belief, a portion of the federal financial assistance that is received by defendant NYCDOE is used by and/or for John Bowne High School.

40.     Defendant NYCDOE operates the New York City Department of Education Office of School And Youth Development ("OSYD"). Upon information and belief, OSYD is the unit within NYCDOE generally responsible for the development and implementation of, *inter alia*, student disciplinary policies and programs within the NYCDOE.

41.     Defendant **HOWARD KWAIT** was, at all times complained of herein, the Principal of John Bowne High School, who has embarrassed New York City and the United States to a friendly nation, India; a strategic partner of the United States. Mr. Kwait is sued in his official and individual capacities. In his official capacity as a Principal with the Department of Education, Mr. Kwait is deemed a resident of the State of New York.

42.     Defendant **JAMIE KIM-ROSS** was, at all times complained of herein, a teacher at John Bowne High School, who has embarrassed New York City and the United States to a friendly nation, India; a strategic partner of the United States. Ms. Kim-Ross

29

is sued in her official and individual capacities.  In her official capacity as a Teacher with the Department of Education, Ms. Kim-Ross is deemed a resident of the State of New York.  Moreover, in her individual capacity, defendant Kim-Ross resided in the County of New York, within the Southern District of New York.

43.    Upon information and belief, defendant Kim-Ross is of Oriental Asian race, heritage and descent.

44.    While at John Bowne High School, Kim-Ross frequently bragged about her daughters, including a daughter's apparently exceptional abilities with the violin.  Such bragging was done to students in all of Kim-Ross' classes, as well as to school staff, faculty and administrators over several semesters.

45.    Defendant Kim-Ross favored students of similar ethnicity to herself while disfavoring students of Southeast Asian Indian ancestry.  Such disparate treatment was done on behalf of the NYCDOE and consisted of, *inter alia*, harsher grading practices and diminished opportunities for in-class academic advancement directed at students of Southeast Asian ancestry.  Conversely, students of Oriental Asian descent, similar to Kim-Ross, enjoyed easier grading practices and far more opportunities for in-class participation which had a significant impact on the grades received by Kim-Ross' students.

46.    Defendant **ELAYNA KONSTAN** was, at all times complained of herein, the Chief Executive Officer of the OSYD.    Ms. Konstan is sued in her official and individual capacities.  In her official capacity, Ms. Konstan maintains her principal offices in New York County and accordingly is a resident of the Southern District of New York.

47.    Defendants **JOHN/JANE DOE NEW YORK CITY DEPARTMENT OF EDUCATION PERSONNEL ## 1-10**, so named as their identities have yet to be established, are unidentified employees, servants, agents or others acting under the authority and/or control of the New York City Department of Education who were involved in the sham investigation, unlawful arrest and detention and unlawful suspension of Krittika Biswas.  These John/Jane Does 1 - 10 are sued in their official and individual capacities.

48.    Defendant **POLICE OFFICER MARGARET MALDONADO** was, at the times complained of herein, a Police Officer employed by the NYPD.  Defendant Maldonado participated in the unlawful arrest and detention of Krittika Biswas.   P.O. Maldonado is sued in her official and individual capacities.  Upon information and belief, all NYPD Police Officers are required to be citizens of the United States and residents of the State of New York, and accordingly, P.O. Maldonado was, upon information and belief, at all relevant times a resident of the State of New York.  In her official capacity as

a Police Officer with the NYPD, Officer Maldonado is deemed a resident of the State of New York.

49.    Defendant **POLICE OFFICER LARRY GRANSHAW**, was, at the times complained of herein, a Police Officer employed by the NYPD. Officer Granshaw participated in the unlawful arrest and detention of Krittika Biswas.   P.O. Granshaw is sued in his official and individual capacities. Upon information and belief, all NYPD Police Officers are required to be citizens of the United States and residents of the State of New York, and accordingly, P.O. Granshaw is, upon information and belief, a resident of the State of New York.  In his official capacity as a Police Officer with the NYPD, Officer Granshaw is deemed a resident of the State of New York.

50.    Defendants **JOHN/JANE DOE POLICE PERSONNEL## 1 - 10**, so named as their identities have yet to be established, are unidentified employees, servants, agents or others acting under the authority and/or control of the NYPD who were involved in the sham investigation, unlawful arrest and detention of Krittika Biswas. These John/Jane Does 1 - 10 are sued in their official and individual capacities.  Upon information and belief, all NYPD Police Officers are required to be citizens of the United States and residents of the State of New York.  Upon further information and belief, all law enforcement personnel of the NYPD are required to reside within the State of New York.  Accordingly, upon information and belief, all of the John/Jane Does are residents of the State of New York.

## VI.    JURY DEMAND

51.    The plaintiff demands a trial by jury on each and every one of her claims and causes of action.

## VII.    NOTICE OF CLAIM TO MUNICIPAL DEFENDANTS

52    On or about May 6, 2011, the plaintiff timely served Notices of Claim upon the municipal defendants pursuant to New York General Municipal Law § 50-e.  A true copy of this Notice, along with its 13 attached exhibits, is appended hereto as Exhibit 1, and its contents are incorporated herein.

53.    Each Notice of Claim concerned the plaintiff herein and stated, amongst other things, the name and post office address of plaintiff and her attorney, the nature of the claim, the time and place where and the manner in which the claim arose, and the injuries and damages sustained insofar as they were then practicable, for adjustment.

54.    On or about July 20, 2011, the municipal defendants conducted an Examination of Claim of the plaintiff under oath pursuant to New York General Municipal Law §  50-h.

55.    The municipal defendants are therefore on notice of the facts and circumstances alleged herein, and have been afforded ample opportunity to investigate Krittika's claims.

56.    The municipal claims remain unadjusted, and suit is commenced timely, to wit: the plaintiffs have complied with all of the conditions precedent to the bringing of this action by presenting to and serving the above referenced Notices of Claim upon the municipal defendants, within the time prescribed by law, and all municipal defendants have refused or neglected for more than thirty (30) days and up to commencement of this action to make any adjustment or payment thereof, and that thereafter and within the time provided by law, this action is commenced.

57.    Pursuant to Fed. R. Civ. P. 9(c), all conditions precedent to bringing this suit have been met by plaintiff.

## VIII.    <u>FACTUAL ALLEGATIONS COMMON TO ALL COUNTS</u>

58.    At all relevant times defendant Jamie Kim-Ross was employed by defendant NYCDOE as a mathematics teacher at John Bowne High School.

59.    Defendant Kwait was the principal at John Bowne High School.

- *KRITTIKA WAS ENROLLED IN AN ENRICHED ACADEMIC PROGRAM OF STUDY*

60.    Krittika had been a student in an Advanced Placement calculus course taught by defendant Kim-Ross.

61.    Generally, Advanced Placement courses are designed to permit well prepared high school students the opportunity to take college level courses as part of their high school curriculum.

34

62.    Generally, Advanced Placement courses follow a syllabus designed by The College Board and geared toward a standardized test at the conclusion of the academic year.

63.    Generally, students who perform well enough on the standardized Advanced Placement examination can seek college credit for the course from the college or university they matriculate at.

64.    At all relevant times, there were two Advanced Placement calculus courses available, to wit: "calculus AB" and "calculus BC."  The "BC" course covers more topics in the same amount of time as the "AB" course.

65.    The "Calculus BC" course is generally considered harder and/or more advanced than the "Calculus AB" course.

66.    With the approval and consent of defendant NYCDOE, Krittika was enrolled in "Calculus BC."

67.    With the approval and consent of defendant NYCDOE Krittika was also enrolled in other academically enriched courses, including Advanced Placement chemistry.

- *DEFENDANT KIM-ROSS WAS RECOMMENDING KRITTIKA TO AN HONORS COLLEGE: OCTOBER 2010*

68.    At all relevant times, with the approval and consent of defendant NYCDOE, while Krittika was attending classes at and within John Bowne High School,

she was enrolled in a college preparatory program that was generally expected to be academically enriched.

69.    Krittika had considered applying to the Macaulay Honors College at the City University of New York ("Macaulay")  for her college studies after graduation from high school.

70.    Macaulay is an academically enriched program geared towards high achieving students, which, upon admission, provides, *inter alia*, a full undergraduate tuition scholarship, *i.e.* free tuition.

71.    Given her desire to pursue an academically challenging college experience, with goals of studying hard sciences and/or engineering, Krittika believed it appropriate to obtain a college recommendation letter from her calculus teacher, defendant Kim-Ross.

72.    Accordingly, Krittika requested that defendant Kim-Ross write her a letter of recommendation for Macaulay.

73.    Defendant Kim-Ross agreed to write a letter of recommendation for Krittika.

74.    Krittika's grandmother passed away in India in or about late September 2010.

75.    As a result of the death of her grandmother, Krittika received an authorized absence from school of up to three weeks to attend to her grandmother's last rites. Krittika then left New York and went to India on or about October 6, 2010.

76.     Krittika received school work from some of her teachers and took it to India with her in an effort to stay on top of her studies.

77.     Because she was in India for bereavement when recommendations for Macaulay were then due, Krittika was unable to apply; however, defendant Kim-Ross had shown the letter of recommendation to Krittika in October 2010 on a computer screen at John Bowne High School.

78.     Kim-Ross informed Krittika that she had written the letter on her own home computer and e-mailed it to her NYCDOE/ John Bowne High School e-mail account for access at school.  It was on that NYCDOE/ John Bowne High School account that the letter of recommendation written by Kim-Ross was shown to Krittika.

79.     From the time that Kim-Ross first sent the recommendation letter to her NYCDOE/ John Bowne High School e-mail account, the NYCDOE has had a record of the e-mail and its contents, including the letter of recommendation written for Krittika.

- *DEFENDANT KIM-ROSS RECEIVED OFFENSIVE E-MAILS WHICH KRITTIKA HAD NOTHING TO DO WITH - BUT WHICH THE DEFENDANTS FALSELY ACCUSED HER: NOVEMBER 2010*

80.     Upon information and belief, thereafter, on or about November 18, 2010, defendant Kim-Ross received an offensive e-mail on her NYCDOE and/or John Bowne High School e-mail account.

81.     Upon information and belief, on or about November 19, 2010 defendant Kim-Ross reported the offensive e-mail to NYCDOE officials (*see e.g.* Ex. 1(4)).

82.     Upon information and belief, thereafter, on or about December 16, 2010, defendant Kim-Ross received another offensive e-mail on her NYCDOE/ John Bowne High School  e-mail account.

83.     Defendant Kim-Ross had no reason to believe that Krittika sent any offensive e-mails.

84.     Defendant Kim-Ross had no evidence linking Krittika to the e-mails she received.

85.     Defendant Kim-Ross knew that Krittika did not write or send the offensive e-mails.

86.     In an attempt to penalize Kriitika out of social and racial animus, defendants Kim-Ross and Kwait, along with A.P. Eutsey all acting individually and on behalf of the NYCDOE, fabricated an alleged nexus between Krittika and the offensive e-mails received by defendant Kim-Ross and teacher Mr. Cohill.

87.     Krittika did not send any offensive e-mails.

88.     Krittika did not send any offensive e-mails to defendant Kim-Ross.

89.     Krittika did not have any involvement in the creation or transmission of these e-mails.

- ***THE FIRST CONFRONTATION WITH KRITTIKA BY SCHOOL ADMINISTRATORS SEEKING A FALSE CONFESSION, BY COERCION*:**
  **ON OR ABOUT *DECEMBER 21, 2010***

90.    On or about December 21, 2010 Krittika was attending her Advanced Placement chemistry class at which time she was directed to leave the learning environment and go to the office of Naomi Eutsey, the Assistant Principal of Security (A.P. Eutsey).

91.    Krittika immediately complied and went to A.P. Eutsey's office where she was directed to identify a fellow student from an image on a computer monitor, to wit: "Student 1."[3]

92.    A.P. Eutsey then took Krittika to a school cafeteria and had Krittika locate Student 1, at which time both students were directed to accompany A.P. Eutsey to her office.

93.    Upon returning to A.P. Eutsey's office, Krittika and Student 1 were told that their names had "come up" in an "investigation" being conducted by A.P. Eutsey regarding foul and sexually "threatening" e-mails being sent to two teachers.

94.    According to A.P. Eutsey's statements to Krittika, the "building IP" address of the e-mails was identified, in substance, as the IP Address of the entire large apartment building, with more than 200 apartments, where Krittika lived.

_____

[3]This is a pseudonym to protect this non-party student's privacy.

95.    The "Internet Protocol" is essentially the "language" that computers use to communicate with one another over the Internet.  Each device that is connected to the Internet has a unique identifying address called an Internet Protocol address ("IP address").  An IP address  permits a computer to communicate with other computers via the Internet.  IP addresses permit the location of devices that are connected to the internet to be identified and distinguished from one another.  In simplest terms, an IP address is like a postal street address to a particular underline computer connection to the Internet.

96.    When viewed by human beings, an IP address consists of four sets of numbers, each containing between one and three digits, ranging from 0 to 255.  Each set of digits is separated by a decimal point.  When computers communicate with one another over the Internet, the IP address is converted into "binary" format - which is a series of ones and zeros that computers understand.  For instance, the IP address from which the offensive e-mails originated, 24.239.172.20, converts to 00011000.11101111.10101100. 00010100 in binary format.  Moreover, Krittika's IP address, 72.229.54.162, wholly different from the IP address used to send the offensive e-mails, converts to 01001000.11100101.00110110. 10100010 in binary format.  Thus, IP addresses are readily distinguishable from one another in either format.

97.    An international organization known as The Internet Assigned Numbers Authority ("IANA") manages pool of IP addresses available throughout the world.  IANA allocates large blocks of IP addresses to five different Regional Internet Registries

("RIR") throughout the world, including the American Registry for Internet Numbers ("ARIN"), which distributes IP addresses to operators of large scale networks, including Internet Service Providers ("ISP") in the United States, Canada and much of the Caribbean.  Upon receiving its blocks of IP addresses from the ARIN pool, ISP's like Time Warner's RoadRunner and Earthlink can then further allocate the IP addresses within their pool to subscribers or other end users.

98.    Because IP addresses are allocated to different ISP's in blocks, geographically, by accessing publically accessible databases known as "WHOIS," IP addresses can be often be used to identify the continent, country, region and perhaps city that the computer using a particular IP address is located in.  Moreover, these publically accessible databases can easily reveal which ISP was assigned a given IP address by the governing RIR.  For instance, ARIN assigned IP address 24.239.172.20, which was used to send the offensive e-mails, to the Earthlink ISP.  Moreover, ARIN assigned Krittika's IP address, 72.229.54.162 ,to Time Warner's ISP RoadRunner.

99.    As IP addresses are assigned to the end user by the ISP, the identification of end user subscribers and physical address of service is maintained by the ISP themselves and is not available by public search.  Accordingly, while a WHOIS search may show that an IP address is assigned to a particular ISP for service in a neighborhood, it will <u>not</u> be able to pinpoint the physical address and actual end user subscriber.   Such information is protected by federal law and cannot be freely disseminated to government entities.

Rather, for a government entity to obtain subscriber identification from an ISP, they must use proper process, depending on the circumstances, ranging from subpoena to Order of a Court of competent jurisdiction.

100.    Defendants Kim-Ross, Kwait and NYCDOE, along with A.P. Eutsey, individually  and collectively <u>fabricated</u> the claim that the IP address of the offensive e-mails was assigned to the entirety of Krittika's 27 floor, 200 plus apartment building.

101.    All of the defendants knew that the claim that the IP address of the offensive e-mails was assigned to the entirety of Krittika's 200 plus apartment building was false and fabricated.

102.    The claim that the IP address of the offensive e-mails was assigned to the entirety of Krittika's 200 plus apartment building was not a "mistake" and was instead an intentional misrepresentation and perversion of facts.

103.    The accused students at the December 201o meetings were both of Southeast Asian Indian background and both had parents who were part of India's United States resident consular corps.

104.    Student 1 asked A.P. Eutsey which two teachers received the e-mails, and A.P. Eutsey identified them as defendant Kim-Ross and a teacher named Mr. Cohill. A.P. Eutsey then demanded to know if Krittika and/or Student 1 had any information about the e-mails, and both students advised that they personally had nothing to do with sending such e-mails, and did not know who, if anyone, was responsible.

105.   On or about December 21, 2010, after meeting with A.P. Eutsey, Krittika and Student 1 informed defendant Kim-Ross that they had not sent any e-mails to her.

- *THERE WAS NO DIRECT EVIDENCE LINKING KRITTIKA TO ANY OFFENSIVE OR THREATENING E-MAILS - SO THE DEFENDANTS FABRICATED "EVIDENCE": ON OR ABOUT DECEMBER 22, 2010*

106.   On or about December 22, 2010, at approximately 9:00 a.m., Krittika and her father, Debashish Biswas, as well as Student 1 and Student 1's father and brother met with A.P. Eutsey, at A.P. Eutsey's direction. A.P. Eutsey repeated that teachers had received threatening e-mails and that Krittika and Student 1's names had "come up" because the "building IP" address was identified.

107.   A.P. Eutsey further indicated to Krittika's father, in Krittika's presence, that there was greater suspicion as to Krittika because she had both defendant Kim-Ross and Mr. Cohill as teachers and because one of the e-mails had words in the French language, and Krittika was, according to A.P. Eutsey, without any supporting basis, the only person in her 27 story residential building, with some 240 apartments, who had "French as a second language."

108.   Krittika's first language is Bengali and her second language is English.

109.   The French language word in the offensive e-mail was "merde," which in English means "sh*t."

110.    Upon information and belief many English speaking non-French speakers know the word "merde" and know that it is French for "sh*t."  Moreover, throughout the ballet dance community "merde" is also used in a fashion synonymous with "break a leg" in the acting community, as a means of offering  good luck.

111.    Students, other than Krittika, that had both Kim-Ross and Mr. Cohill as teachers, whether previously or at the same time as Krittika, knew that the French word "merde" means "sh*t" in English.

112.    Students, other than Krittika, that had both Kim-Ross and Mr. Cohill as teachers, whether previously or at the same time as Krittika, knew that the French word "merde" was a means of offering "good luck" in the ballet dancing community.

113.    A.P. Eutsey then stated, in substance, that because Krittika and Student 1 refused to confess, that the matter would be turned over to the NYPD.

114.    That Krittika could be arrested was never addressed at this meeting.

115.    That Krittika could be suspended was never addressed at this meeting.

116    S.M., the actual culprit and sender of the e-mails, a fact then unknown to Krittika, also simultaneously had defendant Kim-Ross and Mr. Cohill as teachers; however, S.M. was removed from Kim-Ross' class because, upon information and belief, S.M. was academically ineligible to continue in Calculus BC.

117.    Like defendant Kim-Ross, S.M. is of Oriental Asian descent.

118.    S.M. actually sent the offensive e-mails to defendant Kim-Ross.

119.    Because S.M. was of Oriental Asian background, notwithstanding direct evidence linking S.M. to the offensive e-mails, and S.M. having been enrolled in classes taught by defendant Kim-Ross and Mr. Cohill, he was excluded as a "suspect" in the defendants' sham "investigation."

120.    S.M. was omitted from the suspect list because defendant Kim-Ross refused to consider that an Oriental Asian  student could  send offensive e-mails.

121.    S.M. was omitted from the suspect list because defendant Kim-Ross refused to blame an Oriental Asian student for sending offensive e-mails.

122.    S.M. was omitted from the suspect list because only Southeast Asian Indian students were targeted.

123.    S.M. was omitted from the suspect list although the defendants had conclusive evidence that Krittika was not the sender of the offensive e-mails and that it was S.M.'s IP address that was used to send the e-mails, because the "investigation" was a sham, and was merely cover for being able to maliciously and in bad faith provide punitive treatment to Krittika, notwithstanding her actual innocence, and the defendants' knowledge of Krittika's actual innocence.

