

**RAVI BATRA**

---

**THE BATRA BUILDING**
**142 LEXINGTON AVE.**
**NEW YORK, NEW YORK 10016**
**212-545-1993**

RAVI@RAVIBATRALAW.COM
Fax: 212-545-0967

August 23, 2013

**Via Facsimile: (212) 805-7912**
Hon. John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:  *Biswas v. City of New York, et. al.*, Docket # 12 Civ 3607 (JGK)(HP)

Dear Respected Judge Koeltl:

We represent plaintiff Krittika Biswas ("Krittika") who is opposing a motion pursuant to Fed. R. Civ. P. 12(b)(6), jointly made by all defendants, seeking dismissal of the entirety of her amended complaint interposing federal civil rights and related state claims. We write in accordance with Your Honor's instructions at oral argument held on August 9, 2013. At that time, Your Honor posed certain questions and authorized responses by way of letter.

- *THE NEW YORK CITY DEPARTMENT OF EDUCATION'S OWN POLICIES AND REGULATIONS REVEAL THAT PROCEDURAL DUE PROCESS APPLIES TO REMOVAL FROM A CLASSROOM*

Firstly, Your Honor inquired about Krittika seeking relief under the procedural due process clause and sought decisional law regarding the application of such due process principles to the removal of a student from a classroom. Our research thus far has not uncovered any such cases. However, we note that the Regulations of the Chancellor for the New York City Department of Education shed some light on this issue. Notably, these regulations provide, in pertinent part, that removal is permitted only

1

> [w]hen a student engages in behavior which is substantially
> disruptive of the educational process or substantially interferes
> with a teacher's authority over the classroom, the student may
> be removed from the classroom by the teacher.

(Chancellor's Regulation A-443§ III.A.1 (2004)).  Moreover, prior to any removal from the classroom

> the teacher must provide the student with an explanation of the
> basis for the removal and allow the student to informally present
> his/her version of the events. If the student's presence in that
> classroom poses a continuing danger and presents an ongoing
> threat of disruption to the academic process, the student may be
> removed immediately, and such notification to the student and
> opportunity to be heard must be provided within one school day
> of the removal.

(*Id.* at § III.A.2).    Furthermore, when a student is removed from classrooms, these regulations mandate that "a student removal form" be completed by the end of business the same day (*id.* at § III.A.3).  While there are other parts of these procedures, these appear most pertinent.

Furthermore, pursuant to the New York City Public School's Discipline Code

> [s]tudents cannot be removed from a classroom and/or school
> except pursuant to the procedures set forth in Chancellor's
> Regulation A-443 regarding removal by a teacher, principal's
> suspension, and superintendent's suspension.

(Citywide Standards of Discipline and Intervention Measures (The Discipline Code and Bill of Student Rights and Responsibilities, K-12) (2008) at p. 3).  Moreover,

> [a]ll suspensions and removals from the classroom must be done
> substantively and procedurally in accordance with relevant
> Regulations of the Chancellor, State Education Law and Federal
> Laws.

(*Id.* at p. 9). It is therefore respectfully submitted that the DOE's own mandates establish that procedural due process is applicable for any step of the disciplinary process.

- *AS A QUASI-JUDICIAL PROCEEDING, A SCHOOL SUSPENSION HEARING IS ANALOGOUS TO ADMINISTRATIVE PROCEEDINGS THE COMMENCEMENT OF WHICH HAVE BEEN FOUND TO SUPPORT A CLAIM FOR MALICIOUS PROSECUTION*

Your Honor also inquired if we knew of any case law finding that a school suspension proceeding could support a claim for malicious prosecution. While we have not yet identified any decisional law that answers that specific question, we have identified case law that is analogous and which requires that, at this motion to dismiss stage, on the pleadings alone, that Krittika's claims go forward. As the Second Circuit has held

> In order to prevail in an action for malicious prosecution in New York, a plaintiff must show: 1) the initiation of an action by the defendant against [him], 2) begun with malice, 3) without probable cause to believe it can succeed, 4) that ends in failure or, in other words, terminates in favor of the plaintiff. In addition, if the proceeding of which plaintiff complains was a civil action, the plaintiff must prove special injury-"some interference with [the] plaintiff's person or property ... beyond the ordinary burden of defending a lawsuit.