- *DEFENDANT KIM-ROSS BEGINS TO OVERTLY PENALIZE KRITTIKA*

124.    In or about January 2011 Krittika asked defendant Kim-Ross for the recommendation letter she had previously written so that Krittika could apply to different colleges; however, Kim-Ross then expressed an unwillingness to issue the letter.

• *THE "INVESTIGATION" WAS A SHAM*

125.   Upon information and belief, NYCDOE personnel performed what they referred to as an "investigation" which revealed that the e-mail messages received by defendant Kim-Ross originated from an Internet Protocol Address ("IP Address") <u>not</u> associated with Krittika Biswas.

126.   Generally, an IP Address is an identifier of computers and devices on an internet network.

127.   Generally, e-mail messages contain information referred to as a "header" which contains details about the sender, the route the e-mail took, when the e-mail was sent, and the targeted receiver of the e-mail.

128.   Generally, the e-mail header contains the IP Address of the sender's computer.

129.   By accessing the IP Address of the sender of an e-mail the network where the e-mail originated from can be identified.

130.   The IP Addresses associated with the e-mails that defendant Kim-Ross identified as offensive were sent on a computer network maintained by Earthlink, Inc. (*See* Ex. 1(5)).

131.   Upon information and belief, other students that had both defendant Kim-Ross and Mr. Cohill as teachers, whether previously or at the same time as Krittika, had Earthlink as their ISP.

46

132.    At the time that Kim-Ross received offensive e-mails on December 16, 2010 and February 6, 2011, Krittika's e-mail and internet access was on a computer network maintained by Road Runner, LLC [Exhibit 2; *see also* Ex. 1(5)].

133.    Prior to subscribing to Time Warner and its RoadRunner service, Krittika's family obtained their internet service through RCN [Exhibit 3].  At the time that Kim-Ross received the first e-mail on November 18, 2010, Krittika's ISP was RCN.  *Id*..

134.    Upon information and belief, Road Runner was, at all relevant times, a joint venture of Time Warner and AT&T.

135.    Upon information and belief, Road Runner was, at all relevant times, the only internet service available to Time Warner cable television subscribers if they obtain their internet access packaged with their television signal.

136.    Upon information and belief, at all relevant times Earthlink was a publically traded company.

137.    Upon information and belief, the RoadRunner and Earthlink networks are unrelated competitors.  Moreover, RoadRunner and Earthlink were also unrelated to and in competition with RCN.

138.    Upon information and belief, at all relevant times herein, Earthlink, RoadRunner and RCN were separate unrelated entities was information available to the general public.

139.    In an attempt to cover up their bad faith malice based abuse of Krittika, the defendants individually and collectively falsely claimed that the IP Address that the e-mail messages received by defendant Kim-Ross originated from were associated with <u>all</u> internet users in the 27 floor apartment building with over 200 apartments that Krittika Biswas resided in with her family, including the Vice-Consul.

140.    Other students at John Bowne High School resided in the same large apartment building that Krittika and her family resided within.

141.    Other students that had both defendant Kim-Ross and Mr. Cohill as teachers, whether previously or at the same time as Krittika, lived in multiple locations, not just Krittika's 27 floor 200 plus apartment building.

142.    Upon information and belief, other students that were in danger of failing classes taught by defendant Kim-Ross and Mr. Cohill, lived in multiple locations, not just Krittika's 27 floor 200 plus apartment building.

143.    The pool of people to whom defendant Kim-Ross had bragged about her daughters, including the apparently exceptional violin playing daughter, included Kim-Ross' students past and present, fellow-teachers, school staff and school administrators.

144.    Upon information and belief, a plurality of John Bowne High School students had a presence on the Facebook.com website.

145.    At no time did Krittika ever say anything threatening about defendant Kim-Ross, Mr. Cohill or any other person, including by way of any postings made by Krittika on Facebook.com.

146.    The only Facebook.com postings that A.P. Eutsey of any of the defendants, including Kim-Ross, Konstan, Kwait, NYCDOE, Granshaw, Maldonado and/or the City of New York, ever reviewed in their sham "investigation" was Krittika's, which postings contained nothing even remotely of a threatening nature about anyone.

147.    Krittika's Fecbook.com page was accessed and printed by the defendants in an effort to provide cover for their malicious and bad faith based punitive treatment of Krittika, who was actually innocent, and whom the defendants knew was actually innocent.

148.    Krittika had rights, including under the First Amendment, to post her opinions about teachers, including Kim-Ross, on the non-school based Facebook.com website.

149.    The IP Address associated with the computer in Krittika's apartment was not associated with any other computer in Krittika's 27 floor building with approximately 240 apartments.

150.    There was and is no single IP Address associated with all internet users in the apartment building that Krittika resided at.

151.    None of the defendants ever had any non-fabricated evidence linking the IP address that the e-mails originated from to Krittika.

152.    Without a subpoena or Order issued by a Court of competent jurisdiction, the defendants could not access subscriber information from the ISP's.

153.    Pursuant to 18 U.S.C. § 2711(4) "a department or agency of the United States or any State or political subdivision thereof" is a "government entity."

154.    The NYCDOE is a government entity.

155.    The City of New York is a government entity.

156.    The NYPD is a part of the City of New York and is accordingly a government entity.

157.    Pursuant to 18 U.S.C. § 2702(a)(3) an ISP may not divulge subscriber information to a government entity absent a proper subpoena, Court Order or warrant, issued in accordance with 18 U.S.C. § 2703.

158.    RoadRunner and Time Warner, as ISP's, were both barred from divulging subscriber information to government entities absent a proper subpoena, Court Order or warrant, in accordance with 18 U.S.C. § 2703.

159.    None of the defendants obtained a proper subpoena, Court Order or warrant to obtain subscriber information to identify the sender of the e-mails defendant Kim-Ross complained of - or of the e-mail apparently received by Mr. Cohill.

160.    None of the defendants actually obtained or possessed subscriber information associated with the sender of the e-mails defendant Kim-Ross complained of - or of the e-mail apparently received by Mr. Cohill.

161.    Absent information obtained via compliance with federal law, the defendants could not have accessed data from any ISP indicating a physical street address where an IP Address was assigned.

162.    The defendants knew that the IP Address used to send the offensive e-mails received by defendant Kim-Ross and by Mr. Cohill was not associated with Krittika, but was S.M's.

163.    Defendants NYCDOE, NYC, NYPD, Kim-Ross, Kwait, Maldonado and Granshaw all knew that they had no subscriber information or any other evidence linking Krittika to the e-mails received by defendant Kim-Ross, or the e-mail received by Mr. Cohill.

164.    The defendants individually and collectively fabricated a claim that the IP address of the e-mails received by defendant Kim-Ross was assigned to all of Krittika's approximately 240 family apartment building.

165.    There is no IP address associated with an entire residential apartment building, like Krittika's, wherein the residents are able to select amongst various ISP's. Rather, in circumstances, like those here, the IP Addresses are assigned to different subscribers from a pool of IP Addresses maintained by each ISP.

- *THE DEFENDANTS KNEW THEY HAD NO EVIDENCE AGAINST KRITTIKA, WHO WAS ACTUALLY INNOCENT*

166.    No defendant had any evidence, whatsoever, linking Krittika to the e-mail messages received by defendant Kim-Ross, as <u>no such evidence existed</u>.

167.    No defendant had any evidence, whatsoever, linking any computer that Krittika used to the e-mail messages received by defendant Kim-Ross, as <u>no such evidence existed</u>.

168.    No defendant had any evidence, whatsoever, linking any computer that Krittika used to the network that the e-mail messages received by defendant Kim-Ross originated from, <u>as no such evidence existed</u>.

169.    There was <u>no evidence to support any claim against Krittika</u>, as Krittika was <u>completely innocent</u> and had no involvement whatsoever in the drafting or transmittal of any offensive e-mails to defendant Kim-Ross or Mr. Cohill.

170.    The actual evidence readily available to all of the defendants indicated that the e-mails sent to defendant Kim-Ross originated from a source other than Krittika.

171.    The defendants always possessed evidence exculpatory to Krittika.

172.    On their face, each of the e-mails the defendants complained of clearly did not originate with Krittika, as each such e-mail contained a senders IP address associated with another student, S.M..

173.    Upon information and belief, the e-mails received by Kim-Ross (and Cohill) were sent to e-mail accounts maintained and/or accessible by NYCDOE and John Bowne High School personnel.

174.    Upon information and belief, the system that Kim-Ross used to access the offensive e-mails was maintained and/or accessible by NYCDOE and John Bowne High School personnel.

175.    Upon information and belief, the system that Kim-Ross used to access the offensive e-mails <u>captured</u> the IP address of the sender.

176.    All of the offensive e-mails originated from the IP address 24.239.172.20.

177.    Upon information and belief, S.M. had previously sent legitimate e-mails to NYCDOE personnel at John Bowne High School, wherein he had identified himself as S.M., and which e-mails were retrieved by the NYCDOE/ John Bowne High School e-mail system that captures the sender's IP address.

178.    Upon information and belief, the defendants always had the association of S.M. to IP address 24.239.172.20 in their possession.

179.    IP address 24.239.172.20, which was used to send all of the offensive e-mails, is within the pool of IP addresses maintained by the Earthlink ISP.

180.    Krittika's IP address as assigned by Time Warner's RoadRunner was 72.229.54.162.

181.    All of the defendants knew that the IP address 24.239.172.20, which was used to send the offensive e-mails, belonged to S.M. and not Krittika.

182.    Upon information and belief, defendant Kim-Ross is not a police officer.

183.    Upon information and belief, defendant Kim-Ross is not a peace officer.

184.    There was no real evidence to support a claim that Krittika sent any offensive e-mail messages, because no such evidence existed.

185.    Defendant Kim-Ross knew that there was no evidence linking Krittika to any of the e-mails sent to her.

186.    It was not reasonable for defendant Kim-Ross to believe that Krittika had sent any of the e-mails to her.

187.    Defendant Kim-Ross knowingly made false and discriminatory assumptions about Krittika.

188.    Defendant Kim-Ross knowingly reported her false assumptions as facts.

189.    It was not reasonable for defendant Kim-Ross to believe that Krittika had sent any of the offensive e-mails.

190.    Upon information and belief, defendant Kwait is not a police officer.

191.    Upon information and belief, defendant Kwait is not a peace officer.

192.    Defendant Kwait knowingly made false and discriminatory assumptions about Krittika.

193.    Defendant Kwait knowingly reported her false assumptions as facts.

194.    It was not reasonable for defendant Kwait to believe that Krittika had sent any of the e-mails to defendant Kim-Ross.

195.    The NYPD has a Computer Crimes Squad/Unit.

196.    The NYPD has investigators with training in the investigation of acts involving computers, including sending offensive and/or threatening e-mails.

197.    Upon information and belief, the defendants did not alert the NYPD Computer Crime Squad/Unit to the investigation of the e-mails sent to defendant Kim-Ross.

198.    Upon information and belief, the defendants did not involve the NYPD Computer Crime Squad/Unit in the investigation of the e-mails sent to defendant Kim-Ross.

199.    Upon information and belief, the defendants did not involve any personnel with sufficient expertise in computers and internet technology in the investigation of the e-mails sent to defendant Kim-Ross.

- *KRITTIKA WAS FALSELY AND WRONGLY ARRESTED: FEBRUARY 8, 2011*

200.    As a result of conclusory, unfounded, unsubstantiated and factually baseless allegations, which were contradicted by electronic evidence in the possession of the NYCDOE, that all defendants were aware of, and which with the exercise of reasonable inquiry and discretion they should have been aware of, Krittika was arrested, restrained

55

and detained involuntarily and against her will by NYCDOE personnel at John Bowne High School on February 8, 2011.

201.   A.P. Eutsey along with defendant Kim-Ross, Kwait and NYCDOE, fabricated the "existence" of an IP address assigned to the entirety of Krittika's 200 plus family 27 story apartment building, in a malicious and bad faith inspired effort to support what they knew would be a wrongful arrest and suspension of Krittika.

202.   A.P. Eutsey along with defendant Kim-Ross, Kwait and NYCDOE knew that there was no nexus between the IP address that the offensive e-mails originated from and Krittika.

203.   On February 8, 2011 at approximately 9:45 a.m., A.P. Eutsey came to Krittika's art classroom and directed Krittika to take all of her belongings and to come with her.

204.   At A.P. Eutsey's direction, Krittika then accompanied her to the office of Assistant Principal Michele Kearse, where Krittika was directed to wait - without any explanation from A.P. Eutsey or any other personnel of the Department of Education or any other entity.

205.   A.P. Eutsey was acting by, for and on behalf of defendants NYC and NYCDOE.

206.   A.P. Eutsey did not have consent to detain Krittika.

207.   Upon information and belief, A.P. Eutsey is not a peace officer.

208.    Upon information and belief, A.P. Eutsey is not a police officer.

209.    Krittika was not free to leave from A.P. Kearse's office.

210.    Krittika believed that she was not free to leave from A.P. Kearse's office.

211.    A reasonable person in the same position as Krittika would have believed that she was not free to leave from A.P. Kearse's office.

211.    Krittika did not commit any crime in the presence of A.P. Eutsey.

213.    A.P. Eutesey arrested Krittika.

214.    After waiting without explanation or freedom to leave for approximately 30 minutes, Krittika was then joined by her guidance counselor, Lauren Prettitore.

215.    Ms. Prettitore informed Krittika that defendant Kim-Ross had received another offensive e-mail on February 6, 2011 and that the police were coming to question her.

216.    Krittika informed Ms. Prettitore, as she had to all prior Department of Education personnel, that she did not send any threatening or offensive e-mails to defendant Kim-Ross, to which Ms. Prettitore responded, in substance, that the school had turned the matter over to the police.

217.    Krittika was not given any choice as to whether she wanted to speak with the police and was instead detained, against her will, awaiting the arrival of defendant Granshaw.

- *KIM-ROSS, KWAIT AND EUTSEY, ALL OF THE NYCDOE CONSPIRED WITH GRANSHAW AND MALDONADO OF THE CITY OF NEW YORK TO UNDERTAKE THE MALICIOUS BAD FAITH BASED ARREST OF KRITTIKA*

218.    A.P. Eutsey along with defendants Kim-Ross and Kwait were, at all relevant times, employed by the NYCDOE, a municipal corporation separate and apart from the City of New York.

219.    Defendants Granshaw and Maldonado were, at all relevant times, employed by the NYPD, an agency of the City of New York, a municipal corporation separate and apart from the NYCDOE.

220.    On February 8, 2011, between the hours of approximately 9:00 a.m. to 11:45 a.m., Kim-Ross, Kwait, Eutsey, Granshaw and Maldonado all communicated amongst one another at or about John Bowne High School, devising a plan to arrest, detain, restrain, prosecute and suspend Krittika, all knowing that there was no evidence linking Krittika to any criminal conduct.

221.    On February 8, 2011, between the hours of approximately 9:00 a.m. through 11:45 a.m., Granshaw and Maldonado were informed by A.P. Eutsey and/or Kim-Ross and/or Kwait that offensive e-mails were received by Kim-Ross.

222.    On February 8, 2011, between the hours of approximately 9:00 a.m. through 11:45 a.m., Granshaw and Maldonado were informed by A.P. Eutsey and/or Kim-Ross and/or Kwait that the IP address on the e-mails did not correspond to Krittika.

223.    On February 8, 2011, between the hours of approximately 9:00 a.m. through 11:45 a.m., Granshaw and Maldonado were informed by A.P. Eutsey and/or Kim-Ross and/or Kwait that they had individually and collectively fabricated a fictitious IP address for the entirety of the 27 story 200 plus apartment building that Krittika lived in, in a malicious effort to sustain an otherwise groundless arrest, prosecution and suspension of Krittika, for the transmission of offensive e-mails that Krittika had nothing to do with, and for which the defendants all knew that Krittika was actually innocent.

224.    On February 8, 2011, between the hours of approximately 9:00 a.m. through 11:45 a.m., defendants Granshaw and Maldonado of the NYPD agreed with A.P. Eutsey and defendants  Kim-Ross and Kwait of the NYCDOE  that they would participate in the forcible arrest and detention, attempts to prosecute and ultimate suspension of Krittika, knowing that there was <u>no</u> evidence that Krittika had committed any crime or offense.

225.    On February 8, 2011, between the hours of approximately 9:00 a.m. through 11:45 a.m., defendants Granshaw and Maldonado of the NYPD agreed with A.P. Eutsey and defendants  Kim-Ross and Kwait of the NYCDOE  that they would participate in the forcible arrest and detention, attempts to prosecute and ultimate suspension of Krittika, knowing that the alleged IP address for the entirety of Krittika's 27 story 200 plus apartment building was a fabrication.

226.    On February 8, 2011, between the hours of approximately 9:00 a.m. through 11:45 a.m., defendants Granshaw and Maldonado of the NYPD agreed with A.P. Eutsey

and defendants Kim-Ross and Kwait of the NYCDOE that Granshaw and Maldonado would use physical force and verbal threats upon Krittika in an effort to coerce a false confession, in an effort to support their knowingly unlawful arrest and detention of Krittika.

227.    On February 8, 2011, between the hours of approximately 9:00 a.m. through 11:45 a.m., defendants Granshaw and Maldonado of the NYPD agreed with A.P. Eutsey and defendants Kim-Ross and Kwait of the NYCDOE that Granshaw and Maldonado would initially proffer the knowingly false evidence to the District Attorney in an effort to cause a criminal prosecution of Krittika based upon the knowingly bogus claims and the fabricated evidence.

228.    On February 8, 2011, between the hours of approximately 9:00 a.m. through 11:45 a.m., defendants Granshaw and Maldonado of the NYPD agreed with A.P. Eutsey and defendants Kim-Ross and Kwait of the NYCDOE that subsequent to her forcible removal from the school by Granshaw and/or Maldonado, Krittika would be suspended and they would all collectively proffer false evidence to the NYCDOE hearing officer in an effort to sustain the unwarranted and constitutionally defective suspension.

●    *DEFENDANT P.O. GRANSHAW TRIES TO UNCONSTITUTIONALLY COERCE A CONFESSION FROM KRITTIKA, THROUGH THREATS AND FORCE*

229.    At approximately 11:45 a.m. on February 8, 2011, defendant P.O. Granshaw, acting individually and on behalf of defendant NYC, entered A.P. Kearse's office, took custody of Krittika and confronted Krittika.

230.    Krittika was not free to go when defendant P.O. Granshaw came to A.P. Kearse's office.

231.    When defendant Granshaw confronted Krittika he knew that there was no evidence linking Krittika to the writing or sending of the offensive e-mails.

232.    When defendant Granshaw confronted Krittika he knew that the alleged IP address associated with the entirety of Krittika's 27 story 200 plus apartment building was a fabrication.

233.    Krittika did not commit any crime, offense or violation.

234.    Krittika did not commit any offense in the presence of any police officer.

235.    Krittika did not commit any crime in the presence of any police officer.

236.    No police officer had reasonable cause to believe that Krittika committed any offense.

237.    No police officer had reasonable cause to believe that Krittika committed any crime.

238.    No police officer had reasonable suspicion to detain or restrain Krittika.

61

239.    A reasonable person in the position of any police officer would not have believed that he or she had reasonable suspicion to detain or restrain Krittika.

240.    No police officer had probable cause to detain, restrain and/or arrest Krittika.

241.    No reasonable person in the position of a police officer would have believed that he or she had probable cause to detain, restrain and/or arrest Krittika.

242.    No police officer observed Krittika commit any crime, violation or offense.

243.    No police officer reported having observed Krittika commit any crime, violation or offense.

244.    No police officer told defendant P.O. Granshaw that they had observed Krittika commit any crime, violation or offense.

245.    No police officer told defendant P.O. Granshaw that they had third-party information giving them cause to believe that Krittika committed any crime, violation or offense.

246.    Defendant P.O. Granshaw did not observe Krittika commit any crime, violation or offense.

247.    Prior to defendant P.O. Granshaw taking custody of Krittika, no reliable informant provided Granshaw with any reason to believe that Krittika had committed any crime, violation or offense.