*Engel v. CBS, Inc.*, 145 F.3d 499, 502 (2d Cir. 1998) (*internal citations and quotation marks omitted*). Here, a disciplinary suspension action was initiated against Krittika. It is respectfully submitted that on the facts alleged in the First Amended Complaint, the action was commenced with malice, without probable cause to believe it could proceed and it ultimately terminated in favor of Krittika by the Department of Education ultimately dismissing the matter as untenable - given that the real culprit - who was wholly unrelated to Krittika - was identified and had confessed. Going further, there was interference with Krittika's person and property - as she was deprived of attendance at her regular school while being compelled to attend disciplinary hearing proceedings at yet another site.

Under New York law, "administrative proceedings which require a hearing and trial of the issues on evidence and testimony under oath, with the right of cross-examination, have sufficient attributes of judicial proceedings to be considered judicial proceedings for the purposes of a cause of action for malicious prosecution." *Groat v. Town Bd. of Town of Glenville*, 73 A.D.2d 426, 429-430 (3d Dept. 1980). *See also Fulton v. Ingalls*, 165 A.D. 323, 326 (2d Dept. 1914) *aff'd sub nom. Fulton v. Richmond Cnty. Soc'y for the Prevention of Cruelty to Children*, 214 N.Y. 665 (1915) (administrative proceedings regarding

3

suspension of public servant without pay and leading to temporary disgrace may form the basis for a malicious prosecution claim); *Dillon v. Boyce*, 1995 WL 116476 (E.D.N.Y. 1995) (physician discipline and employment proceedings may form basis for malicious prosecution claim); *New York City Tr. Auth. v Manti.*, 165 A.D.2d 373, 381 (1ˢᵗ Dept. 1991) (administrative proceedings regarding permits to transport passengers between counties may serve as the basis for a malicious prosecution claim); *Green v. State*, 39 Misc. 3d 1239(A) (N.Y. Ct. Cl. 2013) (parole revocation proceedings meet the standard of an "action" for purposes of malicious prosecution because of the right to a hearing with examination of witnesses and other Constitutional safeguards).

A public school student in New York, like Krittika was, has a Constitutionally protected property interest in her educational rights, and the disciplinary process that must be used to impede those rights requires due process protections including adequate notice, an opportunity to be heard, a hearing before a neutral quasi-judicial officer, the right to present and cross-examine witnesses and a full transcribed record of the proceedings - and a violation of these minimum requirements would itself be a violation of law. *See* Education Law § 3214; *Lopez v. Bay Shore Union Free Sch. Dist.*, 668 F. Supp. 2d 406 (E.D.N.Y. 2009); *Ross v. Disare*, 500 F. Supp. 928, 933 (S.D.N.Y. 1977).  Accordingly, because of these mandated quasi-judicial procedures - along with the attendant penalties and deprivations of rights - it is respectfully submitted that school suspension proceedings fall squarely into the types of civil actions that may form the basis for a malicious prosecution claim.

- *THE POLICIES AND PRACTICES OF THE CITY BY WAY OF THE NYPD AND THE NYPD SUPPORT MONELL LIABILITY FOR THE MUNICIPAL DEFENDANTS*

During oral argument, while discussing the memorandum of understanding between the Department of Education and the City of New York/NYPD (FAC Ex. 6), Your Honor also sought clarification of the role of the NYPD regarding their security function in the schools.  It is respectfully submitted that the NYPD's role is not limited solely to the placement of school safety agents, as Special Patrolmen.  To the contrary, while the Department of Education is still to be actively involved in the development of security and safety protocols (*id*. at § I(2)), the NYPD, within its policing chain of command, created a new division and new executive position of "Deputy Chief of School Security" (*Id.* at § 3). Additionally, each NYPD precinct was to designate uniformed police supervisors to act as liaison with school administrators (*Id*. at § 3(c)).