248.    Prior to defendant P.O. Granshaw taking custody of Krittika, no alleged victim, including defendant Kim-Ross identified Krittika as having committed any crime, violation or offense.

249.    Defendant P.O. Granshaw had no independent knowledge or information from which to conclude that Krittika had committed any crime, violation or offense.

250.    Defendant P.O. Granshaw did not provide Krittika with any of the warnings mandated by the Supreme Court of the United States in *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny.

251.    Defendant P.O. Granshaw questioned Krittika.

252.    Defendant P.O. Granshaw coercively questioned Krittika.

253.    Krittika was in custody while being questioned by defendant Granshaw.

254.    Defendant P.O. Granshaw demanded that Krittika tell him, in substance, why she hated defendant Kim-Ross, to which Krittika replied that she did not hate defendant Kim-Ross.

255.    Defendant P.O. Granshaw demanded that Krittika tell him, in substance, why she sent e-mails to defendant Kim-Ross, to which Krittika replied that she did not send e-mails to defendant Kim-Ross.

256.    Defendant P.O. Granshaw demanded that Krittika tell him, in substance, who sent e-mails to defendant Kim-Ross, to which Krittika replied that she did not know

who sent e-mails to defendant Kim-Ross because she had nothing to do with sending e-mails to defendant Kim-Ross.

257.    Defendant P.O. Granshaw then appeared to be angry, and asked Krittika, in substance, "do you think I'm stupid?  I'm going to walk back out and come back in, and I'm going to start this thing again."

258.    Defendant P.O. Granshaw then left A.P. Kearse's office, while Krittika remained detained within and not free to leave.  Granshaw then expeditiously re-entered the office and again asked Krittika, in substance, why she sent the e-mails to defendant Kim-Ross, and if she did not send the e-mails than who did.

259.    Krittika again truthfully replied, in substance, that she did not send any of the e-mails to defendant Kim-Ross and had nothing to do with the e-mails sent to defendant Kim-Ross.

260.    Notwithstanding Krittika's consistent and persistent denials, and the lack of a scintilla of evidence linking Krittika to the e-mails, defendant P.O. Granshaw then coercively demanded that Krittika either confess to sending the e-mails or be handcuffed.

261.    Defendant P.O. Granshaw again asked Krittika, in substance, why she sent the e-mails to defendant Kim-Ross, and if she did not send the e-mails than who did. Krittika again replied, in substance, that she did not send any of the e-mails to defendant Kim-Ross and had nothing to do with the e-mails sent to defendant Kim-Ross.

262.    Defendant P.O. Granshaw then stood up and <u>tightly</u> placed handcuffs on both of Krittika's wrists <u>as punishment</u>.

263.    Defendant P.O. Granshaw employed handcuffing in an effort to coerce a confession, albeit false, from Krittika.

264.    New York State Criminal Procedure Law § 60.45(1) bars the use of statements "involuntarily made."

265.    Pursuant to New York State Criminal Procedure Law § 60.45(2)(a), a statement is "involuntarily made" if obtained "by the use or threatened use of physical force upon the defendant or another person, or by means of any other improper conduct or undue pressure which impaired the defendant's physical or mental condition to the extent of undermining his ability to make a choice whether or not to make a statement."

266.    As placed by against her wrists by P.O. Granshaw the handcuffs caused Krittika substantial pain, swelling, redness, bruising, annoyance and alarm.

267.    Krittika did not consent to Granshaw handcuffing her.

268.    Krittika did not consent to Granshaw having any physical contact with her.

269.    Defendant P.O. Granshaw did not have reasonable suspicion to detain or restrain Krittika.

270.    A reasonable person in defendant P.O. Granshaw's position would not have believed that he had reasonable suspicion to detain or restrain Krittika.

271.    Defendant P.O. Granshaw did not have probable cause to detain, restrain and/or arrest Krittika.

272.    A reasonable person in defendant P.O. Granshaw's position would not have believed that he had reasonable suspicion to detain, restrain and/or arrest Krittika.

273.    Krittika expeditiously informed P.O. Granshaw that the handcuffs were tight and were causing her pain, to which P.O. Granshaw replied, in substance, that Krittika should not move as movement would make the handcuffs tighter.

274.    Krittika ultimately had to seek medical attention from her own personal physician because of the substantial pain, swelling, redness, bruising, annoyance and alarm caused by Granshaw's retaliatory forceful handcuffing.

275.    Defendant P.O. Granshaw then stated, in substance, to Krittika, that she apparently thought defendant P.O. Granshaw "was stupid" and that he "guaranteed" that if she persisted in refusing to confess that she would "not graduate from high school" and would end up "in jail with prostitutes and people with HIV".

276.    After being handcuffed by defendant P.O. Granshaw, Krittika again repeated her truthful denial of any involvement with e-mails sent to teachers.  Moreover, Krittika expressed a willingness to permit police to access her computer and e-mails.

277.    The physical force exerted by Granshaw upon Krittika was more than was necessary to detain and restrain her.

278.    The physical force that Granshaw exerted upon Krittika was intended to cause her pain and injury with a view towards breaking her will and causing her to falsely confess to crimes to which she had no knowledge or involvement.

279.    The verbal threats made by Granshaw to Krittika were intended to instill further fear in Krittika in furtherance of his efforts to break her will and cause her to falsely confess to crimes to which she had no knowledge or involvement.

280.    Notwithstanding that Krittika offered to make her computers and e-mails available to the police in an effort to demonstrate her actual innocence, defendant P.O. Granshaw made no efforts to follow up on Krittika's offer, instead stating, in substance, that such review would "be taken care of later."

281.    Prior to detaining, handcuffing and arresting Krittika, defendant Granshaw was not provided with any information from a reliable third-party which would justify forcibly detaining Krittika, much less handcuffing and arresting her.

282.    Krittika did not commit any offense in the presence of P.O. Granshaw.

283.    Krittika did not commit any crime in the presence of P.O. Granshaw.

284.    P.O. Granshaw did not have reasonable cause to believe that Krittika committed any offense.

285.    P.O. Granshaw did not have reasonable cause to believe that Krittika committed any crime.

286.    Defendant Granshaw actually knew that Krittika was being framed and he knowingly participated in the sham arrest.

- *DEFENDANT P.O. MALDONADO TAKES
  FORCIBLE CUSTODY OF KRITTIKA*

287.    Shortly thereafter defendant P.O. Maldonado entered A.P. Kearse's office, approached Krittika, removed P.O. Granshaw's handcuffs from Krittika's wrists and then placed her own handcuffs upon Krittika's wrists.

288.    Krittika did not consent to P.O. Maldonado handcuffing her.

289.    Krittika did not consent to Maldonado having any physical contact with her.

290.    Krittika was handcuffed behind her back.

291.    Krittika did not commit any offense in the presence of P.O. Maldonado.

292.    Krittika did not commit any crime in the presence of P.O. Maldonado.

200.    P.O. Maldonado did not have reasonable cause to believe that Krittika committed any offense.

293.    P.O. Maldonado did not have reasonable cause to believe that Krittika committed any crime.

294.    Defendant P.O. Maldonado did not have reasonable suspicion to detain or restrain Krittika.

295.    A reasonable person in defendant P.O. Maldonado's position would not have believed that she had reasonable suspicion to detain or restrain Krittika.

296.    Defendant P.O. Maldonado did not have probable cause to detain, restrain and/or arrest Krittika.

297.    A reasonable person in defendant P.O. Maldonado's position would not have believed that she had probable cause to detain, restrain and/or arrest Krittika.

- *KRITTIKA SOUGHT TO EXERCISE HER RIGHTS UNDER THE VIENNA CONVENTION ON CONSULAR RELATIONS BUT THE DEFENDANTS THWARTED SAME*

298.    Krittika informed both defendants P.O. Maldonado and P.O. Granshaw that her father was vice-consul for the Consulate General of India in New York City and that she had cause to believe that she possessed immunity from detention and/or arrest.

299.    Krittika expeditiously requested of P.O. Granshaw and P.O. Maldonado the opportunity to communicate with the Consulate General of India.

300.    The United States is a signatory to the Vienna Convention on Consular Relations.

301.    India is a signatory to the Vienna Convention on Consular Relations.

302.    Article 36 of the Vienna Convention on Consular Relations is entitled "Communication and contact with nationals of the sending State".

303.    A copy of the Vienna Convention on Consular Relations is appended hereto

as <u>Exhibit 4</u>.[4]  In pertinent part, Article 36 of the Vienna Convention on Consular

---

[4]Articles 40 - 42 of the Vienna Convention on Consular Relations provide:

Article 40:    Protection of consular officers.  The receiving State shall treat consular officers with due respect and shall take all appropriate steps to prevent any attack on their person, freedom or dignity.

Article 41:    Personal inviolability of consular officers.

1.    Consular officers shall not be liable to arrest or detention pending trial, except in the case of a grave crime and pursuant to a decision by the competent judicial authority.

2.    Except in the case specified in paragraph 1 of this article, consular officers shall not be committed to prison or be liable to any other form of restriction on their personal freedom save in execution of a judicial decision of final effect.

3.    If criminal proceedings are instituted against a consular officer, he must appear before the competent authorities. Nevertheless, the proceedings shall be conducted with the respect due to him by reason of his official position and, except in the case specified in paragraph 1 of this article, in a manner which will hamper the exercise of consular functions as little as possible. When, in the circumstances mentioned in paragraph 1 of this article, it has become necessary to detain a consular officer, the proceedings against him shall be instituted with the minimum of delay.

Article 42:    Notification of arrest, detention or prosecution.  In the event of the arrest or detention, pending trial, of a member of the consular staff, or of criminal proceedings being instituted against him, the receiving State shall promptly notify the head of the consular post. Should the latter be himself the object of any such measure, the receiving State shall notify the sending State through the diplomatic channel.

Relations provides that:

> 1.    With a view to facilitating the exercise of consular functions relating to nationals of the sending State:
> (a) consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;
>
> (b) if he so requests, the competent authorities of the receiving State shall, <u>without delay</u>, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any

_____

Furthermore, Article 53 of the Vienna Convention on Consular Relations provides, in pertinent part, that

> Article 53:    Beginning and end of consular privileges and immunities.
>
> 1.    Every member of the consular post shall enjoy the privileges and immunities provided in the present Convention from the moment he enters the territory of the receiving State on proceeding to take up his post or, if already in its territory, from the moment when he enters on his duties with the consular post.
>
> 2.    <u>Members of the family of a member of the consular post forming part of his household</u> and members of his private staff shall receive the privileges and immunities provided in the present Convention from the date from which he enjoys privileges and immunities in accordance with paragraph 1 of this article or from the date of their entry into the territory of the receiving State or from the date of their becoming a member of such family or private staff, whichever is the latest. . .

(<u>emphasis added</u>).   The current Second Circuit jurisprudence on the Vienna Convention on Consular Relations, based upon the "great weight" afforded the Executive's current interpretation,  causes violations of VCCR rights to be vindicated by sovereign states that are parties thereto and not by individual persons.

communication addressed to the consular post by the person arrested, in prison, custody or detention shall be forwarded by the said authorities <u>without delay</u>. The said authorities shall inform the person concerned without delay of his rights under this subparagraph;

(c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation.  They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgement. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.

2.      The rights referred to in paragraph 1 of this article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this article are intended.

(<u>Emphasis added</u>).

304.    Generally, foreign nationals who are arrested and/or detained by law enforcement authorities in the United States, must be advised, without delay, of their right to have consular officers of their home country notified of their arrest and/or detention.

305.    Generally, foreign nationals who are arrested and/or detained by law enforcement authorities in the United States, must be advised, without delay, that they have a right to have communications with consular officers of their home country forwarded to such consular officers.

72

306.    Generally, when a foreign national is arrested or detained by law enforcement authorities in the United States, upon the request of the foreign national their consular officers must be notified without delay of such arrest and/or detention.

307.    The NYPD has rules and regulations governing the conduct of its sworn law enforcement officers, including rules and regulations promulgated into the NYPD "Patrol Guide."

308.    Upon information and belief, the rules and regulations of the NYPD are created and approved by policy makers within the NYPD and NYC.

309.    Upon information and belief, pursuant to the rules and regulations of the NYPD, Police Officers of the NYPD are required to comply with the NYPD rules and regulations, including those delineated within the Patrol Guide.

310.    Upon information and belief, at times the rules and regulations of the NYPD are revised and updated.

311.    Upon information and belief, at time the NYPD alters, suspend, amends and/or changes rules and regulations.

312.    Upon information and belief, at time when the NYPD alters, suspend, amends and/or changes rules and regulations in between revisions of its published rules and regulations, including the Patrol Guide, the NYPD issues and disseminates Interim Orders amongst its personnel to reflect such changes.

313.    Upon information and belief, the rules and regulations of the NYPD, including as reflected in the Patrol Guide and/or Interim Orders, mandate compliance with the consular notification provisions of Article 36 of the Vienna Convention on Consular Relations.

314.    When an Indian foreign national is arrested and/or detained by the NYPD such Indian foreign national must be advised, without delay, of their right to have consular officers of the Consulate General of India notified of their arrest and/or detention.

315.    When an Indian foreign national is arrested and/or detained by the NYPD such Indian foreign national must be advised, without delay, that they have a right to have communications with consular officers of the Consulate General of India forwarded to such consular officers of the Consulate General of India.

316.    When an Indian foreign national is arrested and/or detained by the NYPD, upon the request of such Indian foreign national, the NYPD must, without delay, notify consular officers of the Consulate General of India of the arrest and/or detention of the Indian foreign national.

317.    Upon information and belief, when a foreign national is arrested by the NYPD, the rules and regulations of the NYPD mandate that the arresting officer(s) must notify the foreign national that they have a right to have their embassy or consulate notified.

74

318.   <u>NYPD Inter-City Correspondence Unit Must be Notified by the Arresting</u> <u>Officer</u>:  Upon information and belief, when a foreign national is arrested by the NYPD, and such arrested person requests that notification of their detention be made to consular officials, the rules and regulations of the NYPD mandate that the arresting officer(s) must, *inter alia*: (a) contact the Inter-City Correspondence Unit ("ICCU") of the NYPD; (b) provide pedigree information about the arrested foreign national to the ICCU; and, (c) advise the ICCU exactly where the arrested foreign national is being detained.

319.   Upon information and belief, the rules and regulations of the NYPD mandate that when a foreign national in NYPD custody requests notification of their arrest and detention be made to consular officials, the ICCU must notify the embassy and/or consulate of the arrested foreign national.

320.   Upon information and belief, the rules and regulations of the NYPD mandate that when a foreign national in NYPD custody requests notification of their arrest and detention be made to consular officials, the <u>Desk Officer</u> at the NYPD precinct of arrest must ensure that the arresting officer complied with consular notification requirements.

321.   Upon information and belief, the rules and regulations of the NYPD mandate that when a foreign national in NYPD custody requests notification of their arrest and detention be made to consular officials, the <u>NYPD supervisor on duty at</u>

<u>Central Booking</u> must ensure that the arresting officer complied with consular notification requirements.

322.    Upon information and belief, as a matter of policy, practice and custom, the NYPD and its members, <u>routinely ignore</u> the consular notification requirements imposed by the Vienna Convention on Consular Relations and their own rules and regulations.

323.    The NYCDOE had actual knowledge that Krittika's father was, at all relevant times, including at the time of Krittika's arrest and detention, vice-consul to the Consulate General of India.

324.    Upon information and belief, NYPD personnel obtained personal information about Krittika from NYCDOE personnel at John Bowne High School, and were accordingly on notice that Krittika's father was vice-consul to the Consulate General of India.

325.    Krittika requested to communicate with Consular officials of the Consulate General of India.

326.    Krittika requested that Consular officials of the Consulate General of India be notified of her arrest and detention by the NYPD, including by defendants Granshaw, Maldonado and John/Jane Doe NYPD personnel.

327.    Krittika requested to communicate with her father, the vice-consul of the Consulate General of India.

328.    Krittika requested that her father, the vice-consul of the Consulate General of India, be notified of her arrest and detention.

329.    No representative of NYC, the NYPD and/or the NYCDOE advised Krittika of her right to have the Consulate General of India notified of her arrest and detention.

330.    No representative of NYC, the NYPD and/or the NYCDOE advised Krittika of her right to have communications on her behalf forwarded to the Consulate General of India.

331.    No representative of NYC, the NYPD and/or the NYCDOE notified any Consular Officer from India, including representatives of the Consulate General of India in New York that Krittika was arrested and/or detained.

332.    No representative of NYC, the NYPD and/or the NYCDOE notified Krittika's parents, including Krittika's father, the vice-consul of the Consulate General of India in New York, that Krittika was arrested and/or detained.

- *THE DEFENDANTS PUBLICALLY HUMILIATED KRITTIKA*

333.    Shortly after defendant P.O. Maldonado handcuffed Krittika, defendants P.O. Granshaw and P.O. Maldonado walked her through public areas of John Bowne High School to the front door of the school, humiliatingly exposing the fact that Krittika was handcuffed to other students.

334.    Defendants P.O. Maldonado and P.O. Granshaw then placed Krittika into an NYPD police car and transported her to an NYPD precinct station house.

335.    Upon information and belief, the precinct station house is a building operated and controlled by defendant NYC via and for the NYPD.

336.    After arrival at the NYPD precinct station house, defendant Maldonado directed Krittika to remove her shoelaces and after Krittika complied she was locked within a cell along with another female in custody.

337.    Krittika asked defendant P.O. Maldonado what would happen to her next, and was informed that she would be fingerprinted, photographed and eventually transported to the NYPD Queens Central Booking facility.

338.    While detained at the NYPD precinct station house Krittika was not free to go.

339.    Krittika did not consent to any police officers handcuffing her.

340.    Krittika did not consent to any police officers having any physical contact with her.

341.    While detained at the NYPD precinct station house, Krittika asked to use a bathroom in order to relief herself, and defendant P.O. Maldonado refused to let her use a bathroom, directing her, in substance, to wait until after she was fully processed at the precinct and then transported to central booking.

342.    Maldonado unnecessarily withheld access to a bathroom from Krittika.

78

343.    Maldonado withheld access to the bathroom from Krittika as an exercise of physical force.

344.    The physical force that Maldonado exerted upon Krittika was intended to cause her pain and discomfort with a view towards breaking her will and causing her to falsely confess to crimes to which she had no knowledge or involvement.

345.    Thereafter a bald or balding, male, Caucasian appearing NYPD Officer, John Doe # 1, whose identity is not yet known, came to the vicinity of the holding cell where Krittika was detained and then looked through the e-mails which defendant P.O. Maldonado had placed on a desk.

346.    John Doe Officer # 1 took hold of Krittika and took her within the NYPD precinct station house and fingerprinted and photographed her.

347.    Krittika did not consent to being fingerprinted or photographed.

348.    While John Doe Officer # 1 had custody of Krittika, she asked him for permission to notify her father and/or the Consulate General of India of her arrest and detention; however, John Doe Officer # 1 refused, instead stating, in substance, "you need to call daddy?  You're a big girl and you should have thought of this before you sent the e-mails."

349.    Krittika did not send the e-mails that she was accused of sending.

350.    After photographing and fingerprinting Krittika, John Doe Officer # 1 returned Krittika to the holding cell at which time Krittika again asked John Doe Officer # 1, defendant P.O. Maldonado, and other officers present, to notify her father and/or the Consulate General of India of her arrest and detention; however, all of the officers refused, informing Krittika that she would have to wait until she went to Central Booking before any calls could be made.

351.    While being returned to the holding cell, Krittika again asked to use the bathroom and was again refused, while being told that she would have to wait until she was taken to Central Booking.

352.    Some time thereafter, Krittika and another female detainee were removed from the holding cell by defendant P.O. Maldonado and John Doe Officer # 1, at which time Krittika was again handcuffed behind her back, escorted to an NYPD vehicle, and then transported to Queens Central Booking, arriving at approximately 3:45 p.m. on February 8, 2011.

353.    Upon arrival at Queens Central Booking Krittika was directed to sit on a bench, and was then handcuffed to the bench.