Once the MOU became effective, the NYPD became responsible for all recruitment, training and assignment of school security personnel (*Id.* at § III(9)). Moreover, included in such assignment and training were uniformed police officers, not just school safety officers, and such police officers were to be deployed primarily within the public schools (*Id.*). Moreover, the MOU also provided a means to promote opportunities for school safety officers to become police officers (*Id.* at § III(10)).

The training by the DOE and the NYPD of NYPD personnel was to include various matters including "disciplinary rules governing the conduct of students" (*Id.* at § III(12)(a))). Moreover, the MOU expanded the authority of NYPD police officers, as a matter of City and DOE policy, such that

> in addition to the enforcement of all laws that it is otherwise authorized to enforce within the City, the NYPD. . . through its police officers and otherwise; is hereby authorized to enforce rules, regulations, or procedures of the Board and its schools which are subject to implementation by superintendents and principals in furtherance of school security . . .

(*Id.* at § IV(18)). Furthermore, putting the conduct of defendants Kwait and DOE, including by way of DOE employee Assistant Principal Eutsey squarely at issue, the MOU further provides that NYPD personnel shall

> to the fullest extent practicable, in instances not requiring immediate arrest or other immediate action, shall consult with the principal of a school or his or her designee prior to placing a student enrolled at such school under arrest, or initially issuing to such student any form of criminal process, on the property of such school.    In the course of any such consultation, such personnel and/or officers shall take into account any information provided by the principal or designee. . .

(*Id.* at § IV(19(b))).

Additionally, by his June 11, 2007 letter to Chair of the City Council Education Committee Robert Jackson, Police Commissioner Raymond Kelly reported that police officers are provided the training that school safety agents receive, however at "greater length" (FAC Ex. 7, p. 1).    Commissioner Kelly also reported that the general responsibilities of the school safety personnel assigned to the public schools includes "taking

enforcement action" and "enforc[ing] the rules and regulations governed by the Chancellor's Student Disciplinary Code. . ." (*Id.*.).

Moreover, on October 10, 2007, Assistant Chief James Secretto, then Commanding Officer of the NYPD School Safety Division, testified that the purpose of the MOU was to "utilize the NYPD's expertise, experience and resources in reducing crime and disorder in the schools" (FAC Ex. 8, p. 19, line 22 - p. 20, line 5). Included in the NYPD's responsibilities pursuant to the MOU was hiring and training (*Id.* at p. 20, lines 8-11). Moreover, Chief Secretto confirmed that "management personnel of both the police department and the DOE [] design and implement school safety programs and policies" (*Id.* at p. 21, lines 14-19). Additionally, it was also confirmed that "[u]niformed police personnel have been interwoven into the School Safety Division's leadership structure and work closely with DOE personnel and NYPD's School Safety Personnel" (*Id.* at p. 26, line 23 - p. 27, line 2). Moreover, a police captain at each NYPD Borough Command is also assigned to coordinate between the school safety personnel and the NYPD Borough Commander and regularly meets with NYPD and DOE personnel, including at the precinct "Youth Officer" level (*Id.* at p. 27, lines 3-14). While it is believed that both defendants Maldonado and Granshaw were police officers assigned to the 107th precinct, whether either, or both of them, were regularly assigned to John Bowne High School, or had a role either with the school safety division or as Youth Officers, would properly be explored via discovery. Notably, according to Chief Secretto, at the time of his testimony there were "127 precinct-based police officers assigned to schools throughout the City" and that the federal government provides funding for their salaries (*Id.* at p. 28, lines 14-24). Moreover, at the time of Chief Secretto's 2007 testimony there were additionally nearly 200 uniformed police personnel, including 148 with the rank of police officer, assigned to the school safety division (*Id.* at p. 29, lines 14-17).

Accordingly, it is respectfully submitted that the First Amended Complaint, along with the documentary evidence appended thereto, establishes reasonable cause to believe that there are municipal policies and practices of the City and DOE that have caused Krittika harm. These policies do not, as the defendants urged, solely deal with School Safety Officers. Rather, they impact the interaction between all police officers of the NYPD who are assigned to schools, the school safety division and precinct levels that respond to schools regarding allegations against students - including allegations of a non-criminal nature. By these policies, reflected in the MOU, police officers became "authorized" to use their police role to enforce school "rules" - beyond what their legal authority was under the New York Criminal Procedure Law and applicable principles under the state and federal Constitutions. Thus, the City and DOE jointly created a policy and practice wherein police were to use police power without the need for reasonable suspicion or probable cause, much as they did

to Krittika.    At this pre-disclosure phase, it is respectfully submitted that Krittika has established the predicates for *Monell* liability.