354.    Krittika was then taken for further fingerprinting and photographing at Queens Central Booking, as well as a search of her person physically and with a metal detector.

355.    Krittika did not consent to any search of her person.

80

356.    Krittika again asked for permission to notify her father and/or the Consulate General of India of her arrest and detention; however, she was unable to call until moved to a Central Booking holding cell that had a working telephone.

357.    Not until being placed in a holding cell at Queens Central Booking at approximately 5:00 p.m. was Krittika finally permitted to use a bathroom, and then only on a toilet within a cell in semi-public view of others.

358.    At approximately 7:00 p.m. Krittika was placed in another holding cell at Queens Central Booking, also along with other female detainees, and was then transferred to another cell with a telephone.

359.    While in the third cell at Central Booking that she had been detained within Krittika was finally able to call her father.

360.    Prior to Krittika calling her father, Krittika's family and the Consulate General of India were unaware that she had been arrested and/or detained.

361.    At approximately 9:00 p.m., two law enforcement personnel in plainclothes, whom Krittika perceived to be detectives, took custody of Krittika and took her to a room with videotaping equipment.

362.    These apparent detectives provided Krittika with the warnings mandated by *Miranda v. Arizona* and its progeny and then, in a session the "detectives" claimed was being memorialized on video, questioned Krittika, seeking a confession, wherein Krittika again wholly denied involvement with any e-mails sent to teachers.

363.    After the video statement was concluded, Krittika was escorted back to the holding cell with the working phone, at which time she again called her father.

364.    Krittika called her father 4 times from Queens Central Booking.

365.    Representatives from the Consulate General of India were notified by Krittika's father that Krittika had been arrested and was being detained at Queens Central Booking.

366.    Representatives of the Consulate General of India went to Queens Central Booking and were denied access to Krittika by John and Jane Doe NYPD personnel.

367.    Sometime at or after 11:00 p.m. a Jane Doe NYPD personnel distributed dirty and stained mattresses and blankets to the female detainees being held at Queens Central Booking, including Krittika.

368.    This female Jane Doe NYPD personnel essentially threw the filthy mattresses and blankets at the female detainees, including Krittika.

369.    This female Jane Doe NYPD personnel stepped on the filthy blanket prior to throwing it at Krittika.

370.    In an effort not to expose her person to the filthy mattress and blanket, Krittika joined another arrestee on a bench within the Central Booking holding cell and attempted to sleep on the bench.

371.   Krittika stayed on or near the bench, while locked within the holding cell in Queens Central Booking, until approximately 9:00 a.m. on February 9, 2011, at which time she again called her father.

372.   At approximately 12:00 p.m., having still not been seen by or communicated with consular officials, Krittika again called her father, and was able to speak with an attorney by phone.

373.   Thereafter, at approximately 1:30 p.m., a male John Doe NYPD Officer took custody of Krittika, removed her from the holding cell, handcuffed her and took her to an area where she was first able to meet with an attorney.

374.   After meeting with her attorney, Krittika was escorted back to the holding cell in Queens Central Booking and again locked inside.

375.   At approximately 2:00 p.m. on February 9, 2011, after intervention of counsel on behalf of Krittika, the District Attorney of Queens County dismissed all charges against Krittika prior to criminal court arraignment (*see* Ex. 1(2)).

376.   At approximately 2:30 p.m. on February 9, 2011 Krittika was again removed from the holding cell by a John Doe NYPD Officer who informed her that she had to sign a document and would then be permitted to leave.  Krittika signed the document and was then released from custody.

377.   Krittika was not provided a copy of the document she was directed to sign.

378.    Krittika was involuntarily detained and not free to leave from approximately 9:45 a.m. on February 8, 2011 until approximately 2:30 p.m. on February 9, 2011.

379.    Krittika remained involuntarily in the custody of the NYPD, detained against her will and not free to leave, from approximately 11:45 a.m. on February 8, 2011 until approximately 2:30 p.m. on February 9, 2011.

380.    Krittika did not consent to any part of her seizure, restraint, detention, handcuffing or physical contact with her person by any NYC, NYCDOE and NYPD personnel.

381.    Krittika was detained against her will, without license, basis or reason for approximately 28 hours.

382.    As a result of her wrongful arrest, detention, seizure, restrain and imprisonment, Krittika's family retained an attorney to defend her as necessary.

383.    Retention of counsel to defend Krittika was at great personal expense to Krittika's family.

384.    Krittika's need for retained counsel was caused by NYC, NYCDOE, Kwait , Kim-Ross,  Granshaw, Maldonado and John/Jane Doe NYPD and NYCDOE personnel, including A.P. Eutsey, wrongly causing and effecting Krittika's wrongful and unconstitutional arrest, detention, seizure, restrain and imprisonment.

- *KRITTIKA WAS WRONGLY DISCIPLINED AND
  SUSPENDED BEGINNING ON FEBRUARY 10, 2011*

385.    Notwithstanding that the public prosecutor dismissed all charges against Krittika, on or about February 10, 2011, defendant NYCDOE, via defendants Kim-Ross, Kwait, Konstan and the OSYD suspended Krittika from school.

386.    The suspension was aided by defendants Granshaw and Maldonado's forcible detention and arrest of Krittika and forcible removal of Krittika's person from school.

387.    Notwithstanding that there was no evidence linking Krittika to any e-mails sent to teachers, this suspension was nevertheless sought, approved and authorized by defendants Kim-Ross, Kwait, Konstan and John/Jane Does.

388.    Notwithstanding a claimed IP address associated with the entirety of Krittika's 27 floor 200 plus apartment building, the witness list provided with documents about the suspension contained absolutely no reference to anyone with the training and experience necessary to render an opinion regarding the defendants' claimed link between Krittika's building and the IP address from which the offensive e-mails originated.

389.    The only witness listed was Kim-Ross.

390.    A.P. Eutsey along with Kim-Ross, Kwait, and Konstan knew that the alleged IP address associated with the entirety of Krittika's 27 story 200 plus apartment building was a fabrication, yet they pursued the suspension based upon what was knowingly false evidence.

85

391.    Prior to the suspension, Krittika was not properly provided adequate notice that a suspension was possible.

392.    Krittika repeatedly and truthfully denied all allegations of misconduct levied against her.

393.    Prior to the suspension, Krittika was not properly afforded an informal conference to set forth her side of the story.

394.    Prior to the suspension, Krittika's parents were not properly afforded an informal conference to set forth Krritika's side of the story.

395.    Prior to the suspension, Krittika was not properly afforded an informal conference to ask questions of the allegedly complaining witnesses.

396.    Prior to the suspension, Krittika's parents were not properly afforded an informal conference to ask questions of the allegedly complaining witnesses.

397.    Krittika did not pose a danger to persons or property.

398.    Krittika was not an ongoing threat of disruption to the academic process.

399.    Krittika did nothing to warrant any discipline, including suspension from school and interference with her enriched level academics.

400.    Krittika's suspension from school only compounded the harm resulting from her wrongful and baseless arrest.

401.    As a result of being suspended from John Bowne High School, Krittika was unable to attend Advanced Placement classes and instead had to try to keep up with complex and sophisticated academic work without any professional instruction, in a new setting worthy of "reform school."

402.    As a result of being suspended from John Bowne High School, Krittika was unable to attend Shakespeare studies in her English class and instead was relegated to lower level work that was well below her academic level and ability.

403.    On or about February 16, 2011, after all criminal charges against Krittika were dismissed, defendant Kim-Ross generated a false and misleading hand-written complaint about Krittika, *inter alia*, knowingly falsely alleging that Krittika sent the offensive e-mails when defendant Kim-Ross knew that Krittika had not sent them, and further knew that there was no evidence whatsoever linking Krittika to the e-mails (*See* Ex. 1(4)).

404.    A. P. Eutsey along with defendants Kim-Ross and Kwait fabricated the claimed IP address associated with the entirety of Krittika's 27 floor 200 plus apartment building because they knew that Krittika did not send the offensive e-mails.

405.    A. P. Eutsey along with defendants Kim-Ross and Kwait knew that Krittika did not send offensive e-mails to any teachers, yet still demanded Krittika's arrest and suspension from school.

87

406.   A. P. Eutsey along with defendants Kim-Ross and Kwait knew that there was no evidence linking Krittika to the offensive e-mails sent to her, yet still demanded Krittika's arrest and suspension from school.

407.   Defendants NYCDOE, Kwait , Kim-Ross,  Konstan and John/Jane Doe NYCDOE personnel knew that there was no evidence linking Krittika to the offensive e-mails sent to teachers, yet still authorized her suspension from school.

408.   Defendants NYCDOE, Kwait , Kim-Ross,  Konstan and John/Jane Doe NYCDOE personnel knew that there was no evidence linking Krittika to the offensive e-mails sent to teachers, yet still directed her suspension from school.

409.   Defendants NYCDOE, Kwait , Kim-Ross,  Konstan and John/Jane Doe NYCDOE personnel knew that there was no evidence linking Krittika to the offensive e-mails sent to teachers, yet still caused her suspension from school.

410.   Upon information and belief, defendants Kwait , Kim-Ross and John/Jane Doe NYCDOE personnel publicized Krittika's arrest to staff and students at John Bowne High School.

411.   Upon information and belief, defendants Kwait , Kim-Ross and John/Jane Doe NYCDOE personnel publicized Krittika's suspension to staff and students at John Bowne High School.

412.   In an effort to combat the baseless suspension Krittika's family retained counsel to defend Krittika against the baseless charges.

413.    Krittika's need for counsel in the disciplinary matter, including suspension hearing proceedings, was caused by NYCDOE, Kwait , Kim-Ross,  Konstan and John/Jane Doe NYCDOE personnel, including A.P. Eutsey causing false disciplinary and criminal charges and a resulting suspension to be levied against Krittika.

414.    Krittika's need for counsel in the disciplinary matter, including suspension hearing proceedings, was caused by NYC, Granshaw, Maldonado and NYPD personnel causing false criminal charges leading to the resulting suspension to be levied against Krittika.

415.    The need for a counsel resulted in great personal expense to Krittika and her family.

416.    In an effort to combat the baseless suspension Krittika's family retained Gleb Liferenko, a computer expert, to analyze the e-mails reportedly received by defendant Kim-Ross and their associated "header" information.

417.    Mr. Liferenko determined to a reasonable degree of certainty based upon his expertise that the e-mails received by defendant Kim-Ross did not originate from Krittika's family computer (*see* Ex. 1(5)).

418.    Krittika's need for a computer expert was caused by NYC, NYCDOE, Kwait , Kim-Ross,  Konstan, NYCDOE personnel, Granshaw, Maldonado and NYC personnel causing false disciplinary and criminal charges and a resulting suspension to be levied against Krittika.

419.    The need for a computer expert resulted in great personal expense to Krittika and her family, as reflected in the invoice from Mr. Liferenko for $3,363.20 (*see* Ex. 1(6)).

420.    Defendants NYC, NYCDOE, Kwait , Kim-Ross,  Konstan and John/Jane Doe NYCDOE personnel needlessly and maliciously prolonged the suspension period by delaying Krittika's formal hearing.

421.    On Friday, March 11, 2011 John Tsapelas, a NYCDOE employee at John Bowne High School appeared as a "Dean" on behalf of the NYCDOE at what was to be a hearing regarding Krittika's suspension and reported that the school required an adjournment of the hearing because of a death in the family of a NYCDOE witness against Krittika [Exhibit 5; *see also* Ex. 1(10)].

422.    Krittika, her family, her attorney and her computer expert were present and prepared to proceed on March 11, 2011.

423.    On March 11, 2011 Krittika's attorney provided NYCDOE with the affidavit of Krittika's computer expert.

424.    The adjournment requested by the NYCDOE was granted because of the reported death.

425.    On March 15, 2011 the suspension of Krittika was withdrawn by the Superintendent and reportedly expunged (*see e.g.* Ex. 1(7)).

426.    The suspension hearing was a judicial proceeding.

90

427.   The suspension hearing was terminated in Krittika's favor.

428.   Krittika was actually innocent and, upon information and belief, this actual innocence was the ultimate cause for the withdrawal of the suspension.

429.   A.P. Eutsey later informed Krittika that none of the supposed witnesses against her had experienced a death in their family necessitating an adjournment of the disciplinary hearing.

430.   Because of the needless, baseless, meritless and groundless suspension, Krittika was compelled to remain away from John Bowne High School, involuntarily and against her will, for over 1 month, from February 8, 2011 through March 14, 2011.

- *NYCDOE'S CONSTITUTIONALLY DEFECTIVE SUSPENSION PROTOCOL*

431.   NYCDOE promulgates disciplinary rules and regulations pertaining to students.

432.   Defendant Konstan, as CEO of the OSYD, is a policy maker in the NYCDOE disciplinary process.

433.   Defendant Konstan promulgated, administered, implemented, augmented or otherwise permitted and supervised a disciplinary protocol that permitted a student to be suspended for sending offensive e-mails without any scientific evidence to support such claim.

434.   Defendant Konstan promulgated, administered, implemented, augmented or otherwise permitted and supervised a disciplinary protocol that permitted a student to be

suspended for sending offensive e-mails without any evidence linking the suspended student to the computer used to send the offensive e-mails or any direct evidence of the authorship of the e-mails by the suspended student.

435.    This protocol is in bad faith and devoid of scientific merit.  Accordingly, it threatens the approximately 1.1 Million New York City public school students, in grades K through 12, with constitutional injury.

436.    The protocol is in bad faith because it requires no real proof that the suspended student actually committed or was involved with the predicate offense, to wit: the sending of offensive or threatening e-mails.  Rather, the e-mails self-contain identifying information about the sender, in the form of an IP address, and the protocol requires no actual inspection or investigation so as to determine the subscriber associated with the IP address.

437.    The policy, practice and protocol of the NYCDOE in permitting students, like Krittika, to be suspended based solely on the mere whim bad faith, malice or caprice of a teacher or principal, even in the face of totally exculpatory evidence, as in the case of Krittika, is constitutionally defective as it is in wholesale violation of the state and federal constitutional rights of the approximately 1.1 Million New York City public school students, in grades K through 12, subjected to this disciplinary protocol, and as a result are all now at heightened risk of constitutional injury, and, upon information and belief, injured.

- *KRITTIKA WAS SUBSTANTIALLY HARMED BY THE DEFENDANTS' MISCONDUCT AND VIOLATIONS OF HER CONSTITUTIONAL RIGHTS AND PRIVILEGES*

438.   Krittika returned to John Bowne High School, yet had to withdraw from the Calculus BC course because given that defendant Kim-Ross had falsely accused her of crimes and misconduct, Krittika was understandably uncomfortable with defendant Kim-Ross as a teacher.

439.   Accordingly, Krittika lost the opportunity to even attempt to obtain college calculus credit by way of an Advanced Placement examination.

440.   Furthermore, Krittika also suffered from no longer having calculus on her course program and transcript as reported to potential colleges.

441.   Upon Krittika's return to John Bowne High School she experienced substantial embarrassment as word of her arrest was widely known due to students and staff having seen defendants P.O. Granshaw and P.O. Maldonado escorting her from the school in handcuffs on February 8, 2011.

442.   Krittika was emotionally traumatized by her arrest and involuntary detention.

443.   Krittika was emotionally traumatized by her suspension from school.

444.   Upon Krittika's return to John Bowne High School she experienced substantial embarrassment as word of her arrest was widely known due to, upon

information and belief, defendants Kwait , Kim-Ross and John/Jane Doe NYCDOE

personnel publicizing Krittika's arrest to staff and students at John Bowne High School.

445.    Upon Krittika's return to John Bowne High School she experienced

substantial embarrassment as word of her suspension was widely known due to, upon

information and belief, defendants Kwait , Kim-Ross and John/Jane Doe NYCDOE

personnel publicizing Krittika's suspension to staff and students at John Bowne High

School.

- *KRITTIKA WAS DISCRIMINATED AGAINST BECAUSE OF HER ETHNICITY*

446.    After Krittika's return to John Bowne High School on March 14, 2011, she

was informed that the actual sender of the offensive e-mails was identified as S.M..

447.    Upon information and belief, S.M. admitted to NYCDOE officials that

he wrote and sent the offensive e-mails to teachers, including to defendant Kim-Ross.

448.    On March 15, 2011 S.M. personally admitted to Krittika that he wrote and

sent the offensive e-mails.

449.    Defendant NYCDOE, by way of A.P. Eutsey and defendants Kim-Ross and

Kwait, falsely targeted Krittika for arrest and suspension for offenses for which Krittika

was actually innocent because Krittika is of Southeast Asian Indian decent.

450.    Defendant NYCDOE, by way of A.P. Eutsey and defendants Kim-Ross and

Kwait, falsely targeted Krittika for arrest and suspension for offenses for which Krittika

was actually innocent because Krittika is the daughter of an Indian consular representative to the United States.

451.   Defendant NYCDOE, by way of A.P. Eutsey and defendants Kim-Ross and Kwait, maliciously and falsely claimed that Krittika sent offensive e-mails because of social, racial and ethnic animus towards Krittika.

452.   In accordance with the policy and practice of NYCDOE, defendant Kim-Ross, acting under color of law, falsely accused Krittika of crimes and bad acts based, upon information and belief, upon her race and ethnicity as an Indian of Southeast Asian decent.

453.   In accordance with the policy and practice of NYCDOE, defendant Kwait, acting under color of law, selected Krittika for false arrest and detention, malicious prosecution, suspension and disciplinary treatment based, upon information and belief, upon her race and ethnicity as an Indian of Southeast Asian decent.

454.   In accordance with the policy and practice of NYCDOE, defendants Kwait and Konstan, along with A.P. Eutsey, all acting under color of law, approved of Krittika's false arrest and detention, malicious prosecution, suspension and disciplinary treatment based upon her race and ethnicity as an Indian of Southeast Asian decent.

455.   In accordance with the policy and practice of NYCDOE, defendants Kwait and Konstan, along with A.P. Eutsey, all acting under color of law, authorized Krittika's

false arrest and detention, malicious prosecution, suspension and disciplinary treatment based upon her race and ethnicity as an Indian of Southeast Asian decent.

456.    In accordance with the policy and practice of NYCDOE, defendants Kim-Ross, Kwait and Konstan, along with A.P. Eutsey, all acting under color of law, directed Krittika's false arrest and detention, malicious prosecution, suspension and disciplinary treatment based upon her race and ethnicity as an Indian of Southeast Asian decent.

457.    In accordance with the policy and practice of NYCDOE, defendants Kim-Ross, Kwait and Konstan, along with A.P. Eutsey, all acting under color of law, caused Krittika's false arrest and detention, malicious prosecution, suspension and disciplinary treatment based upon her race and ethnicity as an Indian of Southeast Asian decent.

458.    At the insistence of defendant Kim-Ross, with Kwait's acquiescence, unlike how the defendants acted towards Krittika, S.M. was <u>not</u> referred to the NYPD despite his confession and absolute proof of guilt - given that the IP address of the 5 offensive e-mails came from S.M.'s IP address.

459.    At the insistence of defendants Kim-Ross and Kwait, S.M. was <u>not</u> arrested, despite his actual guilt and admission of guilt.

460.    S.M. and defendant Kim-Ross are both of Oriental Asian decent.

461.    Defendants Kim-Ross and Kwait, in their individual and official capacities, insisted upon S.M. not facing criminal charges for his admitted to misconduct because S.M. is of Oriental Asian decent.

96

462.   As a result of Krittika's wrongful arrest, detention, restraint, arrest and suspension, Krittika experienced emotional and physical injury, including, significant embarrassment, severe anxiety, protracted fear, severe headaches, significant sleeplessness, appreciable loss of appetite, substantial weight loss, and prematurely left the United States for India.

463.   As a result of Krittika's wrongful arrest, detention, restraint, arrest and suspension, Krittika required treatment by a physician and with medication, including analgesics, sleep inducers and appetite enhancement medication (*see e.g.* Ex. 1(13)).