It also bears note, as it was not raised at oral argument, that as regards the NYPD's failure to adhere to proper policies and procedures, the First Amended Complaint also alleges the NYPD's failure to comply with its own internal policies, consistent with federal and international law, to permit Krittika to access her consular representatives.  That a Vice-Consul to the United States from India in New York happened to be Krittika's own father, only made matters worse.  However, it simply cannot be disputed that pursuant to the Vienna Convention on Consular Relations - to which the United States is a signatory - as well as NYPD internal guidelines and procedures, the police were obligated to permit Krittika consular access.  The First Amended Complaint further alleges that Krittika requested such access, the police did not provide such access and that as a matter of practice, the NYPD knows that its police personnel do not comply with the consular notification mandates of the Vienna Convention and does nothing to enforce these guidelines, rooted in federal and international law.  While the police failing to provide such access may  not be grounds for an independent cause of action,[1] the evidence of such failures further evidences the NYPD's policy and practice of depriving people of rights, liberties and entitlements.    Moreover, should the Supreme Court have an opportunity to consider the Vienna Convention issue, as there is a Circuit split, it may become a cause of action in and of itself.[2]

---

[1]In *Mora v. New York*, 524 F.3d 183 (2d Cir. 2008), the Court of Appeals held that the Vienna Convention was not in and of itself privately enforceable.  Rather, pursuant to the Second Circuit, disputes over the application and enforcement of the Vienna Convention should be left to interactions between the Executive Branch of the United States government (*e.g.* the Secretary of State) and the other sovereign nations effected.  Nothing in *Mora*, however, holds that the NYPD's failure to enforce its own policies which mandate compliance with the Vienna Convention cannot be used to further evidence a policy and practice on behalf of the City to deprive foreign nationals of their right to consular access.

[2]The Seventh Circuit has held that the Vienna Convention on Consular Relations does provide individually enforceable rights. *Jogi v. Voges*, 480 F.3d 822 (7th Cir. 2007). Additionally, the Supreme Court has found that the Vienna Convention "arguably confers on an individual the right to consular assistance following arrest." *Breard v. Greene*, 523 U.S. 371, 376 (1998) (emphasis added).

- *PLAINTIFF INTENDS TO COOPERATE WITH DEFENDANTS' COUNSEL IN PROVIDING A TRANSLATION OF WORDS IN THE HINDI LANGUAGE; HOWEVER, GIVEN THE ABSENCE OF ANY EVIDENCE THAT THE INDIVIDUAL DEFENDANTS UNDERSTOOD HINDI, THE TRANSLATION IS NOT RELEVANT*

As we agreed with defendants' counsel, it is our intention to meet and confer with the hopes of reaching a stipulated agreement as to the translation of words and phrases in the Hindi language contained in "Facebook" postings that the defendants appended to their motion papers. Critically, however, there is not a scintilla of evidence which even suggests, much less proves, that any of the defendants spoke and/or understood the Hindi language. Furthermore, defendant Kim-Ross did not provide her statement regarding plaintiff Krittika Biswas until February 16, 2011 (Def. Ex. D) - 8 days <u>after</u> Krittika was arrested. Accordingly, none of that information could be pertinent to the probable cause calculus given that probable cause must be based upon the information available to the arresting officers at the time of the arrest or immediately prior thereto. *See e.g. Allyn v. Rockland Cnty.*, 2013 WL 4038602 (S.D.N.Y. July 30, 2013).

Respectfully submitted,

Ravi Batra, Esq. (RB 4299)

cc:
A.C.C. Elizabeth N. Krasnow
A.C.C. Sumit Sud
(212) 788-9776

Biswas.782\082313JKoeltloralargumentfollowupltr

8