## IX.   THE MUNICIPAL DEFENDANTS' UNCONSTITUTIONAL POLICIES, PRACTICES AND CUSTOMS

- *DEFENDANT NYC AND THE NYPD*

464.   Upon information and belief, NYC and the NYPD, by and through their final policymakers, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques, including but not limited to the following: (a) disregarding the Fifth Amendment rights of criminal suspects and defendants, in particular young people; (b) fabricating evidence; (c) failing to document and disclose material and exculpatory evidence; and (d) failing to investigate known exculpatory evidence and otherwise failing to conduct constitutionally adequate investigations.

465.    Upon information and belief, NYC and the NYPD, including its School Safety Division and NYPD personnel performing law enforcement functions within NYC public schools under the control of NYC and the NYCDOE, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional detentions, questioning, searching, and arresting of NYC public school students, in violation of the Fourth Amendment of the United States Constitution and state law, including, *inter alia*, (i) arresting students for minor violations of school rules, notwithstanding that such conduct does not constitute probable cause of criminal activity; (ii) handcuffing students within NYCDOE public school buildings, without parental knowledge and/or consent, for alleged conduct that does not constitute probable cause of criminal activity; and, (iii) removing school children from schools without parental knowledge and/or consent, detaining them, and transporting them to NYPD facilities, while handcuffed, for continued detention, including within holding cells, for alleged conduct that does not constitute probable cause of criminal activity.

466.    Upon information and belief, as a result of these unconstitutional  policies, customs, patterns and practices, students at NYC public schools suffer continued damage. Like Krittika, they face the indignity of being paraded in front of their classmates and teachers while handcuffed.  Moreover, they further face the humiliation of being dragged from school, while handcuffed, in front of fellow students, teachers and administrators, and going through the lengthy and at times terrifying NYPD arrest processing procedures,

including lengthy detentions in holding cells at the precinct of arrest and central booking facilities.

467.    Upon information and belief, NYC and the NYPD, by and through their policymakers, maintained a policy, custom, or pattern and practice of failing to train and supervise NYPD law enforcement personnel in connection with fundamental investigative tasks implicating the constitutional rights of witnesses and suspects, including but not limited to conducting and documenting criminal investigations, conducting custodial interrogations and witness interviews, and documenting and disclosing exculpatory evidence.

468.    The policy, custom, or pattern and practice of NYC and the NYPD of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques, and its policy, custom, or pattern and practice of failing to train and supervise NYPD law enforcement personnel, were evidenced by, among other actions, multiple constitutional violations and related acts of misconduct committed by defendants Granshaw, Maldonado and John/Jane Does, in the course of the investigation and prosecution of Krittika, and in the course of prior and subsequent cases.

469.    The policies, customs, patterns and practices challenged by this action, constitute the official municipal policy of defendant NYC.

470.    By Memorandum of Understanding ("MOU") dated September 17, 1998, the NYPD and the then NYC Board of Education (now defendant NYCDOE) transferred school security functions from the Board of Education's then Division of School Safety to the NYPD [Exhibit 6].    Thereafter, by Executive Order No. 44 of 1998, the Mayor directed that the MOU take effect immediately. (*Id.*).  Thereafter, by agreement dated January 22, 2003, defendants NYC, by the Mayor, and NYCDOE, by its Chancellor, agreed that the transfer given effect by the September 1998 MOU would continue in effect unless further amended or terminated by written agreement (*Id.*).

471.    The enforcement of school policies, including through arrest, seizure and detention, including by handcuffing, of NYC public school students for alleged behavior that does not rise to the level of probable cause of criminal activity, is the official stated policy of NYC, the NYPD and what is now the NYCDOE (*see e.g.* Ex. 6, MOU at ¶ 19).

472.    On June 11, 2007, Police Commissioner Kelly, in his official capacity, wrote to New York City Council Member Hon. Robert Jackson, in Member Jackson's capacity as Chair of the Council's Education Committee.  By this letter, Commissioner Kelly conceded that NYPD personnel participate in conduct which constitutes the arrest of students for non-criminal conduct, including, "removing unruly students" [Exhibit 7].

473.    Upon information and belief, the removal of an allegedly "unruly" student by NYPD personnel constitutes an unconstitutional seizure and/or an arrest.  Such students are not free to go after they have been seized by NYPD personnel and are

frequently transported to NYPD precincts for arrest processing when their alleged

conduct did not rise to the level of probable cause to believe that a crime had been

committed.  Case in point, Krittika: she did nothing whatsoever in or out of school that

was criminal or even remotely provided NYPD personnel with probable cause to believe

that a crime had been committed - and even under threat and upon application of physical

force - consistently and truthfully denied any misconduct or criminality.  Notwithstanding

same, consistent with the policies, customs, patterns and practices of the NYPD, on

behalf of defendants NYC and NYCDOE, as regards their enforcement activities in NYC

public schools operated by NYCDOE, Krittika was unlawfully restrained, detained,

questioned, and imprisoned for approximately 28 hours - for nothing; and she was never

"unruly," although, the defendants individually and collectively treated Krittika as if she

were "unruly."

474.    Upon information and belief, unlawful seizures of, excessive force toward

and arrests of NYC public school students constitutes municipal policy of defendants

NYC and NYCDOE because such instances occur so often as to amount to the policy,

custom, pattern and/or practice.

475.    Notably, in his June 11, 2007 letter, Commissioner Kelly advised that

since 2002, NYC had received 2,670 complaints against NYPD school safety personnel.

Furthermore, Commissioner Kelly confirmed that 27 percent of the complaints were

substantiated by the NYPD itself.

476.    Furthermore, upon information and belief, defendants NYC and the NYCDOE are on actual notice of such instances based upon, *inter alia*: (a) frequent complaints made to the NYPD, including its Internal Affairs Bureau; (b) testimony at City Council proceedings; (c) legal proceedings commenced against NYC and/or NYCDOE, in state and federal courts, many of which have resolved in favor of the mistreated public school students and their families; (d) published media reports; and, (e) reports and publications submitted to NYC by non governmental organizations, such as the Drum Major Institute for Public Policy and the ACLU/NYCLU.

477.    Upon information and belief, the failures on the part of NYC and including by way of the NYPD, to appropriately train and supervise personnel involved in law enforcement functions, including NYPD officers, like defendants P.O. Granshaw, P.O. Maldonado and John/Jane Does, who are involved in the detention, arrest, discipline and prosecution of NYC public school students, in order to address a known pattern of unconstitutional arrests and seizures, and the use of excessive force amounts to deliberate indifference, thus constituting official municipal policy of defendant NYC.

478.    Upon information and belief, NYC and NYPD policymakers were deliberately indifferent to the known and obvious risk that the policy, custom, or pattern and practice of investigative misconduct and failure to train and supervise NYPD law enforcement personnel created a risk that the constitutional rights of criminal suspects like Krittika would be, and are violated.

479.   Upon information and belief, Police Commissioner Kelly, School's Chancellor Walcott, and defendants NYCDOE and NYC, including via the NYPD, are keenly aware of the allegations described herein, and of the pervasive nature of the policy, custom, pattern and/or practice of the NYPD unlawfully seizing and arresting NYC public school students, and subjecting them to excessive force; however, the defendants have been deliberately indifferent to such policy, custom, pattern and/or practice, and have not attempted to remedy it, despite causing constitutional and tortious injury, including to Krittika.

480.   Upon information and belief, the misconduct and constitutional violations committed by defendants Granshaw, Maldonado and John/Jane Doe defendants of the NYPD in the course of the sham "investigation" and attempt at criminal prosecution of Krittika were carried out pursuant to the policy, custom, or pattern and practice of investigative misconduct of NYC and the NYPD, and were directly and proximately caused by NYC and the NYPD's failure to train and supervise law enforcement personnel.

- *DEFENDANT NYCDOE*

481.   Upon information and belief, prior to and at the time of the putative investigation, prosecution, and detention of Krittika, and continuing to at least 2011, the NYCDOE, by and through final policymakers and their delegees, including then Chancellor Black and now Chancellor Dennis Walcott, and defendant Konstan as CEO of

the OSYD,  maintained a policy, custom, or pattern and practice of failing to supervise, train, and discipline teachers and school administrators in connection with fundamental and recurring constitutional violations against students, such as Krittika.

482.   This policy, custom, or pattern and practice of failing to supervise, train, and discipline teachers and school administrators was evidenced by, *inter alia*, multiple constitutional violations and related acts of misconduct committed by teachers and school administrators of the NYCDOE in the course of the putative investigation and disciplinary prosecution of Krittika, and in the course of prior and subsequent investigations and disciplinary proceedings with other students.

483.   Upon information and belief, NYCDOE, by and through its policymakers, including, but not limited to, its Chancellor and defendant Konstan, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional discipline, arrests, detentions and academic suspensions, including, *inter alia*: (a) disregarding the Fifth Amendment rights of students; (b) fabricating evidence; (c) failing to document and disclose material and exculpatory evidence; (d) failing to investigate known exculpatory evidence and otherwise failing to conduct constitutionally adequate investigations; (e) seeking the arrest of students who had not committed any crime and for which probable cause was lacking; (f)  imposing discipline, including suspension from school, when school officials know that the student had not committed any wrongdoing; (g) continuing with disciplinary proceedings after the

104

innocence of a student has been established, or known from the beginning; and, (h) encouraging the use of excessive physical force upon students by NYPD personnel - as in Krittika's case.

484.    Upon information and belief, NYCDOE, including via its interactions with the NYPD School Safety Division and the influence over such functions that NYCDOE principals, including defendant Kwait have over enforcement policies within schools, and the influence that defendant Konstan and her OSYD similarly have over NYPD functions and actions within NYC public schools under the control the NYCDOE, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional detentions, questioning, searching, and arresting of NYC public school students, leading to unwarranted and unconstitutional depravation of educational rights through abuses of the disciplinary and suspension process.

485.    Upon information and belief, such violations also  manifested themselves by NYCDOE, Konstan, and the Chancellor, permitting such unconstitutional  policies, customs, patterns and practices within New York City public schools, in violation of the Fourth Amendment of the United States Constitution and state law, including, *inter alia*, (i) arresting students for minor violations of school rules, notwithstanding that such conduct does not constitute probable cause of criminal activity; (ii) handcuffing students within NYCDOE public school buildings, without parental knowledge and/or consent, for alleged conduct that does not constitute probable cause of criminal activity; and, (iii)

removing school children from schools without parental knowledge and/or consent, detaining them, and transporting them to NYPD facilities, while handcuffed, for continued detention, including within holding cells, for alleged conduct that does not constitute probable cause of criminal activity.

486.   Upon information and belief, as a result of these unconstitutional policies, customs, patterns and practices, students at NYC public schools suffer continued damage. Like Krittika, they face the indignity of being paraded in front of their classmates and teachers while handcuffed.  Moreover, they further face the humiliation of being dragged from school, while handcuffed, in front of fellow students, teachers and administrators, and going through the lengthy and at times terrifying NYPD arrest processing procedures, including lengthy detentions in holding cells at the precinct of arrest and central booking facilities.

487.   Similarly, such students, like Krittika, are, upon information and belief, also forced to stay away from the school in which they are enrolled at, while wrongly and unjustly suspended from school, and must then face similar humiliation when their suspension and discipline become known to classmates, teachers and administrators.

488.   Expungement of disciplinary records does little to mitigate the immediate physical and emotional harm to such students, like Krittika, who suffer public humiliation for conduct they did not commit, and their families suffer economic cost and

loss in opposing defendants' misconduct, fabrications and knowing violations of constitutional rights.

489.    Upon information and belief, the NYCDOE, by and through its policymakers, including, but not limited to, the Chancellor and defendant Konstan, maintained a policy, custom, or pattern and practice of failing to train and supervise NYCDOE personnel in connection with fundamental tasks implicating the constitutional rights of students, including but not limited to improperly conducting and documenting investigations of alleged disciplinary and criminal violations, use of detention and force, conducting custodial interrogations, and documenting and disclosing exculpatory evidence.

490.    Upon information and belief, the policy, custom, or pattern and practice of the NYCDOE of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigations leading to unwarranted and unconstitutional suspensions, limiting and at times depriving students of their rights to education, and the policy, custom, or pattern and practice of failing to train and supervise NYCDOE personnel, were evidenced by, among other actions, multiple constitutional violations and related acts of misconduct committed by defendants Kim-Ross, Kwait, Konstan and John/Jane Does, as well as A.P. Eutsey, in the course of the investigation, arrest, detention, imprisonment, prosecution, discipline and suspension of Krittika, and in the course of prior and subsequent cases.

491.    The policies, customs, patterns and practices challenged by this action, constitute the official municipal policy of defendant NYCDOE.

492.    Upon information and belief, the enforcement of school policies, including through arrest, seizure and detention, including by handcuffing, of NYC public school students for alleged behavior that does not rise to the level of probable cause of criminal activity, is the official stated policy of NYC, the NYPD and what is now the NYCDOE (*see e.g.* Ex. 6, MOU at ¶ 19, *supra*).

493.    Upon information and belief, the policies, customs, patterns and practices of NYC and the NYCDOE encourage and permit the unconstitutional seizure and/or arrest of public school students.  Such students are not free to go after they have been seized by NYCDOE personnel and are frequently detained in rooms within schools without legal representation, and often are then further detained by NYPD personnel and transported to NYPD precincts for arrest processing when their alleged conduct did not rise to the level of probable cause to believe that a crime had been committed.  Case in point, Krittika: she did nothing whatsoever in or out of school that was criminal or even remotely provided NYPD personnel with probable cause to believe that a crime had been committed - and even under threat and upon application of physical force - consistently and truthfully denied any misconduct or criminality.  Notwithstanding same, consistent with the policies, customs, patterns and practices of the NYPD, on behalf of defendants NYC and NYCDOE, as regards their enforcement activities in NYC public schools

operated by NYCDOE, Krittika was unlawfully restrained, detained, questioned, and imprisoned for approximately 28 hours - when the defendants had documented proof in the e-mails themselves that Krittika was actually innocent.

494.    Upon information and belief, unlawful seizures of, excessive force toward and arrests of NYC public school students constitutes municipal policy of defendant NYCDOE because such instances occur so often as to amount to the policy, custom, pattern and/or practice.

495.    Furthermore, upon information and belief, defendants NYC and the NYCDOE are on actual notice of such instances based upon, *inter alia*: (a) frequent complaints made to the NYPD, including its Internal Affairs Bureau; (b) testimony at City Council proceedings; (c) legal proceedings commenced against NYC and/or NYCDOE, in state and federal courts, many of which have resolved in favor of the mistreated public school students and their families; (d) published media reports; and, (e) reports and publications submitted to NYC by non governmental organizations, such as the Drum Major Institute for Public Policy and the ACLU/NYCLU.

496.    Upon information and belief, the failures on the part of NYCDOE to appropriately train and supervise personnel involved in the investigation, detention, discipline and suspension of students, including NYCDOE teachers like defendant Kim-Ross, administrators like defendants Kwait and Konstan, and including A.P. Eutsey and John/Jane Does, who are involved in the detention, arrest, discipline, suspension and

prosecution of NYC public school students, in order to address a known pattern of

unconstitutional arrests, seizures, suspensions and the use of excessive force amounts to

deliberate indifference, thus constituting official municipal policy of defendant

NYCDOE.

497.    Upon information and belief, NYCDOE policymakers were deliberately

indifferent to the known and obvious risk that the policy, custom, or pattern and practice

of investigative and overbearing disciplinary misconduct and failure to train and

supervise NYCDOE  personnel created a risk that the constitutional rights of students like

Krittika would be, and are violated.

498.    Upon information and belief, defendants the NYCDOE is keenly aware of

the allegations described herein, and of the pervasive nature of the policy, custom, pattern

and/or practice of the NYCDOE  unlawfully seizing, detaining, restraining, arresting,

disciplining and suspending NYC public school students, and subjecting them to

excessive force; however, the defendants  have been deliberately indifferent to such

policy, custom, pattern and/or practice, and have not attempted to remedy it.

499.    The misconduct and constitutional violations committed by defendants

Kim-Ross, Kwait and Konstan, John/Jane Does, including A.P. Eutsey, who were

involved in the detention, arrest, discipline, suspension and prosecution of Krittika were

carried out pursuant to what is, upon information and belief, the policy, custom, or pattern

and practice of misconduct of NYC and the NYCDOE, and were directly and proximately

caused by NYC and the NYCDOE's failure to properly train and supervise their personnel.

500.    As a direct and proximate result of what is, upon information and belief, NYC and the NYCDOE's policies, customs, or patterns and practices of failing to properly supervise, train, and discipline teachers and school administrators, teachers, including but not necessarily limited to defendant Kim-Ross, and school administrators, including, but not necessarily limited to, defendants Kwait and Konstan, along with A.P. Eutsey, committed multiple constitutional violations and related misconduct in the course of the putative investigation and resulting improper and unwarranted discipline of Krittika, including, *inter alia*:

a.    defendants Kim-Ross and Kwait, along with A.P. Eutsey, acting by and for the NYCDOE, fabricated inculpatory evidence to provide a false report/ false complaint for causing the arrest and discipline of Krittika - while suppressing the exculpatory nexus between the IP address used to send the offensive e-mails and S.M, which had been previously captured by the school's network;

b.    A.P. Eutsey, acting by and for the NYCDOE, attempted to coerce a false confession from Krittika, by threatening her with police involvement and unwarranted discipline for her failure to confess, notwithstanding Krittika's actual innocence;

      c.     A.P. Eutsey, acting by and for the NYCDOE, with the direction, knowledge and consent of defendant Kwait, and at the request of defendant Kim-Ross, improperly detained and arrested Krittika such that she was not free to go, for alleged crimes that did not occur in A.P. Eutsey's presence, and for which Krittika was actually innocent;

      d.     defendants Kim-Ross, Kwait and Kostan along with A.P. Eutsey, and John/Jane Does, caused Krittika to be placed into the custody of the NYPD for alleged crimes that did not occur in their presence and for which Krittika was actually innocent - a fact known by the defendants from the beginning;

      e.     A.P. Eutsey, acting by and for the NYCDOE, with the direction, knowledge and consent of defendant Kwait, permitted Krittika to be questioned by defendant P.O. Granshaw, without Krittika's parents being notified;

      f.     defendants Kim-Ross, Kwait and Kostan along with A.P. Eutsey, and John/Jane Does, caused Krittika to be suspended from John Bowne High School for acts that she did not commit - a fact the defendants' knew; and,

      g.     defendants Kim-Ross, Kwait and Kostan along with A.P. Eutsey, and John/Jane Does, caused Krittika to be suspended from John Bowne High School without providing her and her parents with an opportunity to explain their side of the story and to confront the evidence against them, notwithstanding that Krittika was not a

threat to the academic environment at John Bowne High School and she was actually innocent.

501.    Upon information and belief, prior to and at the time of the putative investigation, prosecution, and detention of Krittika, and continuing to at least 2011, the NYCDOE, by and through final policymakers and their delegees, including then Chancellor Black and now Chancellor Dennis Walcott, and defendant Konstan as CEO of the OSYD,  maintained a protocol which permitted and encouraged constitutionally deficient arrests and suspensions of students for alleged offenses involving the transmission of allegedly offensive e-mails.

502.    This protocol which permitted and encouraged constitutionally deficient arrests and suspensions of students for alleged offenses involving the transmission of allegedly offensive e-mails was evidenced by, *inter alia*, multiple constitutional violations and related acts of misconduct committed by teachers and school administrators of the NYCDOE in the course of the putative investigation and  disciplinary prosecution of Krittika, and in the course of prior and subsequent investigations and disciplinary proceedings with other students.

503.    This protocol which permitted and encouraged constitutionally deficient arrests and suspensions of students for alleged offenses involving the transmission of allegedly offensive e-mails is known to the final policy makers of the NYCDOE, including its Chancellor and defendant Konstan, as CEO of the OSYD.

113

504.    This deficient protocol which permits and encourages constitutionally deficient arrests and suspensions of students for alleged offenses involving the transmission of allegedly offensive e-mails includes, *inter alia*: (a) disregarding the Fifth Amendment rights of students; (b) fabricating evidence; (c) failing to document and disclose material and exculpatory evidence; (d) failing to investigate known exculpatory evidence and otherwise failing to conduct constitutionally adequate investigations; (e) seeking the arrest of students who had not committed any crime; (f)  imposing discipline, including suspension from school, when school officials know that the student had not committed any wrongdoing; (g) continuing with disciplinary proceedings after the innocence of a student has been established; (h) encouraging the use of excessive physical force upon students by NYPD personnel; (i) suspend a student for sending offensive e-mails without any scientific evidence to link the student to the e-mails origin; (j) permits a student to be suspended for sending offensive e-mails without any evidence linking the suspended student to the computer used to send the offensive e-mails; (k) permits a student to be suspended for sending offensive e-mails without any direct evidence of the authorship of the e-mails by the suspended student.

505.    As a direct and proximate result of what is, upon information and belief, the NYCDOE's protocol which permits and encourages constitutionally deficient arrests and suspensions of students for alleged offenses involving the transmission of allegedly offensive e-mails, NYCDOE personnel, including but not necessarily limited to

114

defendants Kim-Ross, Kwait and Konstan, along with A.P. Eutsey, committed multiple

constitutional violations and related misconduct in the course of the putative investigation

and resulting improper and unwarranted discipline of Krittika, including, *inter alia*:

   a.   defendants Kim-Ross and Kwait, along with A.P. Eutsey, acting by

and for the NYCDOE, fabricated inculpatory evidence to provide a false report/ false

complaint for causing the arrest and discipline of Krittika - while suppressing the

exculpatory nexus between the IP address used to send the offensive e-mails and S.M,

which had been previously captured by the school's network;

   b.   A.P. Eutsey, acting by and for the NYCDOE, attempted to coerce

a false confession from Krittika, by threatening her with police involvement and

unwarranted discipline for her failure to confess, notwithstanding Krittika's actual

innocence;

   c.   A.P. Eutsey, acting by and for the NYCDOE, with the direction,

knowledge and consent of defendant Kwait, and at the request of defendant Kim-Ross,

improperly detained and arrested Krittika such that she was not free to go, for alleged

crimes that did not occur in A.P. Eutsey's presence, and for which Krittika was actually

innocent - as was known by the defendants from the beginning;

   d.   defendants Kim-Ross, Kwait and Kostan along with A.P. Eutsey,

and John/Jane Does, caused Krittika to be placed into the custody of the NYPD for

alleged crimes that did not occur in their presence and for which Krittika was actually innocent - a fact known by the defendants;

   e. A.P. Eutsey, acting by and for the NYCDOE, with the direction, knowledge and consent of defendant Kwait, permitted Krittika to be questioned by defendant P.O. Granshaw, without Krittika's parents being notified;

   f. defendants Kim-Ross, Kwait and Kostan along with A.P. Eutsey, and John/Jane Does, caused Krittika to be suspended from John Bowne High School for acts that she did not commit  - a fact the defendants knew; and,

   g. defendants Kim-Ross, Kwait and Kostan along with A.P. Eutsey, and John/Jane Does, caused Krittika to be suspended from John Bowne High School without providing her and her parents with an opportunity to explain their side of the story and to confront the evidence against them, notwithstanding that Krittika was not a threat to the academic environment at John Bowne High School and she was actually innocent.

## X. FEDERAL LAW BASED COUNTS
## COUNTS PURSUANT TO 42 U.S.C. 1983

### COUNT I

### (U.S. Const. 4th and 14th Amend.)
### (Unreasonable Searches, Seizures and Arrests)
### (Against all Defendants except Konstan)

  506. Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

116

507.    In arresting, searching and detaining Krittika without sufficient cause, the defendants engaged in unreasonable searches and seizures in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

508.    Defendants Kim-Ross, Kwait and Konstan are liable pursuant to 42 U.S.C. § 1983 for unreasonably causing, authorizing and directing the seizure and arrest of Krittika in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

509.    NYC and NYCDOE are liable pursuant to 42 U.S.C. § 1983 for A.P. Eutsey unreasonably seizing and arresting Krittika in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

510.    Defendants Granshaw and Maldonado are liable pursuant to 42 U.S.C. § 1983 for unreasonably seizing and arresting Krittika in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

511.    Defendants John/Jane Does  are liable pursuant to 42 U.S.C. § 1983 for unreasonably causing, authorizing, directing the seizure and arrest of Krittika, and for seizing and arresting Krittika in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

512.    Municipal liability for these violations of the Fourth Amendment is based upon the individual defendants in this case acting in a manner consistent with the policy, practice and custom of NYC, the NYPD and the NYCDOE of unreasonably seizing and

unlawfully arresting New York City public school students, absent probable cause of criminal activity in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

513.    Municipal liability for these violations of the Fourth Amendment is further based upon the failure of the NYC, the NYPD and the NYCDOE to properly train, supervise and discipline, amounting to deliberate indifference to the constitutional rights of Krittika.

514.    As a direct and proximate result of the defendants' actions Krittika was wrongly arrested, detained, restrained and imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

## COUNT II

**(U.S. Const. 14th Amend.)**
**(Deprivation of Liberty Without Due Process of Law by**
**Fabricating Evidence and Failing to Investigate )**
**(Against all Defendants)**

515.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

516.    Defendants NYC, NYCDOE, Kim-Ross, Kwait, Konstan, Granshaw, Maldonado and John/Jane Does, acting individually and in concert, fabricated evidence, including, but not limited to, issuing false report(s) and/or false complaint(s), and deliberately and recklessly failed to conduct a constitutionally adequate criminal

118

investigation, thereby depriving Krittika of her Fourteenth Amendment right not to be deprived of liberty without due process of law.

517.    Defendant Kim-Ross, in her individual and official capacity, falsely reported that Krittika sent offensive e-mails to her.

518.    Defendants NYC, NYCDOE, Kim-Ross, Kwait, and John/Jane Does, acting individually and in concert, falsely reported that the IP Address that the offensive e-mails originated from was linked to Krittika's apartment building.

519.    Defendants NYC, NYCDOE, Kim-Ross, Kwait, and John/Jane Does, acting individually and in concert, falsely reported that the IP Address that the offensive e-mails originated from was assigned to the entire apartment building that Krittika and her family resided within.

520.    The false evidence which these defendants fabricated was used as a basis to call for Krittika's arrest.

521.    The false evidence which these defendants fabricated was used as a basis to suspend Krittika from John Bowne High School.

522.    Defendants NYC, NYCDOE, Kim-Ross, Kwait, Granshaw, Maldonado and John/Jane Does had no evidence linking Krittika to the offensive e-mails.

523.    Even after coercive questioning by NYCDOE and NYPD personnel, Krittika steadfastly and truthfully maintained her innocence.

524.     Defendants NYC, NYCDOE, Kim-Ross, Kwait, Granshaw, Maldonado and John/Jane Does deliberately and recklessly failed to investigate leads pointing toward other suspects, including S.M., and corroborating Krittika's actual innocence, including, but not limited to: failing to interview witnesses whose knowledge tended to disprove Krittika's guilt and prove her innocence; failing to investigate known exculpatory and potentially exculpatory information provided by Krittika and witnesses; failing to investigate exculpatory and potentially exculpatory computer forensic evidence, and disregarding and suppressing the exculpatory evidence linking the IP address used to send the offensive e-mails to S.M, which had been previously captured by the school's network;

525.     The defendants' deliberate and reckless failure to investigate exculpatory evidence that was known to them, or that in the absence of their deliberate and reckless indifference should have been known to them, caused Krittika to be deprived of her liberty without due process of law.

526.     The defendants' deliberate fabrication of evidence caused Krittika to be deprived of her liberty without due process of law.

527.     The defendants' proffering of knowingly false and fabricated evidence caused Krittika to be deprived of her liberty without due process of law

528.   The defendants' conduct violated Krittika's clearly established constitutional right to not be deprived of liberty without due process of law, as guaranteed by the Fourteenth Amendment.

529.   No reasonable person, including police officers, school teachers and/or school administrators in 2010 and 2011 would have believed that the actions taken by the defendants in fabricating evidence were reasonable or lawful.

530.   No reasonable person, including police officers, school teachers and/or school administrators in 2010 and 2011 would have believed that the actions taken by the defendants in suppressing known evidence exculpatory to Krittika, as was contained in the offensive e-mails and within the computer networks of defendant NYCDOE and its John Bowne High School,  was reasonable or lawful.

531.   Municipal liability for these violations of the Fourthteenth Amendment is based upon the individual defendants in this case acting in a manner consistent with the policy, practice and custom of NYC, the NYPD and the NYCDOE of fabricating evidence and deliberately and recklessly failing to conduct constitutionally adequate criminal and disciplinary investigations, thereby depriving Krittika of her rights in violation of the Fourteenth Amendments to the United States Constitution.

532.   Municipal liability for these violations of the Fourth Amendment is further based upon the failure of the NYC, the NYPD and the NYCDOE to properly train,

supervise and discipline, amounting to deliberate indifference to the constitutional rights of Krittika.

533.    As a direct and proximate result of the defendants' actions Krittika was wrongly arrested, detained, restrained and imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

**COUNT III**
**(U.S. Const. 4th and 14th Amend.)**
**(Malicious Prosecution)**
**(Against all Defendants)**

534.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

535.    Defendants NYC, NYCDOE, Kim-Ross, Kwait, Konstan, Granshaw, Maldonado and John/Jane Does, despite knowing that probable cause did not exist to arrest and prosecute Krittika for sending offensive and/or threatening e-mails to teachers, including defendant Kim-Ross, acted individually and in concert to cause Krittika to be arrested and prosecuted.

536.    Defendants NYC, NYCDOE, Kim-Ross, Kwait, Konstan, Granshaw, Maldonado and John/Jane Does suppressed known evidence exculpatory to Krittika, as was contained in the offensive e-mails and within the computer networks of defendant NYCDOE and its John Bowne High School, in order to cause Krittika's wrongful arrest, detention, imprisonment and post arrest and arraignment impairment of liberty.

537.    The defendants' conduct violated Krittika's rights pursuant to the Fourth and Fourteenth Amendments of the United States Constitution to be free of unreasonable searches and seizures.

538.    Defendants NYC, NYCDOE, Kim-Ross, Kwait, Granshaw, Maldonado and John/Jane Does knew, or in the absence of their deliberate and reckless indifference to the truth should have known, that probable cause did not exist to arrest and prosecute Krittika.

539.    Defendants NYC, NYCDOE, Kim-Ross, Kwait, Granshaw, Maldonado and John/Jane Does knew, or in the absence of their deliberate and reckless indifference to the truth should have known, that Krittika was actually innocent.

540.    The deliberate and reckless investigative failures of the defendants included, but were not limited to, failing to investigate known exculpatory and potentially exculpatory information provided by witnesses and Krittika; failing to investigate exculpatory and potentially exculpatory computer forensic evidence; failing to timely pursue evidence and leads concerning other suspects; and, suppressing evidence known to be exculpatory to Krittika, as was contained in the offensive e-mails and within the computer networks of defendant NYCDOE and its John Bowne High School.

541.    As a result of her forcible arrest and detention, Krittika's liberty was curtailed.

542.    Defendants NYCDOE, Kim-Ross, Kwait and Kostan collaborated with defendants NYC, Granshaw and Maldonado in the prosecution of Krittika's suspension by using the false custodial arrest and detention, knowingly suppressing evidence absolutely exculpating Krittika, and inculpating S.M., to have Krittika physically and forcibly removed from the school. Thereafter, Krittka's suspension began and Krittika's liberty continued to be impaired in that she could no longer attend John Bowne High School and had to repeatedly attend suspension hearings.

543.    The suspension hearing was a judicial proceeding.

544.    The Notice of Suspension (Ex. 1(4)) was the equivalent of an arraignment.

545.    The Notice of Suspension was served on Krittika only after her forcible arrest and detention.

546.    The Notice of Suspension was the equivalent of an arraignment.

547.    Subsequent to receiving the Notice of Suspension Krittika continued to have her liberty curtailed both by not being able to return to John Bowne High School and being compelled to return for suspension hearing proceedings.

548.    The defendants caused Krittika to be maliciously prosecuted.

549.    The defendants caused Krittika to be arrested and prosecuted deliberately, with reckless disregard for the truth, and with malice.

550.    Krittika was actually innocent of all charges.

551.    On or about March 15, 2011, the disciplinary prosecution of Krittika terminated in Krittika's favor when all disciplinary charges resulting in her unjust and unwarranted suspension were withdrawn by the superintendent and the suspension was expunged from Krittika's records.

552.    Defendants' actions to deprive Krittika of her educational rights and opportunities were in violation of clearly established constitutional law, and no reasonable person, including a police officer, school teacher or school administrator in 2010 and 2011 would have believed that the defendants' actions were lawful.

553.    Municipal liability for these violations of the Fourth and Fourteenth Amendments is based upon the individual defendants in this case acting in a manner consistent with the policy, practice and custom of NYC, the NYPD and the NYCDOE of unreasonably seizing and unlawfully arresting New York City public school students, absent probable cause of criminal activity, fabricating evidence, deliberately and recklessly failing to conduct constitutionally adequate criminal and disciplinary investigations, and pursuing disciplinary charges and suspensions knowing they are without merit, thereby depriving Krittika of her rights in violation of the Fourteenth Amendments to the United States Constitution.

554.    Municipal liability for these violations of the Fourth Amendment is further based upon the failure of the NYC, the NYPD and the NYCDOE to properly train,

supervise and discipline, amounting to deliberate indifference to the constitutional rights of Krittika.

555.    As a direct and proximate result of the defendants' actions Krittika was wrongly arrested and imprisoned for approximately 28 hours, suspended from school, and was required to attend an alternative school while being compelled to present herself for suspension hearing proceedings, and suffered other grievous and continuing injuries and damages as set forth herein.

## COUNT IV

**(U.S. Const. 14th Amend.)**
**(Engaging in Conduct that Shocks the Conscience)**
**(Against all Defendants)**

556.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

557.    In their zeal to scapegoat Krittika, defendants NYC, NYCDOE, Kim-Ross, Kwait, Konstan, Granshaw, Maldonado and John/Jane Does, deliberately engaged in arbitrary and conscious-shocking conduct that contravened fundamental canons of decency and fairness and violated Krittika's substantive due process right under the Fourteenth Amendment - by suppressing known evidence, contained within the offensive e-mails themselves and within the computer networks of defendant NYCDOE and its John Bowne High School, which was wholly exculpatory to Krittika.

558.    The defendants deliberately sought to exploit Krittika's youth, naivete, and vulnerabilities; attempted to coerce a confession by threatening academic disciplinary action; further sought to coerce a confession by threats of lengthy incarceration and exposure to fatal disease; further sought to coerce a confession by physical force, including the tight placement of handcuffs only when Krittika would not confess to crimes and bad acts in which she had no involvement; concealed the defendants' coercion and other misconduct; fabricated additional allegedly inculpatory evidence to corroborate false allegations of Krittika's guilt prior to her arrest; deliberately and recklessly failed to investigate leads pointing toward other suspects and corroborating Krittika's actual innocence; and engaged in additional, conscience-shocking misconduct that led to the false arrest and wrongful imprisonment of an innocent girl.

559.    The defendants' conduct violated Krittika's clearly established constitutional right to substantive due process, as guaranteed by the Fourteenth Amendment, and no reasonable person, including a police officer, school teacher or school administrator in 2010 and 2011 would have believed that the defendants' actions, including their deliberate failure to conduct a constitutionally adequate investigation, and their use of threats and physical force in an attempt to obtain a false confession, were lawful.

560.    Municipal liability for these violations of the Fourth and Fourteenth Amendments is based upon the individual defendants in this case acting in a manner consistent with the policy, practice and custom of NYC, the NYPD and the NYCDOE of unreasonably seizing and unlawfully arresting New York City public school students, absent probable cause of criminal activity, fabricating evidence, deliberately and recklessly failing to conduct constitutionally adequate criminal and disciplinary investigations, and pursuing disciplinary charges and suspensions knowing they are without merit, thereby depriving Krittika of her rights in violation of the Fourteenth Amendments to the United States Constitution.

561.    Municipal liability for these violations of the Fourth Amendment is further based upon the failure of the NYC, the NYPD and the NYCDOE to properly train, supervise and discipline, amounting to deliberate indifference to the constitutional rights of Krittika.

562.    As a direct and proximate result of the defendants' actions Krittika was wrongly arrested and prosecuted, and was wrongfully imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

## COUNT V

### (U.S. Const. 4th and 14th Amend.)
### (Excessive Force)
### (Against Defendants NYC, NYCDOE and P.O. Granshaw)

563.    Krittika repeats, reiterates, and re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

564.    Defendants P.O. Granshaw is liable pursuant to 42 U.S.C. § 1983 for using excessive force against Krittika in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

565.    Municipal liability for these violations of the Fourth and Fourteenth Amendments is based upon P.O. Granshaw acting in a manner consistent with the policy, practice and custom of NYC, the NYPD and the NYCDOE of unreasonably seizing and unlawfully arresting New York City public school students, absent probable cause of criminal activity and using excessive force against New York City public school students in violation of the Fourth and Fourteenth Amendments to the United States Constitution, thereby depriving Krittika of her rights in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

566.    Municipal liability for these violations of the Fourth Amendment is further based upon the failure of the NYC, the NYPD and the NYCDOE to properly train, supervise and discipline, amounting to deliberate indifference to the constitutional rights of Krittika.

567.    As a direct and proximate result of the defendants' actions Krittika was wrongly arrested and prosecuted, and was wrongfully imprisoned for approximately 28 hours, sustained substantial redness, swelling, annoyance and alarm necessitating medical attention, and suffered other grievous and continuing injuries and damages as set forth herein.

## COUNT VI

### (Civil Rights Conspiracy Pursuant to 42 U.S.C. § 1983)
### (Against All Defendants)

568.    Krittika repeats, reiterates, and re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

569.    defendants Kim-Ross, Kwait, Konstan, Granshaw, Maldonado, John/Jane Does and others yet unknown, agreed among themselves and with other individuals to act in concert in order to deprive Krittika of her clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures and not to be deprived of her liberty without due process of law.

570.    A.P. Eutsey along with defendants Kim-Ross and Kwait were, at all relevant times, employed by the NYCDOE, a municipal corporation separate and apart from the City of New York.

571.    Defendants Granshaw and Maldonado were, at all relevant times, employed by the NYPD, an agency of the City of New York, a municipal corporation separate and apart from the NYCDOE.

572.    On February 8, 2011, between the hours of approximately 9:00 a.m. to 11:45 a.m., Kim-Ross, Kwait, Eutsey, Granshaw and Maldonado all communicated amongst one another at or about John Bowne High School, devising and agreeing upon a plan to arrest, detain, restrain, prosecute and suspend Krittika, while knowing that there was no evidence linking Krittika to any criminal conduct and that actual evidence which exculpated Krittika and inculpated S.M. was contained within the offensive e-mails themselves and the network of NYCDOE and John Bowne High School and that said exculpatory evidence would be suppressed from Krittika.

573.    On February 8, 2011, between the hours of approximately 9:00 a.m. through 11:45 a.m., Granshaw and Maldonado were informed by A.P. Eutsey and/or Kim-Ross and/or Kwait that offensive e-mails were received by Kim-Ross.

574.    On February 8, 2011, between the hours of approximately 9:00 a.m. through 11:45 a.m., Granshaw and Maldonado were informed by A.P. Eutsey and/or Kim-Ross and/or Kwait that the IP address on the e-mails did not correspond to Krittika.

575.    On February 8, 2011, between the hours of approximately 9:00 a.m. through 11:45 a.m., Granshaw and Maldonado were informed by A.P. Eutsey and/or Kim-Ross and/or Kwait that they had individually and collectively fabricated a fictitious IP address for the entirety of the 27 story 200 plus apartment building that Krittika lived in, in a malicious effort to sustain an otherwise groundless arrest, prosecution and suspension of

Krittika, for the transmission of offensive e-mails that Krittika had nothing to do with, and for which the defendants all knew that Krittika was actually innocent.

576.    On February 8, 2011, between the hours of approximately 9:00 a.m. through 11:45 a.m., defendants Granshaw and Maldonado of the NYPD agreed with A.P. Eutsey and defendants Kim-Ross and Kwait of the NYCDOE that they would participate in the forcible arrest and detention, attempts to prosecute and ultimate suspension of Krittika, knowing that there was no evidence that Krittika had committed any crime or offense.

577.    On February 8, 2011, between the hours of approximately 9:00 a.m. through 11:45 a.m., defendants Granshaw and Maldonado of the NYPD agreed with A.P. Eutsey and defendants Kim-Ross and Kwait of the NYCDOE that they would participate in the forcible arrest and detention, attempts to prosecute and ultimate suspension of Krittika, knowing that the alleged IP address for the entirety of Krittika's 27 story 200 plus apartment building was a fabrication.

578.    On February 8, 2011, between the hours of approximately 9:00 a.m. through 11:45 a.m., defendants Granshaw and Maldonado of the NYPD agreed with A.P. Eutsey and defendants Kim-Ross and Kwait of the NYCDOE that Granshaw and Maldonado would use physical force and verbal threats upon Krittika in an effort to coerce a false confession, in an effort to support their knowingly unlawful arrest and detention of Krittika.

579.    On February 8, 2011, between the hours of approximately 9:00 a.m. through 11:45 a.m., defendants Granshaw and Maldonado of the NYPD agreed with A.P. Eutsey and defendants Kim-Ross and Kwait of the NYCDOE that Granshaw and Maldonado would initially proffer the knowingly false evidence to the District Attorney in an effort to cause a criminal prosecution of Krittika based upon the knowingly bogus claims and the fabricated evidence.

580.    On February 8, 2011, between the hours of approximately 9:00 a.m. through 11:45 a.m., defendants Granshaw and Maldonado of the NYPD agreed with A.P. Eutsey and defendants Kim-Ross and Kwait of the NYCDOE that subsequent to her forcible removal from the school by Granshaw and/or Maldonado, Krittika would be suspended and they would all collectively proffer false evidence to the NYCDOE hearing officer in an effort to sustain the unwarranted and constitutionally defective suspension.

581.    In furtherance of the conspiracy the defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

a.    A.P. Eutsey along with defendants Kim-Ross and Kwait fabricated a false allegation of the existence of a single IP address encompassing all internet service at Krittika's 27 story 200 plus apartment building;

b.    A.P. Eutsey, Kim-Ross, Kwait, Granshaw and Maldonado falsely reported to government agencies, including the NYPD and municipal corporations, including NYC and NYCDOE, that Krittika sent offensive and/or threatening e-mails to

teachers, including defendant Kim-Ross - knowing that said fabricated evidence would be used as a basis for an arrest, detention, attempted criminal prosecution and disciplinary suspension of Krittika;

        c.     Defendants Kim-Ross, Kwait, Konstan, Granshaw, Maldonado and John/Jane Does planned to obtain a false confession from Krittika by again having her removed from class by A.P. Eutsey, detained at length, threatened by P.O. Granshaw with exposure to deadly disease, should she fail to confess, notwithstanding her actual innocence, tightly handcuffed by defendant P.O, Granshaw for refusing to confess, and then handcuffing by defendant P.O. Maldonado, all notwithstanding Krittika's actual innocence and the defendants' then knowledge of her actual innocence;

        d.     Defendants Kim-Ross, Kwait, Konstan, Granshaw, Maldonado and John/Jane Does, and others deliberately and recklessly failed to investigate leads pointing to other suspects and corroborating Krittika's actual innocence, including but not limited to the following: intentionally failing to interview witnesses whose knowledge tended to disprove Krittika's guilt; failing to investigate known exculpatory and potentially exculpatory information provided by witnesses and Krittika; failing to investigate exculpatory and potentially exculpatory computer forensic evidence;

        e.     Defendants Kim-Ross, Kwait, Konstan, Granshaw and Maldonado withheld evidence identifying S.M. as the actual sender of the offensive e-mails;

f.   Defendants Kim-Ross, Kwait, Konstan, Granshaw and Maldonado proffered false evidence to the District Attorney;

g.   Defendants Kim-Ross, Kwait, Konstan, Granshaw and Maldonado proffered false evidence to the student suspension hearing officer;

h.   Defendants Kim-Ross, Kwait, Konstan, Granshaw, Maldonado and John/Jane Does, and others hid their misconduct and caused Krittika's wrongful arrest and extended detention, notwithstanding her actual innocence and their actual knowledge of Krittika's actual innocence.

582.   As a direct and proximate result of the defendants' conspiracy and actions in furtherance of that conspiracy, Krittika was wrongly arrested, detained, wrongfully imprisoned for approximately 28 hours, civilly prosecuted with a post arrest ane effective arraignment deprivation of her liberties, and Krittika suffered other grievous and continuing injuries and damages as set forth herein.

## COUNT VII

### (42 U.S.C. § 1983 Claim Against the City of New York)

583.   Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

584.   As a direct and proximate result of NYC and the NYPD's policies, customs, or patterns and practices, Krittika was wrongly arrested and prosecuted, and was

wrongfully imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

## COUNT VIII

**(42 U.S.C. § 1983 Claim Against the New York City Department of Education**)

585.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

586.    As a direct and proximate result the NYCDOE's policies,  customs, patterns and/or practices, Krittika was wrongly arrested and prosecuted, and was wrongfully imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

## COUNT PURSUANT TO 42 U.S.C. 1985

## COUNT IX

**(Civil Rights Conspiracy Based Upon Race Based Animus - 42 U.S.C. § 1985(3))
(Against All Defendants)**

587.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

588.    While in the course of their duties and under color of law, defendants conspired to injure and damage Krittika Plaintiff because of defendants' race-based animus, including against persons of Southeast Asian Indian descent, in violation of 42 U.S.C. § 1985(3).

589.    In furtherance of this conspiracy, defendants subjected Krittika to unlawful acts  thereby depriving Krittika of her rights to equal protection and equal privileges and immunities under the law in contravention of the Fourteenth Amendment of the United States Constitution.

590.    Defendants committed the foregoing acts intentionally, willfully, and with malicious disregard for Krittika's rights and are therefore liable for punitive damages.

591.    Dfendants Kim-Ross, Kwait, Konstan, Granshaw, Maldonado, John/Jane Does and others yet unknown, agreed among themselves and with other individuals to act in concert in order to deprive Krittika of her clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures and not to be deprived of her liberty without due process of law.  Krittika being a student of Southeast Asian racial descent was a motivating factor surrounding the defendants' misconduct.

592.    A.P. Eutsey along with defendants Kim-Ross and Kwait were, at all relevant times, employed by the NYCDOE, a municipal corporation separate and apart from the City of New York.

593.    Defendants Granshaw and Maldonado were, at all relevant times, employed by the NYPD, an agency of the City of New York, a municipal corporation separate and apart from the NYCDOE.

594.   On February 8, 2011, between the hours of approximately 9:00 a.m. to 11:45 a.m., Kim-Ross, Kwait, Eutsey, Granshaw and Maldonado all communicated amongst one another at or about John Bowne High School, devising and agreeing upon a plan to arrest, detain, restrain, prosecute and suspend Krittika, all knowing that there was no evidence linking Krittika to any criminal conduct, with the motivation being Krittika being a student of Southeast Assian Indian racial background - and hence, a target of their racial animus.

595.   On February 8, 2011, between the hours of approximately 9:00 a.m. through 11:45 a.m., Granshaw and Maldonado were informed by A.P. Eutsey and/or Kim-Ross and/or Kwait that offensive e-mails were received by Kim-Ross.

596.   On February 8, 2011, between the hours of approximately 9:00 a.m. through 11:45 a.m., Granshaw and Maldonado were informed by A.P. Eutsey and/or Kim-Ross and/or Kwait that the IP address on the e-mails did not correspond to Krittika.

597.   On February 8, 2011, between the hours of approximately 9:00 a.m. through 11:45 a.m., Granshaw and Maldonado were informed by A.P. Eutsey and/or Kim-Ross and/or Kwait that they had individually and collectively fabricated a fictitious IP address for the entirety of the 27 story 200 plus apartment building that Krittika lived in, in a malicious effort to sustain an otherwise groundless arrest, prosecution and suspension of Krittika, for the transmission of offensive e-mails that Krittika had nothing to do with, and for which the defendants all knew that Krittika was actually innocent.

598.    On February 8, 2011, between the hours of approximately 9:00 a.m. through 11:45 a.m., defendants Granshaw and Maldonado of the NYPD agreed with A.P. Eutsey and defendants  Kim-Ross and Kwait of the NYCDOE  that they would participate in the forcible arrest and detention, attempts to prosecute and ultimate suspension of Krittika, knowing that there was no evidence that Krittika had committed any crime or offense.

599.    On February 8, 2011, between the hours of approximately 9:00 a.m. through 11:45 a.m., defendants Granshaw and Maldonado of the NYPD agreed with A.P. Eutsey and defendants  Kim-Ross and Kwait of the NYCDOE  that they would participate in the forcible arrest and detention, attempts to prosecute and ultimate suspension of Krittika, knowing that the alleged IP address for the entirety of Krittika's 27 story 200 plus apartment building was a fabrication.

600.    On February 8, 2011, between the hours of approximately 9:00 a.m. through 11:45 a.m., defendants Granshaw and Maldonado of the NYPD agreed with A.P. Eutsey and defendants  Kim-Ross and Kwait of the NYCDOE  that Granshaw and Maldonado would use physical force and verbal threats upon Krittika in an effort to coerce a false confession, in an effort to support their knowingly unlawful arrest and detention of Krittika.

601.    On February 8, 2011, between the hours of approximately 9:00 a.m. through 11:45 a.m., defendants Granshaw and Maldonado of the NYPD agreed with A.P. Eutsey and defendants  Kim-Ross and Kwait of the NYCDOE  that Granshaw and Maldonado

would initially proffer the knowingly false evidence to the District Attorney in an effort to cause a criminal prosecution of Krittika based upon the knowingly bogus claims and the fabricated evidence.

602.    On February 8, 2011, between the hours of approximately 9:00 a.m. through 11:45 a.m., defendants Granshaw and Maldonado of the NYPD agreed with A.P. Eutsey and defendants Kim-Ross and Kwait of the NYCDOE that subsequent to her forcible removal from the school by Granshaw and/or Maldonado, Krittika would be suspended and they would all collectively proffer false evidence to the NYCDOE hearing officer in an effort to sustain the unwarranted and constitutionally defective suspension.

603.    In furtherance of the conspiracy the defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

    a.    A.P. Eutsey along with defendants Kim-Ross and Kwait fabricated a false allegation of the existence of a single IP address encompassing all internet service at Krittika's 27 story 200 plus apartment building;

    b.    A.P. Eutsey, Kim-Ross, Kwait, Granshaw and Maldonado falsely reported to government agencies, including the NYPD and municipal corporations, including NYC and NYCDOE, that Krittika sent offensive and/or threatening e-mails to teachers, including defendant Kim-Ross - knowing that said fabricated evidence would be used as a basis for an arrest, detention, attempted criminal prosecution and disciplinary suspension of Krittika;

140

c.    Defendants Kim-Ross, Kwait, Konstan, Granshaw, Maldonado and John/Jane Does planned to obtain a false confession from Krittika by again having her removed from class by A.P. Eutsey, detained at length, threatened by P.O. Granshaw with exposure to deadly disease, should she fail to confess, notwithstanding her actual innocence, tightly handcuffed by defendant P.O, Granshaw for refusing to confess, and then handcuffing by defendant P.O. Maldonado, all notwithstanding Krittika's actual innocence and the defendants' then knowledge of her actual innocence;

d.    Defendants Kim-Ross, Kwait, Konstan, Granshaw, Maldonado and John/Jane Does, and others deliberately and recklessly failed to investigate leads pointing to other suspects and corroborating Krittika's actual innocence, including but not limited to the following: intentionally failing to interview witnesses whose knowledge tended to disprove Krittika's guilt; failing to investigate known exculpatory and potentially exculpatory information provided by witnesses and Krittika; failing to investigate exculpatory and potentially exculpatory computer forensic evidence and, suppressing evidence that the IP address that the offensive e-mails were sent from was exculpatory to Krittika, and which inculpated S.M., as data linking the IP address to S.M. was contained within the computer network of the NYCDOE and/or John Bowne High School ;

e.    Defendants Kim-Ross, Kwait, Konstan, Granshaw and Maldonado withheld evidence identifying S.M. as the actual sender of the offensive e-mails;

   f. Defendants Kim-Ross, Kwait, Konstan, Granshaw and Maldonado proffered false evidence to the District Attorney;

   g. Defendants Kim-Ross, Kwait, Konstan, Granshaw and Maldonado proffered false evidence to the student suspension hearing officer;

   h. Defendants Kim-Ross, Kwait, Konstan, Granshaw, Maldonado and John/Jane Does, and others hid their misconduct and caused Krittika's wrongful arrest and extended detention, notwithstanding her actual innocence and their actual knowledge of Krittika's actual innocence.

 604. As a direct and proximate result of the defendants' conspiracy and actions in furtherance of that conspiracy, Krittika was wrongly arrested, detained, wrongfully imprisoned for approximately 28 hours, civilly prosecuted with a post arrest and effective arraignment deprivation of her liberties, and Krittika suffered other grievous and continuing injuries and damages as set forth herein.

## COUNT PURSUANT TO TITLE VI OF THE CIVIL RIGHTS ACT OF 1964

### COUNT X

**Violation of Krittika's Federal Civil Rights
under Title VI of the Civil Rights Act of 1964
(Against NYC and NYCDOE)**

 605. Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

606.    At all times mentioned herein John Bowne High School was under the auspices of defendant NYCDOE.

607.    At all times mentioned herein, the NYPD was under the auspices of defendant NYC.

608.    Defendants NYC and NYCDOE receive federal funding.

609.    Federal funding received by NYC flows to the NYPD.

610.    Upon information and belief, federal funding received by defendants NYC and NYCDOE flows to John Bowne High School.

611.    Defendant NYC, by way of the NYPD, receives federal funding for purposes of public school safety [Exhibit 8].

612.    Upon information and belief, federal funding received by defendant NYCDOE also flows to the NYPD for purposes of school safety.

613.    At all times mentioned herein Krittika was a New York City public school student, of Southeast Asian Indian descent and ancestry, enrolled at John Bowne High School.

614.    Kriitika was falsely accused of misconduct by NYC, NYCDOE and the NYPD.

615.    Kriitika was falsely accused of criminal conduct by NYC, NYCDOE and the NYPD.

616.    Krittika was wrongly detained by NYC, NYCDOE and the NYPD.

143

617.    Krittika was wrongly arrested by NYC, NYCDOE and the NYPD.

618.    Krittika was wrongly suspended by NYC and NYCDOE.

619.    Krittika was wrongly deprived of educational opportunities by NYC and
NYCDOE.

620.    Krittika was actually innocent of the alleged misconduct.

621.    Krittika was actually innocent of the alleged criminality.

622.    The misconduct was actually committed by S.M., then a New York
City public school student, of Oriental Asian descent and ancestry, enrolled at John
Bowne High School.

623.    Notwithstanding that there was no direct evidence linking Krittika to the
alleged misconduct, NYC and the NYPD caused Krittika to be seized, detained, arrested
and restrained, against her will.

624.    Notwithstanding that there was no probable cause to believe that Krittika
had committed any crime, NYC and the NYPD caused Krittika to be seized, detained,
arrested and restrained, against her will.

625.    Notwithstanding that Krittika repeatedly and consistently denied any
involvement in the alleged misconduct and criminality, NYC and the NYPD caused
Krittika to be seized, detained, arrested and restrained, against her will.

626.   Notwithstanding that there was total exculpatory evidence in the offensive e-mails themselves and in the networks of the NYCDOE and/or John Bowne High School, NYC and NYCDOE caused Krittika to be seized, detained, arrested, restrained, disciplined and suspended, against her will.

627.   Notwithstanding that there was no probable cause to believe that Krittika had committed any crime, NYC and NYCDOE caused Krittika to be seized, detained, arrested, restrained, disciplined and suspended, against her will.

628.   Notwithstanding that Krittika repeatedly and consistently denied any involvement in the alleged misconduct and criminality, NYC and NYCDOE caused Krittika to be seized, detained, arrested, restrained, disciplined and suspended, against her will.

629.   NYC, NYCDOE and the NYPD refused to consider other suspects, notwithstanding that there was no direct evidence linking Krittika to the alleged misconduct and/or criminality.

630.   NYC, NYCDOE and the NYPD refused to consider other suspects who were not of Southeast Asian Indian ancestry and decent.

631.   NYC, NYCDOE and the NYPD refused to consider other suspects because of racial animus towards persons of Southeast Asian Indian ancestry and decent generally and Krittika particularly.

145

632.   While falsely accusing Krittika of misconduct and criminality, NYC, NYCDOE and the NYPD failed and refused to consider S.M. as a suspect - despite the inculpating evidence contained in the offensive e-mails themselves and in the NYCDOE and/or John Bowne High School computer network.

633.   While wrongly and unconstitutionally seizing, detaining, arresting and restraining Krittika, NYC and the NYPD  failed and refused to consider S.M. as a suspect.

634.   While falsely accusing Krittika of and charging Krittika with misconduct and criminality, NYC, NYCDOE and the NYPD failed and refused to consider S.M. as a suspect, notwithstanding that there was direct evidence linking S.M. to the misconduct and criminality.

635.   While wrongly and unconstitutionally seizing, detaining, arresting, restraining, disciplining and suspending Krittika, NYC and NYCDOE  failed and refused to consider S.M. as a suspect.

636.   While falsely accusing Krittika of and charging Krittika with misconduct and criminality, NYC, NYCDOE and the NYPD failed and refused to charge S.M., notwithstanding that there was direct evidence linking S.M. to the misconduct and criminality, and Krittika was actually innocent.

146

637.    Krittika was accused of misconduct and criminality for which she was actually innocent because of racial animus by NYC, NYCDOE and the NYPD directed towards persons of Southeast Asian Indian ancestry and decent.

638.    Krittika was seized, restrained, detained, arrested and imprisoned because of racial animus by NYC, NYCDOE and the NYPD directed towards persons of Southeast Asian Indian ancestry and decent.

639.    Krittika was treated differently than people of other races because of racial animus by NYC, NYCDOE and the NYPD directed towards persons of Southeast Asian Indian ancestry and decent.

640.    S.M. was actually responsible for the alleged misconduct and criminality.

641.    S.M. admitted to the alleged misconduct and criminality.

642.    S.M. was not seized, restrained, detained, arrested and imprisoned.

643.    Representatives of NYC and NYCDOE, including defendants Kim-Ross and Kwait, intervened to ensure that S.M. was not seized, restrained, detained, arrested and imprisoned.

644.    S.M. was given preferential treatment than that afforded to Krittika.

645.    NYCDOE had a policy and practice at John Bowne High School of permitting racially disparate treatment by teachers upon students.

646.   Upon information and belief, NYCDOE knew that defendants Kim-Ross and Kwait overtly favored students of Oriental Asian heritage over other students in general and over Southeast Asian Indian students in particular.

647.   Defendants Kim-Ross and Kwait's disparate treatment against Southeast Asian Indian students, including Krittika, was known to and accepted by the NYCDOE.

648.   Defendant Kim-Ross and Kwait enforced harsher grading standards for students of Southeast Asian Indian descent as compared to other students generally, and Oriental Asian students in particular.

649.   The NYCDOE at John Bowne High School offered far greater opportunities for academic advancement to students of Oriental Asian heritage than to students of Southeast Asian racial background.  For instance, while class participation was a significant part of students' grades, Southeast Asian students, including Krittika, were offered significantly less opportunities to so participate.  Accordingly, by virtue of their race, Southeast Asian Indian students at John Bowne High School had diminished educational opportunity.

650.   Krittika was treated differently and more harshly than similarly situated persons because of her race.

651.   Krittika suffered discrimination on account of her race.

652.    The defendants pattern of false accusations, fabrications of evidence, withholding of exculpatory evidence, failure to adequately investigate, and discrimination directed towards Krittika is in violation of Krittika's  rights under 42 U.S.C. Section 2000d, *et. seq.* and Title VI of the Civil Rights Act of 1964.

653.    Defendants, acting under color of law, deprived Krittika of her rights, including her right to due process of law, by failing to provide Krittika protection of her right to be free from racial harassment and discrimination in violation of Krittika's rights under 42 U.S.C. §2000d,  *et. seq.* and Title VI of the Civil Rights Act of 1964.

654.    Defendants' unequal treatment of Krittika whom they seized, restrained, detained, arrested and imprisoned, while allowing S.M., to go relatively unpunished, notwithstanding that he was actually and admittedly responsible and Krittika was actually innocent, is in violation of Krittika's rights under 42 U.S.C. Section 2000d, *et. seq.* and Title VI of the Civil Rights Act of 1964.

655.    Defendants' unequal treatment of Krittika and other students of Southeast Asian Indian racial background whom they provided diminished educational opportunities to, while encouraging and aiding the advancement of students of other racial backgrounds, is in violation of Krittika's rights under 42 U.S.C. Section 2000d, *et. seq.* and Title VI of the Civil Rights Act of 1964.

656.    The Defendants failed to adequately train and/or supervise their employees, agents, servants and assigns, in regard to the equal and fair handling of identical allegations amongst students of differing ethnic and racial backgrounds, particularly, as here where the actually responsible student was of Oriental Asian background, the same background as the falsely accusing teacher and alleged victim, and Krittika, who was actually innocent, was of Southeast Asian Indian background, a background disfavored by those involved in the putative investigation and resulting seizure, arrest, restraint, detention, imprisonment discipline and suspension, thereby failing to discourage and prevent further Constitutional violations by their employees, agents, servants and assigns.

657.    The above mentioned practices and/or policies of the Defendants, their agents, servants, assigns and employees, demonstrated, at best, a deliberate indifference on the part of the Defendants to Krittika's Constitutional rights, and other students of Southeast Asian Indian ethnicity within NYC and NYCDOE, and they continue to suffer the violation of their Constitutional rights as described herein.

658.    The defendants acted with deliberate indifference to the Krittika's rights, in derogation of Krittika's right to be free of discrimination, and this is in violation of Krittika's rights under 42 U.S.C. §2000d, *et. seq.* and Title VI of the Civil Rights Act of 1964.

659.    By reason of their acts and omissions, defendants, acting under color of state law, and within the scope of their authority, in gross and wanton violation of the Constitutional rights of Krittika and all other similarly situated students of Southeast Asian Indian background, subjected Krittika to unlawful discrimination in violation of the Fourteenth Amendment of the United States Constitution and of 42 U.S.C. §2000d, *et. seq.* and Title VI of the Civil Rights Act of 1964.

660.    As a direct and proximate result the defendants' acts, omissions and misconduct, Krittika was wrongly arrested, was wrongfully imprisoned for approximately 28 hours, was civilly prosecuted while actually innocent, experienced diminished educational opportunity and suffered other grievous and continuing injuries and damages as set forth herein.

## XI.    STATE LAW BASED COUNTS

### COUNT XI

### UNLAWFUL SEIZURES AND ARRESTS IN VIOLATION OF THE NEW YORK STATE CONSTITUTION
### (Against all Defendants except Konstan)

661.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

662.    In arresting, searching and detaining Krittika without sufficient cause, the defendants engaged in unreasonable searches and seizures in violation of Article I, § 12 of the New York Constitution.

151

512.    Defendants NYCDOE, Kim-Ross and Kwait are liable for unreasonably causing, authorizing and directing the seizure and arrest of Krittika in violation of  Article I, § 12 of the New York Constitution.

664.    A.P. Eutsey, acting on behalf of the NYCDOE,  is liable pursuant for unreasonably seizing and arresting Krittika in violation of Article I, § 12 of the New York Constitution.

665.    Defendants NYC, Granshaw and Maldonado are liable for unreasonably seizing and arresting Krittika in violation of Article I, § 12 of the New York Constitution.

666.    Defendants John/Jane Does  are liable for unreasonably causing, authorizing, directing the seizure and arrest of Krittika, and for seizing and arresting Krittika in violation of Article I, § 12 of the New York Constitution.

667.    Defendant NYC is liable for the unreasonable seizure and arrest of Krittika, as caused by defendants Kim-Ross, Kwait, John/Jane Does, including A.P. Eutsey, Granshaw and Maldonado, in violation of Article I, § 12 of the New York Constitution.

668.    Defendant NYCDOE is liable for the unreasonable seizure and arrest of Krittika, as caused by defendants Kim-Ross, Kwait, and John/Jane Does, including A.P. Eutsey, in violation of Article I, § 12 of the New York Constitution.

669.    As a direct and proximate result of the defendants' actions Krittika was wrongly arrested, detained, restrained and imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

## COUNT XII

### DEPRIVATION OF DUE PROCESS  IN VIOLATION OF THE
### NEW YORK STATE CONSTITUTION
### (Against all Defendants)

670.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

671.    The defendants deprivation of due process to Krittika was in violation of Article I, § 6 of the New York Constitution, and the defendants are thereby liable to Krittika.

672.    As a direct and proximate result of the defendants' actions Krittika was wrongly arrested, detained, restrained and imprisoned for approximately 28 hours, civilly prosecuted when actually innocent based upon false and fabricated evidence that the defendants themselves fabricated and/or knew to be false and fabricated, and suffered other grievous and continuing injuries and damages as set forth herein.

## COUNT XIII

### DEPRIVATION OF EQUAL PROTECTION ON THE BASIS OF RACE  IN
### VIOLATION OF THE NEW YORK STATE CONSTITUTION
### (Against all Defendants)

673.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

153

674.    The defendants deprived Krittika of equal protection of the law on account of her race as a minority of Southeast Asian Indian descent, in violation of Article I, § 11 of the New York Constitution, and the defendants are thereby liable to Krittika.

675.    As a direct and proximate result of the defendants' actions Krittika was wrongly arrested, detained, restrained and imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

## COUNT XIV

### FALSE ARREST
### (Against all Defendants except Konstan)

676.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

677.    As a result of the actions of the municipal and individual defendants, Krittika was confined against her will.

678.    Krittika was continuously aware that she was not free to go.

679.    The defendants were without privilege to confine Krittika.

680.    The defendants had no probable cause to stop, arrest, detain, or otherwise confine Krittika.

681.    The defendants did not have a warrant to arrest or detain Krittika.

682.    The municipal defendants are liable to Krittika under the doctrine of *respondeat superior*.

154

683.    As a direct and proximate result of the defendants' actions Krittika was wrongly arrested, detained, restrained and imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

### COUNT XV

### FALSE IMPRISONMENT
### (Against all Defendants except Konstan)

684.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

685.    As a result of the actions of the municipal and individual defendants, Krittika was confined against her will.

686.    Krittika was continuously aware that she was not free to go.

687.    The defendants were without privilege to confine Krittika.

688.    The defendants had no probable cause to stop, arrest, detain, or otherwise confine Krittika.

689.    The defendants did not have a warrant to arrest or detain Krittika.

690.    The municipal defendants are liable to Krittika under the doctrine of *respondeat superior*.

691.    As a direct and proximate result of the defendants' actions Krittika was wrongly arrested, detained, restrained and imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

## COUNT XVI

## MALICIOUS PROSECUTION - DISCIPLINARY PROCEEDINGS
### (Against all Defendants)

692.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

693.    As a result of the actions of the municipal and individual defendants, disciplinary proceedings were commenced against Krittika, in a judicial format.

694.    The disciplinary proceedings were terminated in favor of Krittika.

695.    There was no basis to bring disciplinary proceedings against Krittika.

696.    There was no basis to suspend Krittika from school.

697.    The defendants' collectively brought these disciplinary charges against Krittika with actual malice to Krittika.

698.    The municipal defendants are liable to Krittika under the doctrine of *respondeat superior*.

699.    As a direct and proximate result of the defendants' actions Krittika was wrongly arrested, detained, restrained and imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

## COUNT XVII

## BATTERY
### (Against all Defendants except Konstan)

700.   Krittika repeats, reiterates, and re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

701.   As a result of the actions of the municipal and individual defendants, Krittika was confined against her will.

702.   In order to detain and restrain Krittika, the individual defendants touched her with their hands.

703.   In order to detain and restrain Krittika, individual defendants placed Krittika in handcuffs.

704.   The defendants were without privilege to confine Krittika.

705.   The defendants had no probable cause to stop, arrest, detain, or otherwise confine Krittika.

706.   The defendants did not have a warrant to arrest or detain Krittika.

707.   The arrest of Krittika was unlawful.

708.   The contact by the defendants was offensive to Krittika.

709.   The defendants did not have Krittika's consent to make contact with her.

710.   The municipal defendants are liable to Krittika under the doctrine of *respondeat superior*.

711.    As a direct and proximate result of the defendants' actions Krittika was wrongly arrested, detained, restrained and imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

## COUNT XVIII

### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)
### (Against all Defendants)

712.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

713.    The behavior of the individual and municipal defendants as described herein was extreme and outrageous.

714.    The individual and municipal defendants intended to cause Krittika severe emotional distress

715.    The individual and municipal defendants did cause Krittika severe emotional distress.

716.    As a direct and proximate result of the defendants' actions Krittika was wrongly arrested, detained, restrained and imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

## COUNT XIX

### NEGLIGENCE
### (Against Defendants Granshaw, Maldonado and John/Jane Doe NYPD Personnel)

717.   Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

718.   Defendants Granshaw, Maldonado and John/Jane Doe NYPD defendants owed Krittika a duty of care including the duty to exercise due care in the course of their duties as NYPD officers and the duty to protect Krittika from the misconduct of other NYPD officers.

719.   By their aforementioned acts, defendants Granshaw, Maldonado and John/Jane Doe NYPD defendants negligently failed to use due care in the performance of their duties in that they failed to perform their duties with the degree of care that a reasonably prudent and careful officer would have used under similar circumstances.

720.   Defendant NYC is vicariously liable for the negligence of defendants Granshaw, Maldonado and John/Jane Doe NYPD defendants.

721.   All of these acts were performed without any negligence on the part of Krittika and were the proximate cause of injuries to Krittika.

722.   As a direct and proximate result of the defendants' actions Krittika was wrongly arrested, detained, restrained and imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

**COUNT XX**

**NEGLIGENCE**

**(Against Defendants Kim-Ross, Kwait, Konstan
and John/Jane Doe NYCDOE Personnel)**

723.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein..

724.    Defendants Kim-Ross, Kwait, Konstan and John/Jane Doe NYCDOE defendants owed Krittika a duty of care including the duty to exercise due care in the course of their duties as NYCDOE personnel and the duty to protect Krittika from the misconduct of other NYCDOE personnel.

725.    By their aforementioned acts, defendants Kim-Ross, Kwait, Konstan and John/Jane Doe NYCDOE defendants negligently failed to use due care in the performance of their duties in that they failed to perform their duties with the degree of care that reasonably prudent and careful teachers and school administrators would have used under similar circumstances.

726.    Defendants NYC and NYCDOE are vicariously liable for the negligence of defendants Kim-Ross, Kwait, Konstan and John/Jane Doe NYCDOE defendants.

727.    All of these acts were performed without any negligence on the part of Krittika and were the proximate cause of injuries to Krittika.

728.    As a direct and proximate result of the defendants' actions Krittika was wrongly arrested, detained, restrained and imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

### COUNT XXI

### NEGLIGENCE
**(Against Defendant NYC)**

729.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

730.    Defendant NYC, by its aforementioned acts, negligently failed to use due care in the performance of their duties.

731.    Defendant NYC hired and retained incompetent and unfit police officers whom it knew or should have known possessed dangerous propensities and a lack of proper temperament, and whom they knew or should have known harbored race based animus and hostility.

732.    Defendant NYC failed to exercise care in instructing police officers, officials, supervisors, and civilian employees as to their deportment, behavior, and conduct, including, *inter alia*, failing to: (a) give proper instructions as to determining whether probable cause exists to arrest for allegations of misconduct not occurring in the officers presence; (b) give proper instructions as to the use of force to effect an arrest when the arrestee is not posing a threat of violence or force; (c) give proper instructions on using force in the course of arrests generally and of public school students in

particular; (d) give proper instruction concerning the obligation of police officers to intervene to protect persons threatened with unwarranted force by other officers; (e) give proper instruction concerning the obligation of police officers to intervene to protect persons threatened with violations and deprivations of rights afforded them by the federal and state constitutions by other municipal employees, including other police officers; and, (f) failing to eliminate discrimination based on race.

733.    As a direct and proximate result of the defendants' actions Krittika was wrongly arrested, detained, restrained and imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

## COUNT XXII

## NEGLIGENCE

### (Against Defendant NYCDOE)

734.    Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

735.    Defendants NYC and NYCDOE, by their aforementioned acts, negligently failed to use due care in the performance of their duties.

736.    Defendants NYC and NYCDOE hired and retained incompetent and unfit teachers and public school administrators and disciplinarians whom they knew or should have known possessed dangerous propensities and a lack of proper temperament, and whom they knew or should have known harbored race based animus and hostility.

162

737.    Defendants NYC and NYCDOE failed to exercise care in instructing teachers, school administrators and disciplinarians, involved in the school disciplinary and suspension process, as to their deportment, behavior, and conduct, including, *inter alia*, failing to: (a) give proper instructions as to determining when seizure and detention of a student is permitted; (b) give proper instructions as to when a student may be detained, such that they are not free to go, for allegations of misconduct not occurring in the NYCDOE employees presence; (c) give proper instructions on referring allegations of disciplinary misconduct to the NYPD; (d) give proper instruction on seeking and/or directing the arrest of a student; (e) give proper instruction on seeking and/or directing the use of force upon a student, including the application of handcuffs; (f) give proper instruction concerning the obligation of NYCDOE personnel to intervene to protect public school students threatened with unwarranted force by other persons, including other NYCDOE personnel and/or NYPD personnel; (g) give proper instruction concerning the obligation of NYCDOE personnel to intervene to protect public school students threatened with violations and deprivations of rights afforded them by the federal and state constitutions by other municipal employees, including other NYCDOE personnel and/or NYPD personnel; and, (h) failing to eliminate discrimination based on race.

738.   As a direct and proximate result of the defendants' actions Krittika was wrongly arrested, detained, restrained and imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

## COUNT XXIII

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Against all Defendants)

739.   Krittika repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

740.   In the performance of their duties the defendants owed Krittika a duty of care.

741.   In breach of that duty of care, the defendants' aforementioned conduct endangered Krittika's safety and caused her to fear for her safety.

742.   As a result, Krittika suffered emotional distress.

743.   Defendants' actions negligently to inflict emotion distress upon Krittika were in violation of clearly established law, and no reasonable police officer, teacher, school administrator or disciplinarian in 2010 - 2011 would have believed that the defendants' actions were lawful.

744.   NYC is vicariously liable for the negligence of the individual police officer defendants as set forth herein.

745.   NYC and NYCDOE are vicariously liable for the negligence of the individual NYCDOE defendants as set forth herein.

746.    As a direct and proximate result of the defendants' actions Krittika was wrongly arrested, detained, restrained and imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

## COUNT XXIV

### *RESPONDEAT SUPERIOR* CLAIM AGAINST NYC

747.    Krittika repeats, reiterates, and re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

748.    At all times relevant to this complaint defendants Granshaw, Maldonado and John/Jane acted as agents of, and in the scope of their employment with, defendant NYC.

749.    The conduct by which these defendants committed their misconduct was undertaken while the defendants were carrying out their duties as employees of NYC, including of theNYPD, and engaging in such conduct as would have been reasonably expected, and was in fact foreseen by, by their employer.

750.    NYC is liable for its agents' acts delineated herein under the doctrine of respondeat superior.

751.    As a direct and proximate result of the defendants' actions Krittika was wrongly arrested, detained, restrained and imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

## COUNT XXV

### *RESPONDEAT SUPERIOR* CLAIM AGAINST NYCDOE

752.   Krittika repeats, reiterates, and re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

753.   At all times relevant to this complaint defendants Kim-Ross, Kwait, Konstan, and John/Jane Does, including A.P. Eutsey, acted as agents of, and in the scope of their employment with, defendant NYCDOE.

754.   The conduct by which these defendants committed their misconduct was undertaken while the defendants were carrying out their duties as employees of the NYCDOE, and engaging in such conduct as would have been reasonably expected, and was in fact foreseen by, by their employer.

755.   NYCDOE is liable for its agents' acts delineated herein under the doctrine of respondeat superior.

756.   As a direct and proximate result of the defendants' actions Krittika was wrongly arrested, detained, restrained and imprisoned for approximately 28 hours, and suffered other grievous and continuing injuries and damages as set forth herein.

## XII.    PRAYER FOR RELIEF

**WHEREFORE**, Krittika prays for judgment granting for each of the counts the following:

A.    a fair and reasonable amount of compensatory damages of not less than $500,000.00;

B.    a fair and reasonable amount of not less than $1,000,000 as and for punitive damages;

C.    attorneys fees as and for prosecuting the instant case as well as defending Krittika against the illegal, unlawful and unconstitutional arrest, seizure, restraint, detention, imprisonment, discipline and suspension, as complained of herein;

D.    Costs and Disbursements;

E.    Interest in the greatest amount permitted by governing law; and,

F.    all additional relief as may appear just and proper to the Court.

Dated: New York, New York
       January 11, 2013

Respectfully submitted,
**THE LAW FIRM OF RAVI BATRA, P.C.**
*Attorneys for Plaintiff Krittika Biswas*

Ravi Batra, Esq. (RB 4299)
Todd B. Sherman (TS 4031)
142 Lexington Avenue
New York, NY 10016
(212) 545-1993
E-Mail: ravibatralaw@aol.com
        ravi@ravibatralaw.com

Biswas.782\011113amendcivilcomplaint

167

**CIVIL ACTION No.**
**12 Civ 3607 (JGK)**

================================

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
____

KRITTIKA BISWAS,

*Plaintiff*,

- against -

(1) THE CITY OF NEW YORK, (2) NEW YORK CITY DEPARTMENT OF EDUCATION,  (3) HOWARD KWAIT individually and in his official capacity as a Principal within and for the New York City Department of Education at John Bowne High School, (4) JAMIE KIM-ROSS individually and in her official  capacity as a Teacher within and for the New York City Department of Education at John Bowne High School, (5) ELAYNA KONSTAN, individually and in her official capacity as Chief Executive Officer of the New York City Department of Education Office of School And Youth Development, (6) JOHN/JANE DOE NEW YORK CITY DEPARTMENT OF EDUCATION PERSONNEL ## 1-10, so named as their identities have yet to be established, involved in the sham investigation, unlawful arrest and detention and unlawful suspension of Krittika Biswas, (7) Police Officer MARGARET MALDONADO, individually and in her official capacity as a Police Officer  within and for the New York City Police Department,(8) Police Officer LARRY GRANSHAW, individually and in his official capacity as a Police Officer within and for the New York City Police Department, and (9) JOHN/JANE DOE POLICE PERSONNEL, so named as their identities have yet to be established, involved in the unlawful arrest and detention of Krittika Biswas,

*Defendants*.

================================

**FIRST AMENDED CIVIL COMPLAINT WITH JURY DEMAND**

================================

THE LAW FIRM OF RAVI BATRA, P.C.
*Attorneys for Plaintiff*
The Batra Building
142 Lexington Avenue
New York, NY 10016
(212)545-1993
Biswas.782\011113amendcivilcomplain

================================